# EXHIBIT 6

## SHIP MANAGEMENT AGREEMENT

THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT
CODE NAME: "SHIPMAN 98"                                    PART I

| | |
|---|---|
| **1. Date of Agreement**<br>10 February 2015 | **Name of Vessel**<br>ADVANTAGE START |
| **2. Owners (name, place of registered office and law of registry) (Cl. 1)** | **3. Managers (name, place of registered office and law of registry) (Cl. 1)** |
| **Name**<br>Advantage Start Shipping LLC | **Name**<br>Genel Denizcilik Nakliyati A.Ş. |
| **Place of registered office**<br>Trust Company Complex, Ajeltake Road, Ajeltake Islands, Majuro, Marshall Islands MH96960 | **Place of registered office**<br>Büyükdere Caddesi Yapı Kredi Plaza A Blok Kat:12 34330 Levent / İstanbul |
| **Law of registry**<br>MARSHALL ISLAND | **Law of registry**<br>Turkiye |

| | |
|---|---|
| **4. Day and year of commencement of Agreement (Cl. 2)**    February 2015 | |
| **5. Crew Management (state "yes" or "no" as agreed) (Cl. 3.1)**<br>YES | **6. Technical Management (state "yes" or "no" as agreed) (Cl.3.2)**<br>YES |
| **7. Commercial Management (state "yes" or "no" as agreed) (Cl. 3.3)**<br>YES | **8. Insurance Arrangements (state "yes" or "no" as agreed) Cl. 3.4)**<br>YES |
| **9. Accounting Services (state "yes" or "no" as agreed) (Cl. 3.5)**<br>YES | **10. Sale or purchase of the Vessel (state "yes" or "no" as agreed) (Cl.3.6)**<br>YES |
| **11. Provisions (state "yes" or "no" as agreed) (Cl. 3.7)**<br>YES | **12. Bunkering (state "yes" or "no" as agreed) (Cl. 3.8)**<br>YES |
| **13. Chartering Services Period (only to be filled in if "yes" stated in Box 7) (Cl. 3.3 (i))**<br>5 YEARS | **14. Owners' Insurance (state alternative (i), (ii) or (iii) of Cl. 6.3)**<br>YES |
| **15. Annual Management Fee (state annual amount) (Cl. 8.1)**<br>USD 365,000 (per annum) | **16. Severance Costs (state maximum amount) (Cl. 8.4(ii))**<br>As per Crewing agreement |
| **17. Day and year of termination of Agreement (Cl. 17)**<br><br>5 YEARS FROM DATE OF AGREEMENT | **18. Law and Arbitration (state alternative 19.1, 19.2 or 19.3; If 19.3 place of arbitration must be stated) (Cl. 19)**<br>English Law |
| **19. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Owners) (Cl. 20)**<br><br>operations@advantagetankers.com | **20. Notices (state postal and cable address, telex and telefax number for serving notice and communication to the Managers) (Cl. 20)**<br>Genel Denizcilik Nakliyati A.Ş.<br>Büyükdere Caddesi Yapı Kredi Plaza A Blok<br>Kat:12 34330 Levent / İstanbul<br>Fax: +90 212 283 16 04-05<br>Tel: +90 212 319 51 00 |

It is mutually agreed between the party stated in Box 2 and the party stated in Box 3 that this Agreement consisting of PART I and PART II as well as Annexes "A" (Details of Vessel), "B" (Details of Crew) "C" ("Initial Budget") and "D" (Associated Vessels) attached hereto, shall be performed subject to the conditions contained herein. In the event of a conflict of conditions, the provisions of PART I and Annexes "A", "B", "C" and "D" shall prevail over those of PART II to the extent of such conflict but no further.

| Signature(s) (Owners) | Signature(s) (Managers) |
|---|---|
| Signed by: | Signed by: |
| For & On behalf of the Owner<br>TUGRUL TOKGOZ | For & On behalf of the Manager<br>ORHAN KARADEMIR / COO |

D02475

PART II
"Shipman 98" Standard Ship Management Agreement

1.  **Definitions**

In this Agreement save where the context otherwise requires, the following words and expressions shall have the meanings hereby assigned to them.

"Owners" means the party identified in Box 2.

"Managers" means the party identified in Box 3.

"Vessel" means the vessel or vessels details of which are set out in Annex "A" attached hereto.

"Crew" means the Master, officers and ratings in the numbers, rank and nationality specified in Annex "B" hereto.

"Crew Support Costs" means all expenses of a general nature which are not particularly referable to any individual vessel for the time being managed by the Managers and which are incurred by the Managers for the purpose of providing an efficient and economic management and, without prejudice to the generality of the foregoing, shall include the cost of crew standby pay, training schemes for officers and ratings, cadet training schemes, sick pay, study pay, recruitment and interviews.

"Severance Costs" means the costs which the employers are legally obliged to pay to or in respect of the Crew as a result of the early termination of any employment contract for service on the Vessel.

"Crew Insurances" means insurances against crew risks which shall include but not limited to death, sickness, repatriation, injury, shipwreck unemployment indemnity and loss of personal effects.

"Management Services" means the services specified in sub-clauses 3.1 to 3.8 as indicated affirmatively in Boxes 5 to 12.

"ISM Code" means the International Management Code for the Safe Operation of Ships and for Pollution Prevention as adopted by the International Maritime Organization (IMO) by resolution A.741 (18) or any subsequent amendment thereto.

"STCW 95" means the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended in 1995 or any subsequent amendment thereto.

2.  **Appointment of Managers**

With effect from the day and year stated in Box 4 and continuing unless and until terminated as provided herein, the Owners hereby appoint the Managers, and the Managers hereby agree to act as the Managers of the Vessel.

3.  **Basis of Agreement**

Subject to the terms and conditions herein provided, during the period of this Agreement, the Managers shall carry out Management Services in respect of the Vessel as agents for and on behalf of the Owners. The Managers shall have authority to take such actions as they may from time to time in their absolute discretion consider to be necessary to enable them to perform this Agreement in accordance with sound ship management practice.

3.1  **Crew Management**

(only applicable if agreed according to Box 5)

The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners in accordance with the STCW 95 requirements, provision of which includes but is not limited to the following functions:

(i)  selecting and engaging the Vessel's Crew, including payroll arrangements, pension administration, and insurances for the Crew other than those mentioned in Clause 6;

(ii)  ensuring that the applicable requirements of the law of the flag of the Vessel are satisfied in respect of manning levels, rank, qualification and certification of the Crew and employment regulations including Crew's tax, social insurance, discipline and other requirements;

(iii)  ensuring that all members of the Crew have passed a medical examination with a qualified doctor certifying that they are fit for the duties for which they are engaged and are in possession of valid medical certificates issued in accordance with appropriate flag State requirements. In the absence of applicable flag State requirements the medical certificate shall be dated not more than three months prior to the respective Crew members leaving their country of domicile and maintained for the duration of their service on board the Vessel;

(iv)  ensuring that the Crew shall have a command of the English language of a sufficient standard to enable them to perform their duties safely;

(v)  arranging transportation of the Crew, including repatriation;

(vi)  training the Crew and supervising their efficiency;

(vii)  conducting union negotiations;

(viii)  operating the Managers' drug and alcohol policy unless otherwise agreed.

3.2  **Technical Management**

(only applicable if agreed according to Box 6)

The Managers shall provide technical management, which includes, but is not limited to, the following functions:

(i)  provision of competent personnel to supervise the maintenance and general efficiency of the Vessel;

(ii)  arrangement and supervision of dry dockings, repairs, alterations and the upkeep of the Vessel to the standards required by the Owners provided that the Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel will comply with the law of the flag of the Vessel and of the places where she trades, and all requirements and recommendations of the classification society;

127 (iii) arrangement of the supply of necessary
128 stores, spares and lubricating oil;
129 (iv) appointment of surveyors and
130 technical consultants as the
131 Managers may consider from time to
132 time to be necessary;
133 (v) development, implementation and
134 maintenance of a Safety
135 Management System (SMS)in
136 accordance with the ISM Code (see
137 sub-clauses 4.2 and 5.3).
138 (vi) development, implementation and
139 compliance with International Port Facility
140 Security Code (ISPS)
141    3.3  Commercial Management
142 (only applicable if agreed according to Box 7)
143 The Managers shall provide the commercial
144 operation of the Vessel, as required by the
145 Owners, which includes, but is not limited to, the
146 following functions:
147 (i) providing chartering services in
148 accordance with the Owners'
149 instructions which include, but are not
150 limited to, seeking and negotiating
151 employment for the Vessel and the
152 conclusion (including the execution
153 thereof) of charter parties or other
154 contracts relating to the employment
155 of the Vessel. If such a contract
156 exceeds the period stated in Box 13,
157 consent thereto in writing shall first be
158 obtained from the Owners.
159 (ii) arranging of the proper payment to
160 Owners or their nominees of all hire
161 and/or freight revenues or other
162 moneys of whatsoever nature to which
163 Owners may be entitled arising out of
164 the employment of or otherwise in
165 connection with the Vessel.
166 (iii) providing voyage estimates and
167 accounts and calculating of hire,
168 freights, demurrage and/or despatch
169 moneys due from or due to the
170 charterers of the Vessel;
171 (iv) issuing of voyage instructions;
172 (v) appointing agents;
173 (vi) appointing stevedores;
174 (vii) arranging surveys associated with
175 the commercial operation of the
176 Vessel.
177    3.4  Insurance Arrangements
178 (only applicable if agreed according to Box 8)
179 The Managers shall arrange insurances in
180 accordance with Clause 6, on such terms and
181 conditions as the Owners shall have instructed or
182 agreed, in particular regarding conditions, insured
183 values, deductibles and franchises.
184
185    3.5  Accounting Services
186 (only applicable if agreed according to Box 9)
187 The Managers shall
188 (i) establish an accounting system which
189 meets the requirements of the
190 Owners and provide regular

191 accounting services, supply regular
192 reports and records,
193 (ii) maintain the records of all costs and
194 expenditure incurred as well as data
195 necessary or proper for the
196 settlement of accounts between the
197 parties.
198
199 3.6 Sale or Purchase of the Vessel
200 (only applicable if agreed according to Box 10)
201 The Managers shall, in accordance with the
202 Owners' instructions, supervise the sale or
203 purchase of the Vessel, including the performance
204 of any sale or purchase agreement, but not
205 negotiation of the same.
206 3.7 Provisions (only applicable if agreed according
207 to Box 11)
208 The Managers shall arrange for the supply of
209 provisions.
210 3.8 Bunkering (only applicable if agreed according
211 to Box 12)The Managers shall arrange for the
212 provision of bunker fuel of the quality specified by
213 the Owners as required for the Vessel's trade.
214
215    4.  Managers' Obligations
216 4.1 The Managers undertake to use their best
217 endeavors to provide the agreed Management
218 Services as agents for and on behalf of the
219 Owners in accordance with sound ship
220 management practice and to protect and promote
221 the interests of the Owners in all matters relating
222 to the provision of services hereunder.
223    Provided, however, that the Managers in the
224 performance of their management responsibilities
225 under this Agreement shall be entitled to have
226 regard to their overall responsibility in relation to
227 all vessels as may from time to time be entrusted
228 to their management and in particular, but
229 without prejudice to the generality of the
230 foregoing, the Managers shall be entitled to
231 allocate available supplies, manpower and
232 services in such manner as in the prevailing
233 circumstances the Managers in their absolute
234 discretion consider to be fair and reasonable.
235 4.2 Where the Managers are providing Technical
236 Management in accordance with sub-clause 3.2,
237 they shall procure that the requirements of the
238 law of the flag of the Vessel are satisfied and they
239 shall in particular be deemed to be the
240 "Company" as defined by the ISM Code, assuming
241 the responsibility for the operation of the Vessel
242 and taking over the duties and responsibilities
243 imposed by the ISM Code when applicable.
244 5. Owners' Obligations
245 5.1 The Owners shall pay all sums due to the
246 Managers punctually in accordance with the
247 terms of this Agreement.
248 5.2 Where the Managers are providing Technical
249 Management in accordance with sub-clause 3.2,
250 the Owners shall:
251 (i) procure that all officers and ratings
252 supplied by them or on their behalf comply
253 with the requirements of STCW 95;
254 (ii) instruct such officers and ratings to obey
255 all reasonable orders of the Managers in

D02477

256 connection with the operation of the
257 Managers' safety management system.
258 **5.3** Where the Managers are not providing
259 Technical Management in accordance with sub-
260 clause 3.2, the Owners shall procure that the
261 requirements of the law of the flag of the Vessel
262 are satisfied and that they, or such other entity as
263 may be appointed by them and identified to the
264 Managers, shall be deemed to be the "Company"
265 as defined by the ISM Code assuming the
266 responsibility for the operation of the Vessel and
267 taking over the duties and responsibilities
268 imposed by the ISM Code when applicable.
269 **6.    Insurance Policies**
270 The Owners shall procure, whether by instructing
271 the Managers under sub-clause 3.4 or otherwise,
272 that throughout the period of this Agreement:
273 6.1 at the Owners' expense, the Vessel is insured
274 for not less than her sound market value or
275 entered for her full gross tonnage, as the
276 case may be:
277 (i)  usual hull and machinery marine
278 risks (including crew negligence)
279 and excess liabilities;
280 (ii)  protection and indemnity risks
281 (including pollution risks, and Crew
282 Insurances); and
283 (iii)  war risks (including protection and
284 indemnity and crew risks) in
285 accordance with the best practice
286 of prudent owners of vessels of a
287 similar type to the Vessel, with first
288 class Insurance companies
289 underwriters or associations ("the
290 Owners' Insurances");
291 6.2 all premiums and calls on the Owners'
292 Insurances are paid promptly by their due
293 date,
294 6.3 the Owners' Insurances name the Managers
295 and, subject to underwriters' agreement, any
296 third party designated by the Managers as a
297 joint assured, with full cover, with the
298 Owners obtaining cover in respect of each of
299 the insurances specified in sub-clause 6.1:
300 (i)  on terms whereby the Managers
301 and any such third party are liable
302 in respect of premiums or calls
303 arising in connection with the
304 Owners' Insurances; or
305 (ii)  If reasonably obtainable, on terms
306 such that neither the Managers nor
307 any such third party shall be under
308 any liability in respect of premiums
309 or calls arising in connection with
310 the Owners' Insurances or
311 (iii)  on such other terms as may be
312 agreed in writing.
313 Indicate alternative (i), (ii) or (iii) in Box 14. If
314 Box 14 is left blank then (i) applies
315 6.4 written evidence is provided, to the
316 reasonable satisfaction of the Managers, of
317 their compliance with their obligations under
318 Clause 6 within a reasonable time of the
319 commencement of the Agreement, and of
320 each renewal date and, if specifically

321 requested, of each payment date of the
322 Owners' Insurances.
323 **7.    Income Collected and Expenses Paid on**
324 **Behalf of Owners**
325 7.1 All moneys collected by the Managers under
326 the terms of this Agreement (other than
327 moneys payable by the Owners to the
328 Managers) and any interest thereon shall be
329 held to the credit of the Owners in a
330 separate bank account.
331 7.2 All expenses incurred by the Managers under
332 the terms of this Agreement on behalf of the
333 Owners (including expenses as provided in
334 Clause 8) may be debited against the Owners
335 in the account referred to under sub-clause
336 7.1 but shall in any event remain payable by
337 the Owners to the Managers on demand.
338 **8.    Management Fee**
339 **8.1** The Owners shall pay to the Managers for
340 their services as Managers under this Agreement
341 an annual management fee as stated in Box 15,
342 which shall be payable by equal monthly
343 instalments in advance, the first instalment being
344 payable on the commencement of this Agreement
345 (see Clause 2 and Box 4) and subsequent
346 instalments being payable every month.
347 **8.2** The management fee is fixed (see Box 15) for
348 the first two years and increasing by 5% per year
349 thereafter.
350 **8.3** The Managers shall, at no extra cost to the
351 Owners, provide their own office accommodation,
352 office staff, facilities and stationery. Without
353 limiting the generality of Clause 7 the Owners shall
354 reimburse the Managers for postage and
355 communication expenses, travelling expenses, and
356 other out of pocket expenses properly incurred by
357 the Managers in pursuance of the Management
358 Services.
359 **8.4** In the event of the appointment of the
360 Managers being terminated by the Owners or the
361 Managers in accordance with the provisions of
362 Clauses 17 and 18 other than by reason of default
363 by the Managers, or if the Vessel is lost, sold or
364 otherwise disposed of, the "management fee"
365 payable to the Managers according to the
366 provisions of sub-clause 8.1, shall continue to be
367 payable for a further period of three calendar
368 months as from the termination date. In addition,
369 provided that the Managers provide Crew for the
370 Vessel in accordance with sub-clause 3.1:
371 (i) the Owners shall continue to pay Crew Support
372 Costs during the said further period of *three*
373 *calendar months and*
374 (ii) The Owners shall pay an equitable proportion
375 of any Severance Costs which may materialize,
376 not exceeding the amount stated in Box 16.
377 **8.5** If the Owners decide to lay-up the Vessel
378 whilst this Agreement remains in force and such
379 lay-up lasts for more than three months, an
380 appropriate reduction of the management fee for
381 the period exceeding three months until one
382 month before the Vessel is again put into service
383 shall be mutually agreed between the parties.
384 **8.6** Unless otherwise agreed in writing all
385 discounts and commissions obtained by the

D02478

386 Managers in the course of the management of the
387 Vessel shall be credited to the Owners.

388    9.   Budgets and Management of Funds
389

390 **9.1** The Managers shall present to the Owners
391 annually a budget for the following twelve
392 months in such form as the Owners require. The
393 budget for the first year hereof is set out in
394 Annex "C" hereto. Subsequent annual budgets
395 shall be prepared by the Managers and
396 submitted to the Owners not less than three
397 months before the anniversary date of the
398 commencement of this Agreement (see Clause 2
399 and Box 4).
400 **9.2** The Owners shall indicate to the Managers
401 their acceptance and approval of the annual
402 budget within one month of presentation and in
403 the absence of any such indication the Managers
404 shall be entitled to assume that the Owners have
405 accepted the proposed budget.
406 **9.3** Following the agreement of the budget, the
407 Managers shall prepare and present to the
408 Owners their estimate of the working capital
409 requirement of the Vessel and the Managers
410 shall each month update this estimate, based
411 thereon, the Managers shall each month request
412 the Owners in writing for the funds required to
413 run the Vessel for the ensuing month including
414 the payment of any occasional or extraordinary
415 item of expenditure, such as emergency repair
416 costs, additional insurance premiums, bunkers,
417 or provisions. Such funds shall be received by the
418 Managers within ten running days after the
419 receipt by the Owners of the Managers' written
420 request and shall be held to the credit of the
421 Owners in a separate bank account.
422 **9.4** The Managers shall produce a comparison
423 between budgeted and actual income and
424 expenditure of the Vessel in such form as
425 required by the Owners monthly or at such other
426 intervals as mutually agreed.
427 **9.5** Notwithstanding anything contained herein
428 to the contrary, the Managers shall in no
429 circumstances be required to use or commit
430 their own funds to finance the provision of the
431 Management Services.

432    10.   Managers' Right to Sub-Contract
433 The Managers shall not have the right to sub-
434 contract any of their obligations hereunder,
435 including those mentioned in sub-clause 3.1
436 without the prior written consent of the Owners
437 which shall not be unreasonably withheld. In the
438 event of such a sub-contract, the Managers shall
439 remain fully liable for the due performance of
440 their obligations under this Agreement.

441    11.   Responsibilities
442 **11.1 Force Majeure** - Neither the Owners nor
443 the Managers shall be under any liability for any
444 failure to perform any of their obligations
445 hereunder by reason of any cause whatsoever of
446 any nature or kind beyond their reasonable
447 control.
448 **11.2** Liability to Owners –
449    (i)

450 Without prejudice to sub-clause 11.1, the
451 Managers shall be under no liability
452 whatsoever to the Owners for any loss,
453 damage, delay or expense of whatsoever
454 nature, whether direct or indirect,
455 (including but not limited to loss of profit
456 arising out of or in connection with
457 detention of or delay to the Vessel) and
458 howsoever arising in the course of
459 performance of the Management
460 Services UNLESS same is proved to have
461 resulted solely from the negligence, gross
462 negligence or wilful default of the
463 Managers or their employees, or agents
464 or sub-contractors employed by them in
465 connection with the Vessel, in which case
466 (save where loss, damage, delay or
467 expense has resulted from the Managers'
468 personal act or omission committed with
469 the intent to cause same or recklessly
470 and with knowledge that such loss,
471 damage, delay or expense would
472 probably result) the Managers' liability
473 for each incident or series of incidents
474 giving rise to a claim or claims shall never
475 exceed a total of ten times the annual
476 management fee payable hereunder.
477    (ii)   Notwithstanding anything that
478 may appear to the contrary in this
479 Agreement, the Managers shall not be
480 liable for any of the actions of the Crew,
481 even if such actions are negligent, grossly
482 negligent or wilful, except only to the
483 extent that they are shown to have
484 resulted from a failure by the Managers
485 to discharge their obligations under sub-
486 clause 3.1, in which case their liability
487 shall be limited in accordance with the
488 terms of this Clause 11.
489 **11.3 Indemnity** - Except to the extent and solely
490 for the amount therein set out that the Managers
491 would be liable under sub- clause 11.2, the
492 Owners hereby undertake to keep the Managers
493 and their employees, agents and sub-contractors
494 indemnified and to hold them harmless against all
495 actions, proceedings, claims, demands or
496 liabilities whatsoever or howsoever arising which
497 may be brought against them or incurred or
498 suffered by them arising out of or in connection
499 with the performance of the Agreement, and
500 against and in respect of all costs, losses, damages
501 and expenses (including legal costs and expenses
502 on a full indemnity basis) which the Managers
503 may suffer or incur (either directly or indirectly) in
504 the course of the performance of this Agreement.
505 **11.4 "Himalaya"** - It is hereby expressly agreed
506 that no employee or agent of the Managers
507 (including every sub - contractor from time to
508 time employed by the Managers) shall in any
509 circumstances whatsoever be under any liability
510 whatsoever to the Owners for any loss, damage or
511 delay of whatsoever kind arising or resulting
512 directly or indirectly from any act, neglect or
513 default on his party while acting in the course of
514 or in connection with his employment and,

D02479

515 without prejudice to the generality of the
516 foregoing provisions in this Clause 11, every
517 exemption, limitation, condition and liberty
518 herein contained and every right, exemption from
519 liability, defence and immunity of whatsoever
520 nature applicable to the Managers or to which the
521 Managers are entitled hereunder shall also be
522 available and shall extend to protect every such
523 employee or agent of the Managers acting as
524 aforesaid and for the purpose of all the foregoing
525 provisions of this Clause 11 the Managers are or
526 shall be deemed to be acting as agent or trustee
527 on behalf of and for the benefit of all persons who
528 are or might be their servants or agents from time
529 to time (including sub-contractors as aforesaid)
530 and all such persons shall to this extent be or be
531 deemed to be parties to this Agreement.

532 **12. Documentation**
533 Where the Managers are providing Technical
534 Management in accordance with sub-clause 3.2
535 and/or Crew Management in accordance with
536 sub-clause 3.1, they shall make available, upon
537 Owners' request, all documentation and records
538 related to the Safety Management System (SMS)
539 and/or the Crew which the Owners need in order
540 to demonstrate compliance with the ISM Code
541 and STCW 95 or to defend a claim against a third
542 party.

543 **13. General Administration**
544 　13.1 The Managers shall notify Owners of all
545 claims arising out of the Management Services
546 hereunder and keep the Owners informed
547 regarding any incident of which the Managers
548 become aware which gives or may give rise to
549 claims or disputes involving third parties.
550 　13.2 The owners shall bring or defend actions,
551 suits or proceedings in connection with matters
552 entrusted to the Managers according to this
553 Agreement.
554 　13.3 The Owners shall obtain legal or technical
555 or other outside expert advice in relation to the
556 handling and settlement of claims and disputes or
557 all other matters affecting the interests respect of
558 the Vessel.
559 　13.4 The Owners shall arrange for the provision
560 of any necessary guarantee bond or other
561 security.
562 　13.5 Any costs reasonably incurred by the
563 Managers in carrying out their obligations
564 according to Clause 13 shall be reimbursed by the
565 Owners.

566 **14. Auditing**
567 The Managers shall at all times maintain and keep
568 true and correct accounts and shall make the
569 same available for inspection and auditing by the
570 Owners at such times as may be mutually agreed.
571 On the termination, for whatever reasons, of this
572 Agreement, the Managers shall release to the
573 Owners, if so requested, the originals where
574 possible, or otherwise certified copies, of all such
575 accounts and all documents specifically relating to
576 the Vessel and her operation.

577 **15. Inspection of Vessel**
578 The Owners shall have the right at any time after
579 giving reasonable notice to the Managers to

580 inspect the Vessel for any reason they consider
581 necessary.

582 **16. Compliance with Laws and Regulations**
583 The Managers will not do or permit to be done
584 anything which might cause any breach or
585 infringement of the laws and regulations of the
586 Vessel's flag, or of the places where she trades.

587 **17.    Duration of the Agreement**
588 This Agreement shall come into effect on the day
589 and year stated in Box 4 and shall continue until
590 the date stated in Box 17. Thereafter it shall
591 continue until terminated by either party giving to
592 the other notice in writing, in which event the
593 Agreement shall terminate upon the expiration of
594 a period of two months from the date upon which
595 such notice was given.

596 **18.    Termination**
597 **18.1  Owners' Default**
598 　　(i) The Managers shall be entitled to
599 　　terminate the Agreement with
600 　　immediate effect by notice in writing if
601 　　any moneys payable by the Owners
602 　　under this Agreement and/or ~~the owners~~
603 　　~~of any associated vessel, details of which~~
604 　　~~are listed in Annex "D",~~ shall not have
605 　　been received in the Managers'
606 　　nominated account within ten running
607 　　days of receipt by the Owners of the
608 　　Manager's written request or if the
609 　　Vessel is repossessed by the Mortgagees.
610 　　(ii) If the Owners:
611 　　(a) fail to meet their obligations under
612 　　clause 5.2 and 5.3 of this Agreement
613 　　for any reason within their control, or
614 　　(b) proceed with the employment of or
615 　　continue to employ the Vessel in the
616 　　carriage of contraband, blockade
617 　　running, or an unlawful trade, or on a
618 　　voyage which in the reasonable
619 　　opinion of the Managers is unduly
620 　　hazardous or improper,
621 The Managers may give notice of the default to
622 the Owners, requiring them to remedy it as soon
623 as practically possible. In the event that the
624 Owners fail to remedy it within a reasonable time
625 to the satisfaction of the Managers, the Managers
626 shall be entitled to terminate the Agreement with
627 immediate effect by notice in writing.

628 **18.2  Managers' Default**
629 If the Managers fail to meet their obligations
630 under Clauses 3 and 4 of this Agreement for any
631 reason within the control of the Managers, the
632 Owners may give notice to the Managers of the
633 default, requiring them to remedy it as soon as
634 practically possible. In the event that the
635 Managers fail to remedy it within a reasonable
636 time to the satisfaction of the Owners, the
637 Owners shall be entitled to terminate the
638 Agreement with immediate effect by notice in
639 writing.

640 **18.3  Extraordinary Termination**
641 This Agreement shall be deemed to be terminated
642 in the case of the sale of the Vessel or if the
643 Vessel becomes a total loss or is declared as a

D02480

644 constructive or compromised or arranged total
645 loss or is requisitioned.
646 18.4 For the purpose of sub-clause 18.3 hereof
647    (i) the date upon which the Vessel is to be
648      treated as having been sold or otherwise
649      disposed of shall be the date on which the
650      Owners cease to be registered as Owners
651      of the Vessel;
652    (ii) the Vessel shall not be deemed to be lost
653      unless either she has become an actual
654      total loss or agreement has been reached
655      with her underwriters in respect of her
656      constructive, compromised or arranged
657      total loss or if such agreement with her
658      underwriters is not reached it is adjudged
659      by a competent tribunal that a
660      constructive total loss of the Vessel has
661      occurred.
662 18.5 This Agreement shall terminate forthwith in
663 the event of an order being made or resolution
664 passed for the winding up, dissolution, liquidation
665 or bankruptcy of either party (otherwise than for
666 the purpose of reconstruction or amalgamation)
667 or if a receiver is appointed, or it it suspends
668 payment, ceases to carry on business or makes
669 any special arrangement or composition with its
670 creditors.
671 18.6 The termination of this Agreement shall be
672 without prejudice to all rights accrued due
673 between the parties prior to the date of
674 termination.
675 **19. Law and Arbitration**
676 19.1 This Agreement shall be governed by and
677 construed in accordance with English law and any
678 dispute arising out of or in connection with this
679 Agreement shall be referred to arbitration in
680 London in accordance with the Arbitration Act
681 1996 or any statutory modification or re-
682 enactment thereof save to the extent necessary
683 to give effect to the provisions of this Clause. The
684 arbitration shall be conducted in accordance with
685 the London Maritime Arbitrators Association
686 (LMAA) Terms current at the time when the
687 arbitration proceedings are commenced.
688 The reference shall be to three arbitrators. A
689 party wishing to refer a dispute to arbitration shall
690 appoint its arbitrator and send notice of such
691 appointment in writing to the other party
692 requiring the other party to appoint its own
693 arbitrator within 14 calendar days of that notice
694 and stating that it will appoint its arbitrator as
695 sole arbitrator unless the other party appoints its
696 own arbitrator and gives notice that it has done so
697 within the 14 days specified. If the other party
698 does not appoint its own arbitrator and give
699 notice that it has done so within the 14 days
700 specified, the party referring a dispute to
701 arbitration may, without the requirement of any
702 further prior notice to the other party, appoint its
703 arbitrator as sole arbitrator and shall advise the
704 other party accordingly. The award of a sole
705 arbitrator shall be binding on both parties as if he
706 had been appointed by agreement.

707 Nothing herein shall prevent the parties agreeing
708 in writing to vary these provisions to provide for
709 the appointment of a sole arbitrator.
710 In cases where neither the claim nor any
711 counterclaim exceeds the sum of USD 50,000 (or
712 such other sum as the parties may agree) the
713 arbitration shall be conducted in accordance with
714 the LMAA Small Claims Procedure current at the
715 time when the arbitration proceedings are
716 commenced.
717 19.2 ~~This Agreement shall be governed by and~~
718 ~~construed in accordance with Title 9 of the~~
719 ~~United States Code and the Maritime Law of the~~
720 ~~United States and any dispute arising out of or in~~
721 ~~connection with this Agreement shall be referred~~
722 ~~to three persons at New York, one to be~~
723 ~~appointed by each of the parties hereto, and the~~
724 ~~third by the two so chosen; their decision that of~~
725 ~~any two of them shall be final, and for the~~
726 ~~purposes of enforcing any award, judgment may~~
727 ~~be entered on an award by any court of~~
728 ~~competent jurisdiction. The proceedings shall be~~
729 ~~conducted in accordance with the rules of the~~
730 ~~Society of Maritime Arbitrators, Inc. In cases~~
731 ~~where neither the claim not any counterclaim~~
732 ~~exceeds the sum of USD 50,000 (or such other~~
733 ~~sum as the parties may agree) the arbitration~~
734 ~~shall be conducted in accordance with the~~
735 ~~Shortened Arbitration Procedure of the Society~~
736 ~~of Maritime Arbitrators, Inc. current at the time~~
737 ~~when the arbitration proceedings are~~
738 ~~commenced.~~
739 19.3 This Agreement shall be governed by and
740 construed in accordance with the laws of the
741 ~~place mutually agreed by the parties and any~~
742 ~~dispute arising out of or in connection with this~~
743 ~~Agreement shall be referred to arbitration at a~~
744 ~~mutually agreed place, subject to the procedures~~
745 ~~applicable there.~~
746 19.4 If Box 18 in Part I is not appropriately filled
747 in, sub-clause 19.1 of this Clause shall apply.
748 Note: 19.1, 19.2 and 19.3 are alternatives;
749 indicate alternative agreed in Box 18.
750 **20. Notices**
751 20.1 Any notice to be given by either party to the
752 other party shall be in writing and may be sent
753 by fax, telex, registered or recorded mail or by
754 personal service.
755 20.2 The address of the Parties for service of
756 such communication shall be as stated in Boxes
757 19 and 20, respectively.

ANNEX "A" (DETAILS OF VESSEL OR VESSELS) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT · CODE NAME: "SHIPMAN 98"

| | |
|---|---|
| NAME OF VESSEL : | ADVANTAGE START |
| OWNER: | ADVANTAGE START SHIPPING LLC |
| IMO no: | 9466570 |
| Type: | Oil Tanker |
| Built: | JIANGSU RONGSHEN HEAVY IND.GROUP CO.LTD · RUGAO HARBOR,NANTONG CHINA / 2011 |
| Class: | 1A1 , ' TANKER FOR OIL ESP ' CSR, SPM, EO, VCS-2B, BIS, NAV-O, TMON |
| Tonnage: | 83805 GT / 49031 NT |
| Deadweight: | 156597 Metric Tonnes |
| LOA: | 274.5 Metres |
| Breadth: | 48 Metres |
| Main Engine: | 6S70 MC-C MAN B&W |

ANNEX "B" (DETAILS OF CREW) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

| Date of Agreement | : | As mentioned in box 1 |
| Detail of Crew | ; | 25 Crew Members in total |
| Contract Duration | ; | abt 4 months Senior Officers |
| | | abt 5 -7 months Junior Officers, |
| | | abt 6 months Ratings |

| Numbers | Rank | Nationality |
|---|---|---|
| 1 | Master | Turkish |
| 1 | Chief Officer | Turkish |
| 1 | 2nd Officer | Turkish |
| 1 | 3rd Officer | Turkish |
| 1 | 4th Officer | Turkish |
| 1 | Extra Officer | Turkish |
| | | |
| 1 | Chief Engineer | Turkish |
| 1 | 2nd Engineer | Turkish |
| 1 | 3rd Engineer | Turkish |
| 1 | 4th Engineer | Turkish |
| 1 | Elect. Eng. | Turkish |
| | | |
| 1 | Pumpman | Turkish |
| 5 | Able Seaman | Turkish |
| 2 | Ordinary Seaman | Turkish |
| | | |
| 1 | Fitter | Turkish |
| 3 | Oiler | Turkish |
| 1 | Chief Cook | Turkish |
| 1 | Steward | Turkish |

This complement is for standard trade. In case of Special requirements (STS, Storage etc.) the complement may be
adopted accordingly.

D02483

ANNEX "C" (BUDGET) TO THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)
STANDARD SHIP MANAGEMENT AGREEMENT - CODE NAME: "SHIPMAN 98"

Date of Agreement          :          10 FEBRUARY 2015
Manager's Budget for the first year with the effect from the commencement date of this agreement:
Please refer to operating Expense budget with detailed break down of the operating expenses

Estimated budget for 2015 in USD for MT ADVANTAGE START

| | Budget in USD |
|---|---|
| | Perday |
| Crewing | 4,600 |
| Victualing | 250 |
| Luboil | 500 |
| Technical | 1,200 |
| Insurance and other miscellaneous items | 1,200 |
| G&A - inclusive of management fees | 1,000 |
| Total | 8,750 |

Remarks:
Crewing is based on complement of 25 crew members with Turkish officers & ratings.
Luboil based on 270 seagoing days and on today's prices.
Technical expenses include all costs for stores , spares services,class for engine and deck department
General include all costs for ; communication,represantations,travelling,vetting,transportation,ISM/ISPS,port expenses.
Excluding dry docking and related costs.

D02484

# EXHIBIT 7

## $61,000,000 Secured Loan Agreement

Dated     16     March 2015

(1)     **Advantage Sun Shipping LLC and Advantage Start Shipping LLC**
        **(as Borrowers)**

(2)     **The Financial Institutions**
        **listed in Schedule 1**
        **(as Original Lenders)**

(3)     **CIT Finance LLC**
        **(as Agent)**

(4)     **CIT Finance LLC**
        **(as Security Agent)**

Stephenson Harwood LLP
1 Finsbury Circus
London EC2M 7SH
Tel +44 20 7329 4422
Fax +44 20 7329 7100
DX No 64 Chancery Lane
www.shlegal.com



**STEPHENSON HARWOOD**

# $61,000,000 Secured Loan Agreement

**Dated**    16    **March 2015**

(1)   **Advantage Sun Shipping LLC and Advantage Start Shipping LLC**
      **(as Borrowers)**

(2)   **The Financial Institutions**
      **listed in Schedule 1**
      **(as Original Lenders)**

(3)   **CIT Finance LLC**
      **(as Agent)**

(4)   **CIT Finance LLC**
      **(as Security Agent)**

Stephenson Harwood LLP
1 Finsbury Circus
London EC2M 7SH
Tel +44 20 7329 4422
Fax +44 20 7329 7100
DX No 64 Chancery Lane
www.shlegal.com



**STEPHENSON HARWOOD**

LONLIVE\19173867.15

(c)    similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions.

**"Lender"** means:

(a)    any Original Lender; and

(b)    any bank, financial institution, trust, fund or other entity which has become a Party as a Lender in accordance with Clause 23 (*Changes to the Lenders*),

which in each case has not ceased to be a Lender in accordance with the terms of this Agreement.

**"LIBOR"** means:

(a)    the applicable Screen Rate; or

(b)    (if (i) no Screen Rate is available for the currency of the Loan or (ii) no Screen Rate is available for the relevant Interest Period) the Reference Bank Rate,

as of 11.00 a.m. on the Quotation Day for dollars and for a period equal in length to the relevant Interest Period and, if that rate is less than zero, LIBOR shall be deemed to be zero.

**"Loan"** means the aggregate amount advanced or to be advanced by the Lenders to the Borrowers under Clause 2 (*The Loan*) or, where the context permits, the principal amount advanced and for the time being outstanding.

**"Majority Lenders"** means a Lender or Lenders whose Commitments aggregate more than $66^{2}/_{3}\%$ of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated more than $66^{2}/_{3}\%$ of the Total Commitments immediately prior to the reduction).

**"Management Agreement"** means, for each Vessel, the agreement for the commercial and technical management of that Vessel entered into or to be entered into between the Borrower owning the Vessel and the Manager upon the terms acceptable to the Agent.

**"Manager"** means Genel Denizcilik Nakilyati A.S. in its capacity as both the commercial and technical manager of each Vessel under a Management Agreement and as corporate administrator of each Borrower and the Guarantor under an Administration Agreement or such other commercial and/or technical manager of each Vessel or corporate administrator of each Borrower and the Guarantor nominated by the relevant Borrower as the Agent may approve.

**"Manager's Undertakings"** means the written undertakings of the Manager whereby, throughout the Facility Period unless otherwise agreed by the Agent:

(a)     it will remain the commercial and technical managers of the Vessels and the corporate administrator of the Borrowers and the Guarantor;

(b)     it will not, without the prior written consent of the Agent, subcontract or delegate the commercial or technical management of the Vessels (as the case may be) or the corporate administration of the Borrowers and the Guarantor to any third party;

(c)     the interests of the Manager in the Insurances will be assigned to the Security Agent with first priority; and

(d)     all claims of the Manager against the Borrowers shall be subordinated to the claims of the Finance Parties under the Finance Documents.

**"Margin"** means, in respect of each Tranche three point seven five (3.75%) per cent per annum.

**"Material Adverse Effect"** means in the reasonable opinion of the Majority Lenders a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of any Security Party; or

(b)     the ability of any Security Party to perform its obligations under any Finance Document; or

(c)     the validity or enforceability of, or the effectiveness or ranking of any Encumbrance granted or purporting to be granted pursuant to any of, the Finance Documents or the rights or remedies of any Finance Party under any of the Finance Documents.

**"Maximum Loan Amount"** means $61,000,000.

**"Maximum Tranche Amount"** means the lesser of (a) $30,500,000 and (b) 60.00% of the Fair Market Value of the relevant Vessel in respect of each Tranche (evidenced by the valuations received by the Agent under Clause 4.1 (*Initial conditions precedent*)).

**"MoA"** means in relation to each Borrower, a memorandum of agreement entered into between it and the relevant Seller on the terms and conditions of which the relevant Vessel is transferred into the ownership of that Borrower.

**"Mortgages"** means the first preferred mortgages referred to in Clause 17.1.1 (*Security Documents*) and **"Mortgage"** means any one of them.

**"New Lender"** has the meaning given to that term in Clause 23.1 (*Assignments and transfers by the Lenders*).

**"Non-Consenting Lender"** has the meaning given to that term in Clause 34.4.4 (*Replacement of Lender*).

**"OFAC"** means the Office of Foreign Assets Control of the United States Department of Treasury.

**Signatures**

**The Borrowers**

**Advantage Sun Shipping LLC**                    )
                                                   )
By:                                                )
                                                   )
Address: Yapi Kredi Plaza, A Blok Kat 15,          )
Levent, Istanbul, Turkey                           )
                                                   )
Fax no.: +902123255814                             )
Department/Officer: Mehmet Mat                     )

MEHMET MAT

**Advantage Start Shipping LLC**                   )
                                                   )
By:                                                )
                                                   )
Address: Yapi Kredi Plaza, A Blok Kat 15,          )
Levent, Istanbul, Turkey                           )
                                                   )
Fax no.: +902123255814                             )
Department/Officer: Mehmet Mat                     )

MEHMET MAT

**The Agent**

**CIT Finance LLC**                                )
                                                   )
By:                                                )
                                                   )
Address: 11 West 42nd Street, New York,            )
New York 10036, USA                                )
Fax no.: +1 212 771 1095                           )
Department/Officer: Chief Credit Officer,          )
Maritime                                           )

and with respect to insurance matters only,
with a copy to:

Address: CIT Group Inc., 1 CIT Drive,
Livingston, NJ 07039, USA
Fax No.: +1 973 535 3767
E-mail: InsuranceRenewals@CIT.com
Department: Corporate Insurance

# EXHIBIT 8

# GEDEN HOLDINGS LTD.

85 St.John's Street , Valletta . Malta

Tel: 0090 212 319 51 00 – Fax : 0090 212 325 58 14

Messrs.
PSARA ENERGY LIMITED
Ajeltake Road, Ajeltake Island
Majuro, MH 96960
Marshall Island

04. March. 2010

We hereby confirm that Geden Holdings Ltd., Malta is the Holding Company for all single purpose companies which owns one vessel each. The borrowers for the bank loans are SPCs, not Geden Holdings Ltd., Malta. Geden Holdings Ltd., Malta is the guarantor for the bank loans.

GEDEN HOLDINGS LTD of MALTA

# EXHIBIT 9


Enterprise Improvement


Corporate Turnaround and Restructuring


Financial Advisory Services


Information Management Services



AlixPartners
*When it really matters.*

Chicago   Dallas   Detroit   Düsseldorf   London   Los Angeles   Milan   Munich   New York   Paris   San Francisco   Shanghai   Tokyo   Washington, DC

# Project Hermitage
# Restructuring

March 6 2013



EXHIBIT
tabbies
F

www.alixpartners.com

DEKABANK copy, March 6 2013

# Important Disclaimer

This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). THIS REPORT IS NOT INTENDED TO BE RELIED UPON BY ANYONE OTHER THAN THE COMPANY, OR INDUCE ACTION OR FORBEARANCE BY ANYONE OTHER THAN THE COMPANY. This Report is strictly confidential and subject to the confidentiality provisions of the Engagement Letter.

The addressee of the Report is the Company. The Report may be made available to the following lenders: HSH Nordbank AG, DVB SE, Dekabank, Commerzbank AG, Bremer Landesbank, Norddeutsche Landesbank, Lloyds TSB Bank Plc, Natixis, Santander (the "Lenders") on a strict non-reliance basis only and subject to the provisions of this disclaimer. By taking receipt of this Report, the Lenders accept and agree to the non-reliance limitation set forth in the preceding sentence and the other provisions in this disclaimer. No other person other than the Company and the Lenders is authorized to have access to this Report, unless he has received AlixPartners' prior written consent and has signed and returned to AlixPartners an acceptable non-reliance report letter.

Should any unauthorized person obtain access to and read this Report, such person accepts and agrees to the following terms:

1.  The unauthorized reader of this Report understands that the work performed by AlixPartners was performed in accordance with the instructions provided by the Company and was performed exclusively for the Company's sole benefit and internal use.

2.  The unauthorized reader of this Report acknowledges that this Report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of the unauthorized reader.

3.  The unauthorized reader agrees that AlixPartners, its partners, employees and agents neither owe nor accept any duty or responsibility to the unauthorized reader, whether in contract or in tort (including without limitation, negligence and breach of statutory duty), and shall not be liable in respect of any loss, damage or expense of whatsoever nature which is caused by any use the unauthorized reader may choose to make of this Report, or which is otherwise consequent upon the gaining of access to the Report by the unauthorized reader. Further, the unauthorized reader agrees that this Report is not to be referred to or quoted, in whole or in part, in any prospectus, registration statement, offering circular, public filing, loan, other agreement or document, and this Report is not to be distributed without AlixPartners prior written.

DEKABANK copy March 6 2013

AlixPartners

# Important Disclaimer

The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company. AlixPartners further relied on the assurance of management and staff of the Company that they were unaware of any facts that would make the information provided to AlixPartners incomplete or misleading. In preparing the Report, AlixPartners has assumed, without any independent verification, the accuracy and completeness of all information received from the Company, available from public sources, or which was otherwise provided to us. AlixPartners is not responsible whatsoever for any misrepresentations made to AlixPartners during the course of its review. AlixPartners has not subjected the information contained herein to an examination in accordance with generally accepted auditing or attestation standards.

Accordingly, AlixPartners cannot and does not express an opinion on the financial information and does not assume any responsibility for the accuracy or correctness of the projected financial or other data, information and assessments upon which the enclosed document is presented. AlixPartners expresses no view as to the accuracy, completeness or likelihood of the Company's business plan, scenarios, projections or forecasts contained in this Report.

The recipients of the Report, including the Lenders, accept that they will make their own investigation, analysis and decision relating to the possible or actual transaction/financing/credit relationship and/or matter related to such and will not use or rely upon this Report to form the basis of any such decisions. The Report cannot in any way serve as a substitute for inquiries and procedures which the Lenders will or should be undertaking for the purposes of satisfying themselves regarding the Client's business or financial position or for any other purpose in connection with the Lenders' relationship or transaction with the Client.

AlixPartners makes no representation or warranty regarding any actions the Lenders may or may not take in reliance on or in reference to matters presented in the Report. The Lenders accept and agree that AlixPartners, its affiliates, members, officers, partners, employees and agents (the "AlixPartners Entities") neither owe nor accept any duty or responsibility to the Lenders, whether in contract or in tort (including without limitation, negligence and breach of duty of any sort) or however otherwise arising. Any reliance the Lenders choose to place on the information or the Report is a matter of their judgment exclusively and at their own risk. Accordingly, no liability or responsibility whatsoever is accepted by the AlixPartners Entities for any loss howsoever arising from any use of, or in connection with, the Report.

The information in this Report is non-public and considered strictly confidential by the Company and AlixPartners.

AlixPartners

DEKABANK copy, March 6 2013

# Important Disclaimer

This Report includes analyses of the Company's financial projections. These projections may be based, in whole or in part, on projections or forecasts of future events. A forecast, by its nature, is speculative and includes estimates and assumptions which may prove to be wrong. Actual results may, and frequently do, differ from those projected or forecast. Those differences may be material. Items which could impact actual results include, but are not limited to, unforeseen micro- or macro-economic developments, business or industry events, personnel changes, casualty losses, or the inability of the Company to implement plans or programs. The projections are also based upon numerous assumptions, including business, economic and other market conditions. Many of these assumptions are beyond the control of the Company and are inherently subject to substantial uncertainty. Such assumptions involve significant elements of subjective judgment, which may or may not prove to be accurate, and consequently, no assurances can be made regarding the analyses or conclusions derived from financial information based upon such assumptions.

The report is incomplete without reference to, and should be viewed solely in connection with, the oral briefing provided by AlixPartners which forms part of the Report.

The information in the Report reflects conditions and the views of AlixPartners as of this date, all of which are subject to change. AlixPartners undertakes no obligation to update or provide any revisions to the Report to reflect events, circumstances or changes that occur after the date the Report was prepared.

To the extent that any of the AlixPartners Entities provide any recipient of this Report with an oral presentation or explanations in relation to the Report or Client, the recipient of this Report acknowledges that such presentation and explanation will be given subject to the same terms and conditions as those specified in this disclaimer.

Neither the Report nor any of its contents may be copied, reproduced, disseminated, quoted or referred to in any presentation, agreement or document, with or without attribution to AlixPartners, at any time or in any manner other than for the internal use of the Company, without the express, prior written consent of AlixPartners.

DEKABANK copy, March 6 2013

AlixPartners



## Contents

I.     Executive Summary / Remarks from the Company

II.     Background

III.     Restructuring Proposal

IV.     Financial Analysis

V.     Conclusions

DEKABANK copy. March 6 2013

5

AlixPartners



I. Executive Summary

DEKABANK copy, March 6 2013

AlixPartners

# Executive Summary

▸ The November 20 Proposal provides the basis for a formal or informal standstill period during which the Company can develop, negotiate and implement a structure providing a viable long term solution

▸ The November 20 Proposal has shown to be effective as an interim measure providing liquidity and stability to the Company but it is unlikely to provide a definitive solution. One significant obstacle to its long-term implementation is the transfer of cash flows away from banks towards charterers

▸ In considering alternatives for a financial restructuring, the Company sought to achieve the following key objectives:
  – Compensate stakeholders adequately for their risk-weighted capital exposure and concessions
  – Constrain cross subsidization between stakeholders related to different underlying assets
  – Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)
  – Maximize options for stakeholders and potential for self-selection

▸ A long term plan involves grouping and ringfencing assets according to their debt service capacity and sensitivity to a recovery in rates.

▸ This can be achieved by executing arms-length sale transactions of the [SPVs] at market value into appropriate newcos:
  a) Newco Alpha: up to 29 vessels (mostly Tanker operations) financed by "Hamburg" banks, Natixis, Credit Europe (including Second Lien), NSF Second Lien and Lloyds; Alpha to be partially recapitalized with new equity and financed through 5 different facilites
  b) Newco Beta: 4 vessels financed by CCB and CDB.
  c) Group C: GB Global, NSF (South and East)
  d) Group D: the remaining vessels, essentially comprised of Icon, Octavian, Stealth, FSL

DEKABANK copy, March 6 2013

AlixPartners



II. Background

DEKABANK copy, March 6 2013

8

AlixPartners

# Background
## The Market

‣ Neither the tanker nor the bulker market recovered through 2012 and vessel earnings have remained low
  – The tanker market has shown signs of firmness in Q1 2013 but there is little optimism for a sustained recovery before Q3 2013
  – The bulker market continues to be very weak and has performed slightly below the Nov 20 Business Plan forecast during Q1 2013

‣ Asset values have continued to deteriorate through the end of 2012. The latest levels as per Clarkson Research sustained decline to multiyear lows:
  – 5yr old VLCC, Aframax and Product tankers at $57m, $28m, and $22m
  – 5yr old Capesize, Panamax, and Handysize at $33m, $18m, and $16m





AlixPartners

DEKABANK copy, March 6 2013



# Background
## The Company

▸ The Company has actively been managing its portfolio since 2008, mainly via:
  – The investment of c.$700m in equity along with $1.8B of bank and sale-leaseback (18) financing
  – The Sale of 12 vessels upon delivery for net proceeds of $136m
  – The Sale of 17 vessels operating within the fleet for net proceeds of $79m
  – The sale –leaseback of 18 vessels to finance $665m in deliveries of which 7 in 2013 ($171m)

▸ Earnings from vessels financed by banks have fallen $45m short of debt service in the period 2011-2012. Similarly, earnings from bareboat vessels have fallen $43m short of obligations in the period 2011-2012.

▸ In order to maintain minimum operational liquidity, the Company has instituted a moratorium during the first quarter including the following measures
  – Deferral of 100% from all lenders other than CCB and CDB who have already agreed to a debt rescheduling starting from Q4 2012
  – Deferral of some November and December 2012 principal repayments
  – Deferral of 35% of the bareboat hire payments
  – Refinancing of Royal via Credit Europe facility; Repayment of 2012 bank principal overdue [1]
  – Management of supplier overdue through the quarter

▸ While all stakeholders have reserved their rights, some specific stakeholder actions have affected the cash flows
  – Unicredit has drawn on its deposit accounts
  – Icon issued a lien notice to the charterers and has directly received charter income

▸ With above measures and actions, available cash is projected at only c.$23.8m including retention at the end of March and c.$7.5m in restricted cash deposits

---

[1] Does not include default interest, margin increases and bank fees

AlixPartners

DEKABANK copy March 6 2013

DRAFT & PRELIMINARY

# Company and Fleet Overview

## The Company – Recent Events

▸ Flash

1. The Flash ran aground at the end of June and is currently arrested in Tunisia
2. The customer has invoked damage of goods (wet coal) and has refused to take delivery
3. 180 days have elapsed as of Feb 2013, potentially giving rise to a Constructive Total Loss on a hull coverage of $110m
4. The claim has been rejected by the Club on the basis that the damage is to cargo
5. An arbitrator is to be appointed week of Mar 4 2013

▸ Baytur

1. Baytur is expected to be delivered in the first week of April for $13.6m in proceeds

▸ Royal Refinancing

1. The Royal was refinanced through a $37.5m facility with Credit Europe
2. Credit Europe has cross-collateralized its second lien on the Namrun and the Scope (behind Natixis) with a second mortgage on the Royal
3. $10m has been paid to HSH and $10m is outstanding to the yard

DEKABANK copy March 6 2013

AlixPartners

# Company and Fleet Overview
Employment, Tanker

| | | | | Tankers | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 1 | MT AQUA | Aframax Tanker | 12,675 | CHEVRON | Apr-13 | - | 12,675 | Oct-13 | 6 |
| 2 | MT ACTION | Aframax Tanker | 12,706 | URSA SHIPPING | Mar-13 | - | 12,706 | May-13 | 2 |
| 3 | MT TARGET | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 4 | MT TRUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 5 | MT SPIKE | Aframax Tanker | 12,825 | URSA SHIPPING | Mar-13 | - | 12,825 | Oct-13 | 6 |
| 6 | MT AVOR | Aframax Tanker | 13,063 | URSA SHIPPING | Aug-13 | - | 13,063 | Feb-14 | 6 |
| 7 | MT VALUE | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 8 | MT BRAVO | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 9 | MT POWER | Aframax Tanker | 11,500 | SHELL | Apr-17 | Jun-14 | 11,500 | Apr-22 | 60 |
| 10 | MT PROFIT | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 11 | MT CENTER | Suezmax Tanker | 15,675 | NIDAS | Jun-13 | - | 19,500 | Jun-14 | 12 |
| 12 | MT BLUE | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 13 | MT PINK | Suezmax Tanker | 36,834 | GLENCORE | Jun-15 | - | 36,834 | Jun-15 | - |
| 14 | MT BLANK | Suezmax Tanker | 13,000 | SHELL | Apr-15 | Jun-14 | 13,000 | Apr-18 | 36 |
| 15 | MT REEF | Suezmax Tanker | 37,080 | GLENCORE | Jul-15 | - | 37,080 | Jul-15 | - |
| 16 | MT HERO | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 17 | MT ROYAL | Suezmax Tanker | 13,000 | SHELL | Nov-15 | Jun-14 | 13,000 | Nov-18 | 36 |
| 18 | MT ENJOY | Panamax Tanker | 13,825 | CSSA | Mar-14 | - | - | Mar-14 | - |
| 19 | MT MARKA | Panamax Tanker | 11,959 | Panamax International (P.I.) | Jun-13 | - | 12,925 | Dec-13 | 6 |
| 20 | MT CITRON | MR Pro/Chem Tanker | 13,380 | SHELL | May-13 | - | 13,380 | Jul-13 | 2 |
| 21 | MT CITRUS | MR Pro/Chem Tanker | 13,380 | SHELL | Jul-13 | - | 13,380 | Sep-13 | 2 |
| 22 | MT ACOR | Ice Class Pro/Chem Tanker | 11,700 | NORDEN | Apr-13 | - | - | May-13 | 1 |
| 23 | MT CARRY | Ice Class Pro/Chem Tanker | 11,150 | NORDEN | Aug-13 | - | - | Sep-13 | 1 |
| 24 | MT ROVA | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 25 | MT COTTON | Ice Class Pro/Chem Tanker | 12,250 | CSSA | Nov-13 | - | - | Dec-13 | 1 |
| 26 | MT CARGO | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | May-13 | - | - | Apr-13 | 1 |
| 27 | MT ROCK | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Mar-13 | - | - | Apr-13 | 1 |
| 28 | MT ROCKET | Ice Class Pro/Chem Tanker | 11,690 | NORDEN | Jun-13 | - | - | Jul-13 | 1 |

DEKABANK copy, March 6 2013

AlixPartners

DRAFT - PRELIMINARY

# Company and Fleet Overview
Employment, Bulk

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Bulkers** | | | | | | | | | |
| Ref | Vessel | Type | Daily Charter Net Rate | Charterer | Maturity | Profit Share End Date | Option Rate | Option Maturity | Option (Month) |
| 31 | MV SCOPE | Capesize Bulk Carrier | 10,000 | SWISS MARINE | Oct-13 | - | - | May-14 | 7 |
| 32 | MV FLASH | Capesize Bulk Carrier | | ARRESTED | | - | - | Jan-00 | - |
| 33 | MV PROUD | Capesize Bulk Carrier | 56,000 | COSCO | Jun-14 | - | - | Jun-14 | - |
| 34 | MV ANGEL | Capesize Bulk Carrier | 4,533 | SWISS MARINE | Mar-13 | - | - | Mar-13 | - |
| 35 | MV PRETTY | Capesize Bulk Carrier | 7,600 | SWISS MARINE | Feb-13 | - | - | May-13 | 3 |
| 36 | MV CASH | Kamsarmax Bulk Carrier | | N/A | | - | - | Jan-00 | - |
| 37 | MV COLLECTION | Kamsarmax Bulk Carrier | | N/A | | - | - | Jan-00 | - |
| 38 | MV CITY | Kamsarmax Bulk Carrier | | N/A | | - | - | Jan-00 | - |
| 39 | MV ASIA | Supramax Bulk Carrier | 7,014 | SUPREME BULK CARRIERS | Jan-13 | - | 7,014 | Apr-13 | 3 |
| 40 | MV FANTASTIC | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 41 | MV AMAZING | Supramax Bulk Carrier | 7,267 | SUPREME BULK CARRIERS | Feb-13 | - | 7,267 | May-13 | 3 |
| 42 | MV TARSUS | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | May-13 | - | 6,978 | Jul-13 | 2 |
| 43 | MV SPOT | Supramax Bulk Carrier | 10,925 | COPA | Feb-13 | - | - | Feb-13 | - |
| 44 | MV CLEAR | Supramax Bulk Carrier | 5,850 | Denmar Chartering & Trading GMBH Hamburg, Germany | May-13 | - | 5,850 | May-13 | - |
| 45 | MV NAMRUN | Supramax Bulk Carrier | 7,256 | SUPREME BULK CARRIERS | Jan-13 | - | 7,256 | Apr-13 | 3 |
| 46 | MV BAYTUR | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 47 | MV SOUTH | Supramax Bulk Carrier | 6,978 | SUPREME BULK CARRIERS | Jan-13 | - | 6,978 | Apr-13 | 3 |
| 48 | MV EAST | Supramax Bulk Carrier | 8,422 | WORLDWIDE INVESTMENT | Feb-13 | - | 8,422 | Feb-13 | - |
| 49 | MV WEST | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Jan-13 | - | 7,219 | Apr-13 | 3 |
| 50 | MV SECRET | Supramax Bulk Carrier | 8,422 | SUPREME BULK CARRIERS | Jan-13 | - | 8,422 | Apr-13 | 3 |
| 51 | MV SHARP | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 52 | MV CAPITAL | Supramax Bulk Carrier | 8,075 | SIVA BULK | May-13 | - | - | Jan-00 | 2 |
| 53 | MV METROPOL | Supramax Bulk Carrier | 7,219 | SUPREME BULK CARRIERS | Mar-13 | - | - | Jan-00 | - |
| 54 | MV WORLD | Supramax Bulk Carrier | 8,265 | SIVA BULK | Apr-13 | - | 8,265 | Jul-13 | - |
| 55 | MV EARTH | Mini Bulk Carrier | | On Spot | | - | - | Jan-00 | - |
| 56 | MV WIND | Mini Bulk Carrier | | On Spot | | - | - | Jan-00 | - |
| 29 | MT CV STEALTH | Aframax Tanker | 11,700 | PT Armada | Mar-13 | - | 11,700 | Apr-13 | 1 |
| 30 | MT CS STEALTH | Aframax Tanker | 12,255 | Petrovietnam Transport Corp | Mar-13 | - | 12,255 | Mar-13 | - |

DEK - BANK copy March 5 2013

AlixPartners



III. Restructuring Proposal

DEKABANK copy, March 6 2013

14

AlixPartners

DRAFT & PRELIMINARY

# Restructuring Proposal
## Key Assumptions

▸ Key assumptions under the Plan include
  - All ships sold **at minimum of market value or value of loan** and on an arms-length basis.
  - There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa - type jurisdictions)
  - Stakeholders in groups **C and D will have the option to move into** A subject to loan modifications adhering to the conditions prevalent in that entity.
  - Stakeholders in **C and D can have their vessels redelivered** subject to acceptable terms for termination.

▸ The Company would prefer a coordinated financing approach in Newco

▸ The Second Lien debt relating to NSF and Credit Europe is transferred/novated upon the sale. There may be an opportunity to renegotiate terms of mezzanine debt (NSF, Credit Europe) as part of the sale but it has not been contemplated here

▸ Deposits related to facilities (Unicredit, Profit, etc.) are netted the outstanding loan amounts; the loans are reconstituted after the transaction and the deposits are eliminated

DEKABANK copy, March 2013

AlixPartners

DRAFT & PRELIMIN...

# Plan B – Split of Fleet via Newco A

## Newco A Example

▸ **Newco Alpha:** Intended to form a viable standalone entity of up to 29 vessels (21 Tanker and 8 Bulker) in which the quality of vessel earnings would enable limited deferrals compared to those required in the November 20 proposal; New equity provided in the transaction to reduce total bank exposure and improve LTV coverage ratio for the majority of the facilities

▸ **Assumptions : 1)** Sale of ships at market value from Olco to Newco **2)** Equity to fund any shortfall in collateral in Oldco **3)** New bank financing in Newco provided at 95% LTV **4)** New Equity in Newco as required for 95% LTV.



Note: Indicative transaction structure subject to legal due diligence
(1) Equity of $1.1m also as a result of transfer of Namrun at value greater than senior debt
(2) $52.6m financed in excess of market value of assets

16

AlixPartners


DEKABANK copy March 6 2012

## Plan B – Split of Fleet via Newco: Alpha
### Structuring: Facility #1

▸ **Facility#1:** Newco Alpha financing at 95% LTV, LIBOR +3% on a 15 year loan profile from delivery date based 20 year working life minus 5 years. Pro Forma debt in Facility#1 includes second liens behind Natixis related to Credit Europe ($16.1m)

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan [1] | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY #1 | | Hamburg banks paid down to 95% LTV including any current shortfalls | | | | | | | | | |
| Aframax | NLB | Target | 99% | 95% | 28.7 | 29.0 | 0.3 | 1.5 | 1.5 | 0.3 | 27.6 |
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | (2.4) | 1.6 | 4.0 | 0.0 | 29.5 |
| Aframax | Unicredit | Value | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Bravo | 95% | 95% | 31.5 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Aframax | Unicredit | Power | 97% | 95% | 31.9 | 33.0 | 0.0 | 1.7 | 1.7 | 0.0 [4] | 31.4 |
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |
| Suezmax | CB NLB BrLB | Blue | 99% | 95% | 40.5 | 41.0 | 0.5 | 2.1 | 2.1 | 0.5 | 39.0 |
| Suezmax | HSH 1 | Hero | 99% | 95% | 48.5 | 49.0 | 0.5 | 2.5 | 2.5 | 0.5 | 46.6 |
| MR | HSH 2 | Citron | 107% | 95% | 22.5 | 21.0 | (1.5) | 1.1 | 2.6 | 0.0 | 20.0 |
| MR | HSH 2 | Citrus | 107% | 95% | 23.6 | 22.0 | (1.6) | 1.1 | 2.7 | 0.0 | 20.9 |
| Handy | DVB NLB SAN | Acor | 96% | 95% | 20.1 | 21.0 | 0.9 | 1.1 | 1.1 | 0.9 | 20.0 |
| Handy | DVB NLB SAN | Carry | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB SAN | Rova | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cotton | 100% | 95% | 21.0 | 21.0 | 0.0 | 1.1 | 1.1 | 0.0 | 20.0 |
| Handy | DVB NLB | Cargo | 91% | 95% | 21.0 | 23.0 | 2.0 | 1.2 | 1.2 | 2.0 | 21.9 |
| Handy | DVB NLB | Rock | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handy | DVB NLB | Rocket | 95% | 95% | 21.9 | 23.0 | 1.1 | 1.2 | 1.2 | 1.1 | 21.9 |
| Handymax | DVB | Asia | 102% | 95% | 19.4 | 19.0 | (0.4) | 1.0 | 1.3 | 0.0 | 18.1 |
| Mini Bulker | DVB | Earth | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| Mini Bulker | DVB | Wind | 98% | 95% | 2.9 | 3.0 | 0.1 | 0.2 | 0.2 | 0.1 | 2.9 |
| **Subtotal Facility #1** | **20** | | **99%** | **95%** | **504.7** [1] | **511.0** | **(5.9)** [2] | **25.6** | **31.5** [3] | **12.2** | **485.5** |

[1] To be adjusted for repayments before closing of the transaction (figures do not include principal repayments made week ending Feb 22)
[2] Represents sum of shortfall only
[3] Total amount of equity related to sale / purchase of vessels in Facility #1
[4] $4.1m related to excess collateral in Unicredit facility could be eliminated and repaid/refinanced through NSF 2nd Lien

DEKABANK copy, March 8 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #1

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aframax | NLB | True | 108% | 95% | 33.4 | 31.0 | 2.4 | 1.6 | 4.0 | 0.0 | 29.5 |

1. True is sold from Oldco to Newco Alpha at market value $31m (B)
2. Any shortfall against the mortgage is funded by $2.4m new equity (C) and the whole of the Oldco debt is paid down. If there is value above the mortgage, the excess cash remains in Oldco
3. NLB and New Equity recapitalize Newco at a maximum of 95% LTV; NLB has reduced its exposure by $3.9m and improved LTV by 13%



Note: Indicative transaction structure subject to legal due diligence

18

DEKABANK copy. March 6 2013

AlixPartners



# Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #2

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) [B*(1-95%)] | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|------------------------------|------------------------------|--------------------------------------------|---------------------------------------------------------|-------------------------------------------------------------------------------------|------------------------------------------|-------------------------------|
| Suezmax | DVB NLB | Profit | 96% | 95% | 39.4 | 41.0 | 1.6 | 2.1 | 2.1 | 1.6 | 39.0 |

1. Profit is sold from Oldco to Newco Alpha at $41m market value (B)
2. If there is value above the mortgage, the <u>excess cash remains in Oldco (C)</u>. Any shortfall would need to be funded via additional equity
3. DVB and New Equity recapitalize Newco at maximum of 95% LTV; NLB has reduced its exposure by $0.4m and improved LTV by 1%



DRAFT & PRELIMINARY

DEKABANK copy March 6 2013

# Plan B – Split of Fleet via Newco: Alpha

## Structuring

- Facility#2: Lloyds vessels sold and refinancing provided on the same terms
- Facility#3: Natixis vessels sold and refinancing provided on the same terms; Namrun facility extended and ship potentially sold in 2-3 yrs
- Facility#4: Credit Europe sold and refinancing provided on the same terms
- Facility#5: Dekabank vessels sold and refinancing provided on PAYC basis and no covenants
- Facility#6: NSF Second Lien behind Unicredit on the same terms

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo (LTV of 95%) | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **FACILITY #2** | **Lloyds facility rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |
| Suezmax | Lloyds | Blank | 68% | 68% | 32.2 | 47.0 | 14.8 | 14.8 | 14.8 | 14.8 | 32.2 |
| Suezmax | Lloyds | Reef | 75% | 75% | 34.6 | 46.0 | 11.4 | 11.4 | 11.4 | 11.4 | 34.6 |
| **FACILITY #3** | **Natixis facilities rolled over into Newco Alpha on existing terms** | | | | | | | | | | |
| Capesize | Natixis 1 | Scope | 87% | 87% | 23.4 | 27.0 | n/a | n/a | n/a | n/a | 23.4 |
| Handymax | Natixis 2 | Namrun | 88% | 88% | 14.0 | 16.0 | n/a | n/a | n/a | n/a | 14.0 [2] |
| **FACILITY #4** | **Loan includes $37.5m new refinancing from Credit Europe plus $16.1m 2nd priority loans relating to the Scope and the Namrun** | | | | | | | | | | |
| Suezmax | Credit Europe | Royal | 107% [1] | 107% | 53.6 | 50.0 | n/a | n/a | 0.0 | 0.0 | 53.6 |
| **FACILITY #5** | **Deka facility rolled over into Newco but paid only from available cash from these vessels** | | | | | | | | | | |
| Handymax | Deka | Tarsus | 133% | 133% | 24.0 | 18.0 | n/a | n/a | n/a | n/a | 24.0 |
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| Handymax | Deka | Clear | 139% | 139% | 25.0 | 18.0 | n/a | n/a | n/a | n/a | 25.0 |
| **FACILITY #6** | **NSF 2nd Lien facilities** | | | | | | | | | | |
| | | | n/a | n/a | 25.5 | n/a | | | | | 25.5 |
| **TOTAL Newco Alpha** | | | **29** | **97%** | **95%** | **799.3** | **795.0** | **(5.9)** [3] | **58.5** | **64.4** | **44.6** | **784.0** |

MV of Newco Alpha Assets

Total Capital required

New Alpha debt

(1) Royal refinancing includes second lien ; LTV on first lien is 75%
(2) Equity value from the rollover of the Namrun loan on $16m in MV; equity not retained by Oldco due to 2nd Lien by Credit Europe
(3) Represents sum of shortfall only

AlixPartners

## Plan B – Split of Fleet via Newco: Alpha

Structuring – Example #3

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|------|----------|------|-------------|---------------|-----------------------------|-----------------------------|------------------------------------------|-------------------------------|-------------------------------------------------------------------------------|------------------------------------------|-------------------------------|
| Suezmax | Lloyds | Pink | 85% | 85% | 37.3 | 44.0 | 6.7 | 6.7 | 6.7 | 6.7 | 37.3 |

1. Pink is sold from Oldco to Newco Alpha at market value (B)
2. The excess cash over the mortgage value remains in Oldco (C)
3. Lloyds and New Equity recapitalize Newco at a maximum of 95% LTV; Given that coverage is lower than 95% (85%,) no new equity is required upon refinancing of Newco with $37.3m in debt



DRAFT & PRELIMINARY

# Plan B – Split of Fleet via Newco: Alpha

### Structuring – Example #4



| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value | (C) Excess / (Shortfall) upon sale [B-A] | (D) Capital required in NewCo | (E) Capital required in NewCo (LTV of 95%) and to cover deficiency [D+Negative C] | (F) Equity going into OldCo [Positive C] | (G) New debt drawdown [D - A] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Handymax | Deka | Spot | 139% | 139% | 25.0 | 18.0 | | 0.0 | 0.0 | 0.0 | 25.0 |

1. Spot is sold from Oldco to Newco Alpha at $25m being equivalent to outstanding loans
2. Loans are novated to Newco
3. Loans are paid out of available cash on the vessel only

Amount of loan novated is beyond market value at the time of the transaction; no recapitalization



DEKABANK copy March 6 2013

DRAFT – SUBJECT...

# Plan B – Split of Fleet via Newco: Alpha

Structuring – Sources and Uses, Pro Forma Balance Sheet

| Sources | | Uses | |
|---|---|---|---|
| New equity [1] | 64.4 | Purchase of assets | 784.0 |
| New financing | 784.0 | Net bank debt paydown | 19.3 |
| | | Equity to cover collateral shortfall and excess value | 45.1 |
| **Total Sources** | **$848.4** | **Total Uses** | **$848.4** |

[1] Does not include additional liquidity for operational cash

DEKABANK copy. March 6 2013

23

AlixPartners



# Plan B – Split of Fleet via Newco: Beta

Structuring

▸ **Newco Beta:** Contains 4 Bulkers financed by Chinese banks. These are considerably under water yet they must be offered attractive terms given that the Chinese banks benefit from a Corporate Guarantee.

▸ **Assumptions :**  Loans novated to Newco Beta on existing terms.  **Subject to an appropriate rescheduling of obligations we do not envisage equity being required for Newco Beta.**

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Capesize | CCB | Flash | 100% | 100% | 33.1 | 33.0 |
| Capesize | CCB | Proud | 100% | 100% | 33.1 | 33.0 |
| Capesize | CDB | Angel | 119% | 119% | 43.0 | 36.0 |
| Capesize | CDB | Pretty | 125% | 125% | 45.1 | 36.0 |
| **Total Newco Beta** | | **4** | **112%** | **112%** | **154.3** | **138.0** |

DEKABANK copy. March 8 2013

AlixPartners

## Plan B – Split of Fleet via Newco: Group C
Structuring

‣ **Group C:** Contains 11 Bulkers financed by GB Global as well as the NSF-financed vessels.

‣ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Subject to adequate concessions, facilities could opt into Newco Alpha or desist from participation and take ships back

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Kamsarmax | GB Global | Cash | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | Coll./Chance | 96% | 96% | 26.0 | 27.0 |
| Kamsarmax | GB Global | City | 96% | 96% | 26.0 | 27.0 |
| Handymax | NSF | South | 84% | 84% | 19.3 | 23.0 |
| Handymax | NSF | East | 84% | 84% | 19.3 | 23.0 |
| Handymax | GB Global | West | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Secret | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Sharp | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Capital | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | Metropol | 103% | 103% | 23.7 | 23.0 |
| Handymax | GB Global | World | 103% | 103% | 23.7 | 23.0 |
| **Total Group C** | | **11** | **98%** | **98%** | **258.8** | **265.0** |

AlixPartners

DEKA BANK copy, March 8 20

# Plan B – Split of Fleet: Residual Oldco: Group D
## Structuring

▸ **Group D, Geden Oldco:** 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable. Baytur will be sold April 2013.

▸ **Assumptions :** Entity would require revision of current contractual debt service in order to maintain liquidity; Proceeds from the sale to Newco Alpha would provide liquidity to pay down payables.

| Type | Facility | Name | Current LTV | Pro Forma LTV | (A) Actual Outstanding Loan (PV of leases) | (B) Current Estimated Value |
|---|---|---|---|---|---|---|
| Aframax | FSL | Aqua | 234% | 234% | 60.8 | 26.0 |
| Aframax | FSL | Action | 234% | 234% | 60.8 | 26.0 |
| Aframax | Stealth | Spike | 177% | 177% | 55.0 | 31.0 |
| Aframax | Stealth | Avor | 176% | 176% | 54.5 | 31.0 |
| Suezmax | Icon 1 | Center | 145% | 145% | 67.9 | 47.0 |
| Panamax | Octavian 1 | Enjoy | 141% | 141% | 42.2 | 30.0 |
| Panamax | Octavian 2 | Marka | 128% | 128% | 41.0 | 32.0 |
| Handymax | Icon 2 | Fantastic | 157% | 157% | 29.9 | 19.0 |
| Handymax | Icon 2 | Amazing | 157% | 157% | 29.9 | 19.0 |
| Chartered - Afra_Tanker | not ours | CV Stealth | | | | |
| Chartered - Afra_Tanker | not ours | CS Stealth | | | | |
| **Subtotal SPVs** | | 11 [1] | **169%** | **169%** | **441.9** | **261.0** |
| **Corporate facility** | Bank Asya | | | | 39.5 | |
| **Total Group D** | | | | | **481.4** | |

[1] Baytur sold before the transaction

DEKABANK copy, March 2013

AlixPartners

# Plan B – Summary

Bank Exposure: By Facility

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 60.0 | 62.1 | 104% | 57.0 | 95% | (5.1) | -9% |
| HSH 2 | 43.0 | 46.1 | 107% | 40.9 | 95% | (5.3) | -12% |
| DVB | 25.0 | 25.3 | 101% | 23.8 | 95% | (1.5) | -6% |
| CB NLB BrLB | 41.0 | 40.5 | 99% | 39.0 | 95% | (1.5) | -4% |
| DVB NLB SAN | 63.0 | 62.1 | 99% | 59.9 | 95% | (2.3) | -4% |
| HSH 1 | 49.0 | 48.5 | 99% | 46.6 | 95% | (2.0) | -4% |
| DVB NLB | 131.0 | 125.2 | 96% | 124.5 | 95% | (0.8) | -1% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 38.5 | 84% | 38.5 | 84% | 0.0 | 0% |
| Natixis 1 | 27.0 | 23.4 | 87% | 23.4 | 87% | 0.0 | 0% |
| Natixis 2 | 16.0 | 14.0 | 88% | 14.0 | 88% | 0.0 | 0% |
| Octavian 2 | 32.0 | 41.0 | 128% | 41.0 | 128% | 0.0 | 0% |
| Octavian 1 | 30.0 | 42.2 | 141% | 42.2 | 141% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon 1 | 47.0 | 67.9 | 145% | 67.9 | 145% | 0.0 | 0% |
| Icon 2 | 38.0 | 59.7 | 157% | 59.7 | 157% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,628.8** | **112%** | **1,609.5** | **110%** | **(19.3)** | **-1%** |

DEKABANK copy. March 6 2012

*AlixPartners*

DRAFT & PRELIMINARY

# Plan B – Summary

**Bank Exposure: By Bank**

| | Estimated Value | Current debt | LTV Current | PF Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 94.1 | 95% | (0.8) | -1% |
| NLB | 170.1 | 168.8 | 99% | 161.6 | 95% | (7.1) | -4% |
| DVB | 106.3 | 103.4 | 97% | 100.9 | 95% | (2.5) | -2% |
| Commerzbank | 14.8 | 14.6 | 99% | 14.0 | 95% | (0.6) | -4% |
| BrLB | 13.1 | 13.0 | 99% | 12.5 | 95% | (0.5) | -4% |
| Santander | 23.8 | 22.5 | 95% | 22.0 | 93% | (0.6) | -2% |
| HSH | 92.0 | 94.6 | 103% | 87.4 | 95% | (7.2) | -8% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,635.0** | **112%** | **(19.3)** | **-1%** |

DEKABANK copy, March 6 2013

AlixPartners



IV. Financial Analysis

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRIVILEGED

# Assumptions
## General

▸ Business plan is based on the following main assumptions:

**Operations**

— 20 offhire days for drydocking
— Rates applied to reflect type of vessel, adjusted for contract terms

— Charter-out options exercised if below market rate
— No Opex inflation
— No working capital movements

**Investments**

— Dry docking taken from technical management schedule
— No asset sales
— Capex as per financing commitments

— Charter-in come off upon expiry
— Purchase obligations resold at loss/gain equal to current differential between market value and financial obligation

**Financing**

— No variation in current base rate
— Margins as per specific facilities (following pages)
— Amortization as per specific facilities
— No interest rate swap

— Refinancing of Royal providing $27.5m net liquidity post HSH repayment and before any repayment to yard ($10m)
— Extension of Namrun on same terms upon Nov-13 maturity; likely to be sold within 2-3 years

**Restructuring**

— No mechanism for bareboat catch-up
— Bareboat purchase options not exercised

— No restructuring fees
— All bank deferrals assumed to take on new profile or bullet repayment (no assumption on bareboat deferrals)

DEKABANK copy, March 6 2013

AlixPartners

DRAFT – PRELIMINARY

# Assumptions
## Rates

▸ The Company's market projections  imply CAGR increases of 8-11% for the majority of the fleet:

| $/day | 2013 | 2014 | 2015 | 2016 | 2017 | CAGR (12-17) |
|---|---|---|---|---|---|---|
| Aframax Tanker | 14,000 | 14,000 | 17,500 | 19,000 | 21,000 | 8% |
| Suezmax Tanker | 15,000 | 15,000 | 22,000 | 24,000 | 24,000 | 8% |
| Panamax Tanker | 13,500 | 13,500 | 14,500 | 17,500 | 17,500 | 5% |
| MR Pro/Chem Tanker | 13,000 | 13,000 | 15,000 | 15,000 | 15,000 | 3% |
| Ice Class Pro/Chem Tanker | 12,500 | 12,500 | 14,000 | 14,000 | 14,000 | 3% |
| Capesize Bulk Carrier | 15,000 | 17,500 | 20,000 | 22,000 | 22,000 | 11% |
| Kamsarmax Bulk Carrier | 12,500 | 15,000 | 15,000 | 20,000 | 20,000 | 15% |
| Supramax Bulk Carrier | 10,000 | 11,000 | 15,000 | 17,500 | 17,500 | 17% |
| Mini Bulk Carrier | 5,000 | 6,000 | 7,000 | 8,000 | 8,000 | 15% |

▸ The actual revenue increase accruing to the fleet through the projection differs as a result of the exercise of charter options and the JV structure on certain vessels (mainly Shell). Revenue CAGR through the period is 6.6%



Total Fleet Revenue by quarter ($m)

DEKABANK copy March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #1 | Terms |
|---|---|
| Senior Facilities | - NLB, Uni, DVB NLB, CB NLB BrLB, HSH1, HSH2, DVB NLB SAN, DVB NLB, DVB |
| Amount | - $485.5m ($504.7m outstanding pre-transaction) |
| Interest | - Base Rate: LIBOR<br>- Margin: 300bps w/ potential step-up based on prevalent rates |
| Amortization | - 9-month grace period<br>- Straight line profile based on first 15 years of vessel life<br>- 5 year maturity |
| Covenants | - 95% LTV at close<br>- 85% in Q4 14; 80% in Q4 15 |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts |

| NewCoAlpha #2 | Terms |
|---|---|
| Senior Facilities | - Lloyds |
| Amount | - $104.1m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin: No change (300bps) |
| Amortization | - Current profile<br>- Elimination of cash sweep |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #3 | Terms |
|---|---|
| Senior Facilities | - Natixis |
| Amount | - $37.4m (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Scope: 160bps<br>- Margin Namrun: 120bbps<br>- 300bps starting with refinancing of Namrun |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

| NewCoAlpha #4 | Terms |
|---|---|
| Senior Facilities | - Credit Europe 1st and 2nd Lien on Royal, Namrun, Scope |
| Amount | - $53.6m ($37.5m 1st plus $16.1m 2nd) |
| Interest | - Base Rate: n/a<br>- Interest Royal 1st Lien : 800bps<br>- Interest 2nd Lien: 1,000bps |
| Amortization | - Current profile |
| Covenants | - 2 year grace and 5 year profile |
| Security | - Share pledges, mortgages, earnings |
| Other | - n/a |

| NewCoAlpha #5 | Terms |
|---|---|
| Senior Facilities | - Dekabank |
| Amount | - $74.0 (no change) |
| Interest | - Base Rate: LIBOR<br>- Margin Tarsus: 245bps<br>- Margin Spot: 185bps<br>- Margin Clear: 245bps |
| Amortization | - Amortisation on a cash/pay-as-you-can basis from vessel earnings |
| Covenants | - Suspended |
| Security | - Share pledges, mortgages, earnings |
| Other | - Removal of all deposit accounts<br>- Coordination agreement prohibiting recourse to the remainder of the group |

| NewCoAlpha #6 | Terms |
|---|---|
| Senior Facilities | - NSF 2nd Lien (behind Unicredit) |
| Amount | - $25.5m (no change) |
| Interest | - Base Rate: n/a<br>- Fixed Margin: 1,150bps |
| Amortization | - Current profile |
| Covenants | - No change |
| Security | - 2nd Mortgages with possibility of additional 2nd priority mortgages on entire facilities |
| Other | - n/a |

DEKABANK copy, March 6 2013

AlixPartners

# Financial Analysis
## Summary of Terms: Newco Alpha

▸ The below tables summarises the features of debt on Newco Alpha



Note: surface area represents percentage share of total facility

AlixPartners

# Financial Analysis

## Newco Alpha Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 36.0 | 35.5 | 36.2 | 37.2 | 37.9 | 37.5 | 44.7 | 44.8 | 42.9 | 42.7 |
| OPEX | - | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) | (16.6) | (16.9) | (16.9) | (16.7) |
| Drydock | - | (0.4) | (1.0) | (0.5) | - | (0.9) | (0.8) | (0.9) | (1.8) | (0.9) | - |
| **EBITDA** | **-** | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | **-** | **18.7** | **17.8** | **19.1** | **20.3** | **20.0** | **19.9** | **27.2** | **26.1** | **25.1** | **26.0** |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | 74.4 | - | - | - | - | - | - | - | - | - |
| Bank Interest (Senior) | - | (6.9) | (6.9) | (6.8) | (6.8) | (6.6) | (6.4) | (6.2) | (6.0) | (5.9) | (5.7) |
| Bank Principal Repayments [1] | - | - | (4.5) | (4.5) | (15.5) | (18.3) | (18.3) | (19.0) | (19.3) | (19.4) | (19.4) |
| NSF Interest (2nd lien) | - | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) | (0.7) |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | **-** | **66.7** | **(12.2)** | **(12.1)** | **(23.0)** | **(25.6)** | **(25.4)** | **(26.0)** | **(26.1)** | **(26.0)** | **(25.9)** |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases [2] | - | (64.4) | - | - | - | - | - | - | - | - | - |
| **Net Investment** | **-** | **(64.4)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | | | | | | |
| **Net cashflow for period** | **-** | **21.0** | **5.6** | **7.1** | **(2.7)** | **(5.6)** | **(5.5)** | **1.2** | **0.0** | **(1.0)** | **0.1** |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | **-** | **20.8** | **26.4** | **33.5** | **30.7** | **25.1** | **19.6** | **20.8** | **20.8** | **19.9** | **20.0** |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Senior Debt Balance* | - | (754.5) | (754.5) | (750.0) | (745.5) | (730.0) | (711.7) | (693.4) | (674.4) | (655.1) | (635.6) |
| *NSF 2nd lien Balance* | - | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) | (25.5) |
| Leverage: (Debt/EBITDA) | 0.00x | 10.44x | 10.96x | 10.13x | 9.49x | 9.44x | 9.26x | 6.60x | 6.70x | 6.79x | 6.36x |
| Hamburg Jumbo Facility LTV [3] | | 95% | 96% | 97% | 98% | 97% | 96% | 95% | 94% | 93% | 92% |
| Hamburg Jumbo Value (depreciated) [4] | | 511.0 | 504.7 | 498.5 | 492.2 | 485.9 | 479.6 | 473.4 | 467.1 | 460.8 | 454.5 |
| Vessels | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 | 29 |

[1]  9 months principal deferral on the Jumbo facility would be necessary to establish minimum liquidity requirements. Shortfall in absence of this shown above.
[2]  Asset purchases net of new financing
[3]  Equity cure for 85% covenant in Q4 14 and 80% for Q4 16
[4]  Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

35

AlixPartners

DEKABANK copy. March 6 2013

# Financial Analysis

## Summary of Terms: Newco Beta

▸ The below tables summarises the features of debt on Newco Beta

| NewCo Beta: | Terms |
|---|---|
| Senior Facilities | - CCB, CDB |
| Amount | - $154.3m (no change) |
| Interest | - No change to existing agreements |
| Amortization | - No change to existing agreements |
| Covenants | - No change to existing agreements |
| Security | - No change to existing agreements |
| Other | - n/a |

DEKABANK copy, March 8 2013

AlixPartners

# Financial Analysis

## Newco Beta Quarterly Cashflow

| | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | |
| Income | - | 9.3 | 9.2 | 9.4 | 8.8 | 6.4 | 6.4 | 7.2 | 7.4 | 7.4 | 7.3 |
| OPEX | - | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) | (2.2) |
| Drydock | - | - | - | (0.9) | (0.9) | - | - | - | - | - | - |
| **EBITDA** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| Working capital changes | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | - | 7.1 | 7.0 | 6.4 | 5.8 | 4.2 | 4.2 | 5.0 | 5.2 | 5.2 | 5.1 |
| | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | - | (1.3) | (1.3) | (1.2) | (1.2) | (1.1) | (1.1) | (1.0) | (1.0) | (1.0) | (0.9) |
| Bank Principal Repayments | - | (6.1) | (6.1) | (6.1) | (6.4) | (6.4) | (6.4) | (6.4) | (6.4) | (3.4) | (3.4) |
| Bareboat Payments | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | - | (7.4) | (7.4) | (7.3) | (7.6) | (7.6) | (7.5) | (7.4) | (7.4) | (4.4) | (4.4) |
| | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | |
| Capex | - | - | - | - | - | - | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - | - | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | |
| **Net cashflow for period** | - | (0.4) | (0.4) | (0.9) | (1.8) | (3.3) | (3.3) | (2.4) | (2.3) | 0.8 | 0.7 |
| | | | | | | | | | | | |
| **Cumulative net cash balance** | - | (0.4) | (0.8) | (1.7) | (3.5) | (6.8) | (10.2) | (12.6) | (14.8) | (14.1) | (13.3) |
| | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | |
| *Debt Balance* | - | (161.3) | (155.2) | (149.0) | (142.9) | (136.5) | (130.0) | (123.6) | (117.2) | (110.8) | (107.3) |
| *Bareboat balance* | - | - | - | - | - | - | - | - | - | - | - |
| Leverage: (Debt/EBITDA) | 0.00x | 5.69x | 5.54x | 5.82x | 6.20x | 8.06x | 7.77x | 6.13x | 5.69x | 5.37x | 5.27x |
| Loan to value | 0% | 118% | 115% | 111% | 108% | 104% | 100% | 96% | 92% | 88% | 86% |
| Value (depreciated) | 138.0 | 136.7 | 135.4 | 134.1 | 132.8 | 131.4 | 130.1 | 128.8 | 127.5 | 126.2 | 124.9 |
| Vessels | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |

[1] Value based on depreciation of current market value; depreciation based on remaining life and scrap value (DWT/6*$400)

DEKABANK copy. March 6 2013

AlixPartners

# Financial Analysis

## Geden Oldco Quarterly Cashflow

| | Q1-13 | Q2-13 | Q3-13 | Q4-13 | Q1-14 | Q2-14 | Q3-14 | Q4-14 | Q1-15 | Q2-15 | Q3-15 | Q4-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | | | | | | | | |
| Income | 64.9 | 59.0 | 24.3 | 24.3 | 25.5 | 26.3 | 25.9 | 25.6 | 31.6 | 32.3 | 29.0 | 28.8 |
| OPEX | (29.8) | (28.9) | (12.5) | (12.4) | (12.3) | (12.5) | (12.5) | (12.4) | (12.3) | (12.5) | (11.4) | (11.0) |
| Drydock | (0.4) | (0.8) | - | - | (0.5) | - | - | - | - | (0.7) | (1.3) | - |
| **EBITDA** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| Working capital changes [1] | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net operational cashflow** | 34.7 | 29.3 | 11.8 | 11.9 | 12.7 | 13.7 | 13.3 | 13.2 | 19.3 | 19.1 | 16.3 | 17.7 |
| | | | | | | | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | | | | | | | |
| Equity injections | - | - | - | - | - | - | - | - | - | - | - | - |
| Bank Interest | (10.6) | (9.8) | - | - | - | - | - | - | - | - | - | - |
| Bank Principal Repayments | (23.8) | (29.9) | (39.5) | - | - | - | - | - | - | - | - | - |
| Bareboat Payments | (17.8) | (19.8) | (20.8) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| Pre-Del Drawdown | 45.0 | 8.5 | - | - | - | - | - | - | - | - | - | - |
| Bareboat Drawdowns | 119.3 | 25.3 | 25.3 | - | - | - | - | - | - | - | - | - |
| Pre-Del Repayments | (57.9) | (12.2) | (13.2) | - | - | - | - | - | - | - | - | - |
| **Net Financing Cashflow** | 54.0 | (38.0) | (48.2) | (20.8) | (20.4) | (20.6) | (20.7) | (20.7) | (20.3) | (20.5) | (18.6) | (18.6) |
| | | | | | | | | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | | | | | | | | |
| Capex | (82.7) | (42.3) | - | - | - | - | - | - | - | - | [2] | - |
| Asset Sale net proceeds | - | 5.5 | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| **Net Investment** | (82.7) | (36.8) | 44.6 | - | - | - | - | - | - | - | (23.9) | - |
| | | | | | | | | | | | | |
| **Net cashflow for period** | 6.0 | (45.5) | 8.2 | (8.9) | (7.7) | (6.9) | (7.4) | (7.6) | (0.9) | (1.4) | (26.2) | (0.8) |
| | | | | | | | | | | | | |
| **Cumulative net cash balance** | 41.0 | (4.5) | 3.7 | (5.3) | (12.9) | (19.8) | (27.2) | (34.8) | (35.7) | (37.1) | (63.4) | (64.2) |
| | | | | | | | | | | | | |
| **RATIOS (Beginning of Period)** | | | | | | | | | | | | |
| *Debt Balance* | (1,109.5) | (1,064.2) | - | - | - | - | - | - | - | - | - | - |
| *Bareboat balance* | (471.3) | (453.4) | (433.7) | (412.8) | (392.0) | (371.7) | (351.1) | (330.3) | (309.6) | (289.3) | (268.8) | (250.3) |
| Vessels | 56 | 55 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 20 | 20 |

[1] Working Capital change reflects paydown of corporate facility with cash from sale transaction; $10m ooutstanding to Rongsheng is left unpaid
[2] Purchase obligations on sale leasebacks assumed to generate cash loss  equivalent to deficiency between current outstanding obligation and market value

AlixPartners



# V. Conclusions

DEKABANK copy, March 6 2013

AlixPartners

# Current Proposal
## Strategy and Objectives

▸ The solution provides, directly or indirectly, for the primary objectives held by the different stakeholders.

| Objective | Comments |
|---|---|
| 1. Compensate stakeholders adequately for their risk-weighted capital exposure and concessions | • Assets with similar risk profile pooled together provides for better aligned incentives<br>• Lenders provided with adequate equity cushion, margins, and covenants<br>• Provides for recategorization of exposure from "Geden Holdings Ltd" to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing support |
| 2. Constrain formal or informal cross subsidization between stakeholders related to different underlying assets | • While it reduces the portfolio effect of a broader fleet, combining similar assets together limits risk of cross subsidies going from high to low collateral vessels<br>• Pooling through creation of unique syndicate facility would facilitate granting of a second priority mortgage through the fleet as well as increase liquidity of bank assets, enabling lenders to sell out of assets without disrupting operations |
| 3. Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests) | • Common set of incentives and exposure to recovery protects lenders from disruptive behaviour onset by other stakeholders with a markedly different position<br>• Sister-ship arrest risk minimized given shareholding structure in Newco |
| 4. Maximize options for stakeholders and potential for self-selection | • Rebasing of assets can provide mechanism for transfer from one Newco profile to another (ie. Group C and D into A)<br>• Opting out of the scheme can be achieved via mutually agreed terms for redelivery of vessel to relevant lender |

DEKABANK copy    March 6 2013

40

AlixPartners



# Contents

A.    Facility Description

B.    Financials: Existing

C.    Market Overview

DEKABANK copy, March 6 2013

AlixPartners

DRAFT & PRELIMINARY

# Appendix
## Facility Description

| Facility | HSH1 | HSH2 | Natixis1 | Natixis2 | Icon1 | Icon2 | Octavian1 | Octavian2 |
|---|---|---|---|---|---|---|---|---|
| Debt / Bareboat | Debt | Debt | Debt | Debt | Bareboat | Bareboat | Bareboat | Bareboat |
| Vessels | Hero | Citron / Citrus | Scope | Namrun | Center | Fantasic / Amazing | Enjoy | Marka |
| Lender group | HSH | HSH | Natixis | Natixis | Icon [DVB] | Icon [DVB NLB] | Octavian [DVB] | Octavian [NLB] |

DEKABANK copy March 6 2013

AlixPartners

# Appendix: Transaction Analysis

Newco Beta Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Existing debt rollover | 154.3 | Purchase at outstanding debt level | 154.3 |
| **Total Sources** | **$154.3** | **Total Uses** | **$154.3** |

Additional liquidity to maintain operational cash balance not shown; Estimated at $20m and could be financed via equity of deferrals

DEKABANK copy, March 6 2013

43

AlixPartners

# Appendix: Transaction Analysis
Residual Oldco Sources and Uses

| Sources | | Uses | |
|---|---|---|---|
| Alpha Sale Receipts | 828.6 | Alpha Vessels Debt Repayment | 780.0 |
| Beta Sale Receipts | 154.3 | Beta Vessels Debt Repayment | 154.3 |
| Baytur Sale Receipts | 13.6 | Baytur Debt Repayment | 8.4 |
| Group C Sale Receipts | 258.8 | Group C Repayment | 258.8 |
| | | Change in Working Capital (Repayment of A/P) & corp. facility | 53.8 |
| **Total Sources** | **$1,255.3** | **Total Uses** | **$1,255.3** |

AlixPartners



# Assumptions
Revenue





DEKABANK Copy March 6 2013

AlixPartners

DRAFT & PRELIMINARY

## Assumptions
Revenue





DEKABANK copy March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

Newco Alpha Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 71.5 | 148.8 | 175.2 | 181.3 | 186.7 |
| OPEX | (33.7) | (67.2) | (67.2) | (67.3) | (67.2) |
| Drydock | (1.4) | (2.3) | (3.6) | (6.3) | (2.3) |
| **EBITDA** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **36.5** | **79.3** | **104.4** | **107.7** | **117.2** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | 74.4 | - | - | - | - |
| Bank Interest (Senior) | (13.8) | (26.7) | (23.8) | (20.8) | (17.6) |
| Bank Principal Repayments | (4.7) | (56.6) | (77.2) | (79.1) | (78.2) |
| NSF Interest (2nd lien) | (1.5) | (2.9) | (2.9) | (2.9) | (2.9) |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **54.4** | **(86.2)** | **(104.0)** | **(102.7)** | **(98.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | (64.4) | - | - | - | - |
| **Net Investment** | **(64.4)** | **-** | **-** | **-** | **-** |
| | | | | | |
| **Net cashflow for period** | **26.4** | **(6.8)** | **0.4** | **4.9** | **18.4** |
| | | | | | |
| **Cumulative net cash balance** | **26.4** | **19.6** | **20.0** | **24.9** | **43.3** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Senior Debt Balance* | *(754.5)* | *(749.8)* | *(693.2)* | *(616.0)* | *(536.9)* |
| *NSF 2nd lien Balance* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* | *(25.5)* |
| Leverage: (Debt/EBITDA) | 21.40x | 9.77x | 6.88x | 5.96x | 4.80x |
| Hamburg Jumbo Facility LTV | 95% | 97% | 95% | 91% | 86% |
| Value (depreciated) | 511.0 | 498.5 | 473.4 | 448.3 | 423.2 |
| Vessels | 29 | 29 | 29 | 29 | 29 |

DEKABANK Copy, March 8 2013

AlixPartners

# Appendix: Additional Financial Analysis

Newco Beta Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 18.5 | 31.0 | 29.2 | 31.3 | 32.1 |
| OPEX | (4.4) | (8.8) | (8.8) | (8.8) | (8.8) |
| Drydock | - | (1.7) | - | (1.3) | - |
| **EBITDA** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **14.1** | **20.6** | **20.4** | **21.3** | **23.4** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (2.6) | (4.6) | (3.9) | (3.3) | (2.7) |
| Bank Principal Repayments | (12.3) | (25.4) | (19.7) | (20.2) | (20.2) |
| Bareboat Payments | - | - | - | - | - |
| Pre-Del Drawdown | - | - | - | - | - |
| Bareboat Drawdowns | - | - | - | - | - |
| Pre-Del Repayments | - | - | - | - | - |
| **Net Financing Cashflow** | **(14.8)** | **(30.0)** | **(23.6)** | **(23.5)** | **(22.8)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | - | - | - | - | - |
| Asset Purchases | - | - | - | - | - |
| **Net Investment** | - | - | - | - | - |
| | | | | | |
| **Net cashflow for period** | **(0.8)** | **(9.4)** | **(3.2)** | **(2.2)** | **0.5** |
| | | | | | |
| **Cumulative net cash balance** | **(0.8)** | **(10.2)** | **(13.3)** | **(15.6)** | **(15.0)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(161.3)* | *(149.0)* | *(123.6)* | *(103.9)* | *(83.8)* |
| *Bareboat balance* | | | | | |
| Leverage: (Debt/EBITDA) | 11.45x | 7.24x | 6.05x | 4.89x | 3.59x |
| Loan to value | 117% | 112% | 97% | 85% | 72% |
| Value (depreciated) | 138.0 | 132.8 | 127.5 | 122.3 | 117.0 |
| Vessels | 4 | 4 | 4 | 4 | 4 |

DEKABANK confi. March 6 2013

AlixPartners

# Appendix: Additional Financial Analysis

Residual Oldco Five Year Cashflow

| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | | |
| Income | 172.5 | 103.2 | 121.6 | 121.3 | 105.5 |
| OPEX | (83.7) | (49.7) | (47.2) | (39.6) | (33.6) |
| Drydock | (1.2) | (0.5) | (2.0) | (1.9) | (2.3) |
| **EBITDA** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| Working capital changes | - | - | - | - | - |
| **Net operational cashflow** | **87.7** | **52.9** | **72.4** | **79.7** | **69.6** |
| | | | | | |
| **FINANCING ACTIVITIES** | | | | | |
| Equity injections | - | - | - | - | - |
| Bank Interest | (20.5) | - | - | - | - |
| Bank Principal Repayments | (93.2) | - | - | - | - |
| Bareboat Payments | (79.2) | (82.4) | (77.9) | (64.0) | (49.6) |
| Pre-Del Drawdown | 53.4 | - | - | - | - |
| Bareboat Drawdowns | 169.8 | - | - | - | - |
| Pre-Del Repayments | (83.3) | - | - | - | - |
| **Net Financing Cashflow** | **(53.0)** | **(82.4)** | **(77.9)** | **(64.0)** | **(49.6)** |
| | | | | | |
| **INVESTMENT ACTIVITIES** | | | | | |
| Capex | (125.0) | - | - | - | - |
| Asset Sale net proceeds | 50.1 | - | (23.9) | (37.2) | (24.1) |
| **Net Investment** | **(75.0)** | **-** | **(23.9)** | **(37.2)** | **(24.1)** |
| | | | | | |
| **Net cashflow for period** | **(40.3)** | **(29.5)** | **(29.4)** | **(21.5)** | **(4.2)** |
| | | | | | |
| **Cumulative net cash balance** | **(5.3)** | **(34.8)** | **(64.2)** | **(85.7)** | **(89.9)** |
| | | | | | |
| **RATIOS (Beg. of Period)** | | | | | |
| *Debt Balance* | *(1,109.5)* | *-* | *-* | *-* | *-* |
| *Bareboat balance* | *(471.3)* | *(392.0)* | *(309.6)* | *(231.7)* | *(167.7)* |
| Vessels | 56 | 22 | 20 | 17 | 14 |

DEKABANK copy, March 6 2013

49

AlixPartners



# Appendix

Bank Exposure: Hamburg reduced to 90% LTV

▸ Equity required if LTV improved to 90% is $90.0m ($25.6m more than at an LTV of 95%)

| | Estimated Value | Current debt | LTV Before | New Debt | LTV After | Change in debt | Change in LTV |
|---|---|---|---|---|---|---|---|
| Unicredit | 99.0 | 94.9 | 96% | 89.1 | 90% | (5.8) | -6% |
| NLB | 170.1 | 168.8 | 99% | 153.1 | 90% | (15.7) | -9% |
| DVB | 106.3 | 103.4 | 97% | 95.6 | 90% | (7.8) | -7% |
| Commerzbank | 14.8 | 14.6 | 99% | 13.3 | 90% | (1.3) | -9% |
| BrLB | 13.1 | 13.0 | 99% | 11.8 | 90% | (1.1) | -9% |
| Santander | 23.8 | 22.5 | 95% | 21.2 | 89% | (1.4) | -6% |
| HSH | 92.0 | 94.6 | 103% | 82.8 | 90% | (11.8) | -13% |
| GB Global | 219.0 | 220.3 | 101% | 220.3 | 101% | 0.0 | 0% |
| CDB | 72.0 | 88.1 | 122% | 88.1 | 122% | 0.0 | 0% |
| CCB | 66.0 | 66.2 | 100% | 66.2 | 100% | 0.0 | 0% |
| Credit Europe | 50.0 | 53.6 | 107% | 53.6 | 107% | 0.0 | 0% |
| Lloyds | 137.0 | 104.1 | 76% | 104.1 | 76% | 0.0 | 0% |
| NSF | 46.0 | 64.0 | 139% | 64.0 | 139% | 0.0 | 0% |
| Natixis | 35.0 | 30.4 | 87% | 30.4 | 87% | 0.0 | 0% |
| Octavian | 62.0 | 83.2 | 134% | 83.2 | 134% | 0.0 | 0% |
| Deka | 54.0 | 74.0 | 137% | 74.0 | 137% | 0.0 | 0% |
| Icon | 85.0 | 127.6 | 150% | 127.6 | 150% | 0.0 | 0% |
| Stealth | 62.0 | 109.5 | 177% | 109.5 | 177% | 0.0 | 0% |
| FSL | 52.0 | 121.6 | 234% | 121.6 | 234% | 0.0 | 0% |
| **TOTAL** | **1,459.0** | **1,654.3** | **113%** | **1,609.4** | **110%** | **(44.8)** | **-3%** |

AlixPartners

DRAFT & PRELIMINARY

# Appendix

Potential loss on bareboat purchase obligations

▸ There exist a number of obligations to purchase at future dates under the following bareboat agreements. The cashflows reflect the following losses occurring via purchase and resale at the obligation date. It assumes no changes to market values but applies depreciation to current estimated values over the time until the purchase and resale date. If the vessels were retained rather than crystallize the loss, then there would be a greater cash outflow for refinancing plus further ongoing loss on vessels were these occur.

|  | Purchase obligation ($m) | Estimated value today ($m) | Loss on resale | Depreciated value ($m) | Loss on resale | Purchase Ob. Date | Years | Monthly depreciation |
|---|---|---|---|---|---|---|---|---|
| Avor | 51.5 | 31 | -20.5 | 27.6 | -23.9 | Aug-15 | 2.6 | 0.11 |
| Enjoy | 38.5 | 30 | -8.5 | 25.5 | -13.0 | Apr-16 | 3.2 | 0.11 |
| Centre | 64.5 | 47 | -17.5 | 40.2 | -24.3 | Jun-16 | 3.4 | 0.17 |
| Marka | 37 | 32 | -5 | 26.0 | -11.0 | Apr-17 | 4.2 | 0.12 |
| Fantastic | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| Amazing | 21.5 | 19 | -2.5 | 14.9 | -6.6 | Oct-17 | 4.8 | 0.07 |
| **TOTAL** | **234.5** | **178** | **-56.5** | **149.2** | **-85.3** | | | |

DEKABANK copy. March 6 2013



# Global Locations

AlixPartners is ready to field a team of relevant experts whenever and wherever they are needed. Our professionals work from 15 global offices in more than a dozen different countries. They speak more than 50 languages, and have experience in every corner of the world. Call us, we'll be there when it really matters.

**Chicago**
300 N. LaSalle Street
Suite 1900
Chicago, IL  60654
312.346.2500

**Dallas**
2101 Cedar Springs Road
Suite 1100
Dallas, TX 75201
214.647.7500

**Detroit**
2000 Town Center
Suite 2400
Southfield, MI 48075
248. 358.4420

**Dubai**
Gate Village 10, Level 03
P.O. Box 125115
Dubai Intl Financial Centre
Dubai, United Arab Emirates
+971.4.401.9246

**Düsseldorf**
Königsallee 59 a
40215 Düsseldorf
Germany
+49.211.97.55.10.00

**London**
20 North Audley Street
London W1K 6WE
United Kingdom
+44.20.7098.7400

**Los Angeles**
515 S. Flower Street
Suite 3050
Los Angeles, CA  90071
213.437.7100

**Milan**
Corso Matteotti 9
20121 Milan
Italy
+39.02.360.12000

**Munich**
Mauerkircherstr. 1 a
81679 Munchen
Germany
+49.89.20.30.40.00

**New York**
40 West 57th Street
New York, NY  10019
212.490.2500

**Paris**
49/51 Avenue George V
75008 Paris
France
+33.1.76.74.72.00

**San Francisco**
4 Embarcadero Center
31st Floor, Suite 3110
San Francisco, CA  94111
415.848.0283

**Shanghai**
Suite 6111
Plaza 66 Building I
1266 Nan Jing West Road
Shanghai, 200040 China
+8621.6171.7555

**Tokyo**
Marunouchi Building 33F
2-4-1 Marunouchi
Chiyoda-ku
Tokyo 100-6333  Japan
+81.3.5533.4800

**Washington, DC**
1602 L Street, NW
Suite 300
Washington, DC 20036
202.756.9000

© AlixPartners, LLP, 2010

DEKABANK copy, March 8 2013

AlixPartners

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **PSARA ENERGY, LTD.** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **SPACE SHIPPING, LTD.; GEDEN HOLDINGS** | : | |
| **LTD.; ADVANTAGE START SHIPPING,** | : | |
| **LLC; GENEL DENIZCILIK NAKLIYATI A.S.** | : | |
| **A/K/A GEDEN LINES; ADVANTAGE** | : | |
| **TANKERS, LLC; ADVANTAGE HOLDINGS,** | : | **ADMIRALTY** |
| **LLC;  FORWARD HOLDINGS, LLC;** | : | |
| **MEHMET EMIN KARAMEHMET;** | : | |
| **GULSUN NAZLI  KARAMEHMET -** | : | |
| **WILLIAMS; and TUĞRUL TOKGÖZ** | : | |
| | : | |
| **Defendants** | : | |

## ATTORNEY DECLARATION

Pursuant to 28 U.S.C. § 1746, this declaration is executed by George A. Gaitas, counsel for Plaintiff, PSARA ENERGY, LTD., in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-captioned Admiralty Cause.

I, George A. Gaitas, declare under the penalty of perjury:

I am a Member of the firm of GAITAS, KENNEDY & CHALOS, P.C., attorneys for Plaintiff in the above referenced matter.

I am familiar with the circumstances of the Original Verified Complaint, and I submit this declaration in support of Plaintiff's request for the issuance of Process of Maritime Attachment and Garnishment of the property of the Defendants, SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.; ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET;

1

GULSUN NAZLI KARAMEHMET-WILLIAMS; and TUGRUL TOKGOZ, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

I have personally inquired or have directed inquiries into the presence of the Defendants in this District.

I have directed attorneys in my firm to check with the office of the Louisiana Secretary of State, using the Secretary of State's database, to determine whether the Defendants can be located within this District. SPACE SHIPPING LTD.; ADVANTAGE START SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A GEDEN LINES; GEDEN HOLDINGS, LTD; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC; FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI KARAMEHMET-WILLIAMS; TUGRUL TOKGOZ are not registered with the Louisiana Secretary of State.  Accordingly, I have determined that, as of April 20, 2018, none of these Defendants are incorporated or registered as foreign corporations pursuant to the laws of Louisiana, and have neither nominated nor appointed any agent for the service of process within this District.

I have directed attorneys in my firm to engage a search of the Superpages telephone directory on the internet, and determined that there are no telephone listings or addresses for the Defendants within this District.

I have engaged in a "Google search" in order to determine whether any of the Defendants can be located within this District.  The Google search results did not provide a listing for the named Defendants save for GEDEN HOLDINGS, LTD. for which it showed a former registration with the Secretary of State of Louisiana, which was withdrawn in 2016, and remains inactive.

2

I am unaware of any general or managing agent(s) of the named Defendants within this District.

In that I have been able to determine that the Defendants have not appointed agent for service of process within the Eastern District of Louisiana, and that I have found no indication that the Defendant can be found within this District for the purposes of Rule B, I have formed a good faith belief based on my own investigation and that of the attorneys under my direction that the Defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District that may defeat the conditions for issuance of process of maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my investigation and that performed by attorneys in my firm under my direction that the Defendants cannot be found within this District for purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: April 20, 2018
      Houston, Texas

Respectfully submitted,

Gaitas, Kennedy & Chalos, P.C.

By:   _/s/ George A. Gaitas_____

George A. Gaitas
Louisiana State Bar No. 05879
Federal Bar No. 705176
6250 Westpark Dr.
Suite 222
Houston, Texas 77057
Telephone: 281-501-1800
Fax: 832-962-8178
E-mail:gaitas@gkclaw.com

3

*Attorneys for Plaintiff*

PSARA ENERGY, LTD.