IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TANK PUNK, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-1645 |
| | § | Consolidated with |
| SPIKE SHIPPING, LTD., ADVANTAGE | § | CIVIL ACTION NO. H-15-1675 |
| ARROW SHIPPING, LLC, GEDEN | § | |
| HOLDINGS LTD., GENEL DENIZCILIK | § | |
| NAKLAYATI A.S. a/k/a GEDEN LINES, | § | |
| ADVANTAGE TANKERS, LLC, | § | |
| ADVANTAGE HOLDINGS, LLC, | § | |
| FORWARD HOLDINGS, LLC., | § | |
| MEHMET EMIN KARAMEHMET and | § | |
| GULSUN NAZLI KARAMEHMET | § | |
| WILLIAMS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING DEFENDANTS' AMENDED MOTION TO VACATE ATTACHMENTS AND DISMISS

Before the Magistrate Judge upon referral from the District Judge is Defendants' Amended

Motion to Vacate Attachment and Dismiss (Document No. 52), in which Defendants Advantage

Arrow Shipping LLC, Advantage Tankers LLC, Advantage Holdings LLC, and Gulsun Nazli

Karamehmet Williams (the "Advantage Defendants") seek an Order vacating the Rule B attachment

and dismissing Plaintiff Tank Punk, Inc.'s claims against them. Having considered the motion, the

response, the parties' additional briefing, the argument at a hearing held on February 9, 2016, and

the evidence in the record, the Magistrate Judge RECOMMENDS, for the reasons set forth below,

that Defendants' Amended Motion to Vacate Attachment and Dismiss (Document No. 52) be

GRANTED.



EXHIBIT
*A*

C.A. No. 1:18-cv-00178

## I.   Background and Procedural History

This is a proceeding under Rule B of the Supplemental Rules for Admiralty or Maritime Claims, pursuant to which the M/V ADVANTAGE ARROW was attached. But this is not a straight-forward Rule B attachment case. Here, the attachment of M/V ADVANTAGE ARROW was based on allegations that the M/V ARROW ADVANTAGE was *nominally* owned by the Advantage Defendants, but *beneficially* owned and controlled by Geden Holdings Ltd. and its principal, Mehmet Emin Karamehmet, through a series of business structure transactions, pursuant to which Geden Holdings Ltd. and its principal Mehmet Emin Karamehmet have attempted to insulate themselves from their creditors. Stated differently, the attachment in this case was based on an alter ego/piercing the corporate veil theory that Geden Holdings Ltd., by and through its principal, Mehmet Emin Karamehmet, is one and the same as the Advantage Defendants, thereby justifying the attachment of the Advantage Defendants' property to satisfy and/or provide security for claims against Geden Holdings, Ltd.

Since the attachment, there have been several notable developments. First, by agreement of the parties, security in the amount of $2,200,000.00 was posted and deposited in the registry of the court, and the M/T ADVANTAGE ARROW was released. Second, again by agreement of the parties, $682,800.00 of that posted security was disbursed to the Advantage Defendants through their escrow agent. Third, the claims of Plaintiff Eclipse Liquidity, Inc. and Plaintiff Psara Energy Ltd. for security in this case have been resolved, leaving only the claims of Tank Punk, Inc. And finally, on February 24, 2016, Tank Punk filed a First Amended Complaint (Document No. 47), adding, for the first time, Spike Shipping, Ltd., Geden Holdings, Ltd., Mehmet Emin Karamehmet and Gulsun

2

Nazli Karamehmet Williams as Defendants, and reflecting that only Plaintiff Tank Punk has claims remaining in this case. Those claims are based on an alleged breach of a charter agreement[1] between Plaintiff Tank Punk, Inc. (the vessel owner) on the one side, and Geden Holdings, Ltd. (the original charterer and subsequent performance guarantor) and Spike Shipping, Ltd. (the subsequent charterer), on the other, for the charter of the M/T SPIKE, with the alleged damages consisting of unpaid charter hire ($232,796.82), hull and machinery repairs, drydocking, and a 60-month coating application ($1,070,000.00), off-hire damages for time spent completing repairs ($1,225,000.00), interest ($155,114.00) and attorneys' fees ($200,000.00). Amended Complaint (Document No. 47) at 6, 23. In addition to seeking to maintain the attachment of the funds remaining in the registry of the court ($1,517,200.00), the First Amended Complaint also seeks to attach additional assets of Defendants in this District up to the amount of Tank Punk's claims.[2]

The current alter ego/piercing the corporate veil allegations in support of Tank Punk's claims are that the "Advantage Defendants" are the "successor business entities of" the "Geden-Group" entities (Spike Shipping, Ltd., Geden Holdings Ltd., Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines, and Mehmet Emin Karamehmet), and that the Advantage Defendants: (1) "have acquired and are . . . in possession of the trading assets of" the Geden-Group entities; (2) "occupy and carry on

---

[1] A "charter party is the principal document of the tramp shipping industry. It is a specialized form of contract for the hire of an entire ship, specified by name. . . . The party that obtains the use and service of the ship is called the charterer or shipper; the party supplying the ship is the carrier or shipowner." 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 11-1 (5th ed.).

[2] In response to the Amended Motion to Vacate Attachment, Tank Punk, Inc. argues, somewhat inconsistently with its position in its Amended Complaint, that it is only the sum of $1,517,200.00, currently in the registry of the Court, that is subject to attachment. Document No. 56 at 2-3.

3

business from the same business premises as" the Geden-Group entities; (3) "act by and through identical personnel as" the Geden-Group entities; (4) "have common officers and directors with" the Geden Group entities; (5) "have taken over and are servicing the same customers as were being serviced by" the Geden-Group entities; (6) "have virtually the same financing banks financing their business as" the Geden-Group entities; and (7) "have as shareholders members of the same family group" as that of the Geden-Group entities. First Amended Complaint (Document No. 47) at 8. Against those alter ego allegations is the Advantage Defendants' Amended Motion to Vacate the Attachment and Dismiss. In that motion, the Advantage Defendants first argue that Tank Punk's alter ego allegations, and the evidence it has submitted, are insufficient to support a Rule B attachment of the Advantage Defendants' assets based on an alter ego theory. The Advantage Defendants then argue, additionally and alternatively, that the Rule B attachment cannot be maintained by Tank Punk because Geden Holdings, Ltd. – now named as Defendant – is present in this District, rendering Rule B inapplicable.

The parties have conducted discovery on the alter ego issue, have argued their positions at a hearing held on February 9, 2016, and have submitted substantial briefing and evidence. The Advantage Defendants' Amended Motion to Vacate is ripe for ruling.


## II.    Standard of Review

Rule B provides for the attachment of a defendant's property when the defendant "is not found within the district":

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in

4

the process.

"'Rule B allows a district court to take jurisdiction over a defendant in an admiralty or maritime action by attaching property of the defendant.' The rule has two purposes: 'to secure a respondent's appearance and to assure satisfaction in case the suit is successful.'" *Malin Int'l Ship Repair and Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 244 (5th Cir. 2016) (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 421 (5th Cir. 2001) and *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950)). [3]

A Rule B attachment is warranted if four requirements are met: 1) the plaintiff "has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006). It is the plaintiff's initial burden to show that each of these four requirements have been met. *Id.* Rule B cannot be used when a defendant can be "found" in the district, meaning that "1) the defendant can be found within the district in terms of jurisdiction, and 2) the defendant can be found within the district for service of process." *Heidmar, Inc. v. Anomina Ravennate Di Armamento Sp.A. of Ravenna*, 132 F.3d 264, 268 (5th Cir. 1998); *see also Naveiros*

---

[3] The difference between a Rule B attachment and an in rem action under Rule C was succinctly explained by the First Circuit as follows:

> An *in rem* action [under Rule C] differs from maritime attachment [under Rule B] in that an *in rem* action is brought against the vessel itself as defendant. By contrast, a vessel is attached only as an auxiliary to an in personam claim because the vessel is property belonging to the defendant.

*Navieros Inter-Americanos v. M/V Vasilla Express*, 120 F.3d 304, 313 (1st Cir. 1997) (quoting 2 Schoenbaum, Admiralty & Maritime Law § 21-3, at 478-49).

EXHIBIT 1

*Inter-Americanos, S.A. de C.V. v. M/V Vasilla Express*, 120 F. 3d 304, 315 (1st Cir. 1997) (explaining

Rule B's "found" language in terms of personal jurisdiction and amenability to service of process).

Once property has been attached pursuant to Rule B, the property can be released upon the

posting of a bond, upon the agreement of the parties, or upon an order of the court. *See* FED. R. CIV.

P. SUPP. E(5)(a),(b),(c). A person claiming an interest in the attached property may also seek its

release by filing a motion pursuant to Rule E(4)(f), which provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall
> be entitled to a prompt hearing at which the plaintiff shall be required to show why
> the arrest or attachment should not be vacated or other relief granted consistent with
> these rules.

When a motion to vacate an attachment is filed under Rule E(4)(f), it is the plaintiff's burden to

show that the Rule B attachment was warranted. FED. R. CIV. P. SUPP. E(4)(f) ("the plaintiff shall

be required to show"); *Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527, 541 (4th Cir. 2013)

("To avoid vacatur of attachment, it is the plaintiff's burden to show. . . "). In addition, when, as

here, the attachment is based on alter ego/piercing the corporate veil allegations, the party relying

on those allegations for a Rule B attachment must allege and show: "(1) the owner exercised

complete control over the corporation with respect to the transaction at issue and (2) such control

was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas

S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003) (*Bridas I*), *cert. denied*,

541 U.S. 937 (2004); *Naftomar Shipping and Trading Co., Ltd. v. KMA Int'l S.A.*, Civil Action No.

V-11-2, 2011 WL 888951 *4 (S.D. Tex. March 10, 2011) (citing *Bridas I*). That burden on plaintiff

is heightened when the parties have conducted discovery on the alter ego veil piercing theory and

have been afforded the opportunity for an evidentiary hearing. *See Olendorff Carriers Gmbh & Co.,

KG v. Grand China Shipping (Hong Kong) Co., Ltd.*, Civ. Case No. 2:12-CV-00074, 2013 WL

6

3937450 *2 (S.D. Tex. July 30, 2013) ("While a plaintiff initially need only make a *prima facie* showing that a defendant is amenable to suit, when a district court permits jurisdictional discovery and conducts a full evidentiary hearing on the issue of jurisdiction, the plaintiff must then prove its jurisdictional facts by a preponderance of the evidence.") (internal citations omitted); *see also Seatrade Group N.V. v. 6,785.5 Metric Tons of Cement*, No. Civ. A. H-05-2771, 2005 WL 3878026 *2 (S.D. Tex. Dec. 7, 2005) ("The plaintiff must show by a preponderance of the evidence that it is entitled to a valid lien.").[4] In those circumstances, it is for the Court to determine, from a preponderance of the evidence. whether the Plaintiff has proven the "jurisdictional facts" supporting the attachment. *Olendorff*, 2013 WL 3937450 at *2.[5] That effectively means that in the face of a Rule E(4)(f) Motion to Vacate an Attachment, a plaintiff must prove, by a preponderance of the evidence, each of the four requirements for a Rule B attachment. In also means, when an alter ego theory is asserted as a basis for the Rule B requirement of a "admiralty claim," that a plaintiff must prove, by a preponderance of the evidence, that one entity exercised complete dominion and control over another and that the control was used to commit a fraud or a wrong. *Id.* at *4-5.

In determining, for alter ego purposes, whether one entity is subject to the dominion and control of another, the totality of the circumstances are considered, with reference being made to the following non-exhaustive list of relevant factors:

(1) the parent and subsidiary have common stock ownership; (2) the parent and

---

[4] In a Joint Stipulation (Document No. 9), the parties agreed that there would be no "live" witnesses at the hearing and that the evidence to be considered would be filed with the parties' briefing.

[5] *But see Naftomar Shipping and Trading Co., Ltd. v. KMA Int'l S.A.*, Civil Action No. V-11-2, 2011 WL 888951 (S.D. Tex. March 10, 2011) (utilizing a "probable cause" standard of proof for a plaintiff opposing a Rule E(4)(f) Motion to Vacate a Rule B attachment).

7

EXHIBIT 1

subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities

*Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n. 2 (5th Cir. 2000). However, none of

these factors are, by themselves, determinative. *Bridas I*, 345 F.3d at 359. Instead, all aspects of the

relationship between the alleged alter ego entities must be considered. *Id.*; *see also Bridas S.A.P.I.C.*

*v. Government of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (*Bridas II*) ("In making an alter

ego determination, a court is 'concerned with reality and not form, [and with] how the corporation

operated.'"), *cert. denied*, 549 U.S. 1051 (2006). As for determining whether one entity has

exercised control over another to commit a fraud or a wrong – the second prong of the alter ego veil

piercing analysis – while proof of actual fraud is not required, a party seeking to pierce the corporate

veil must show that one entity used another to "commit a 'fraud or injustice' *against* [the plaintiff]."

*Bridas II*, 447 F.3d at 416-17 (emphasis added); *see also Tejas, Inc. v. Siemers*, No. A-09-CV-0281

LY, 2009 WL 2762066 *4 (W.D. Tex. Aug, 26, 2009) (the second prong of the alter ego test

requires proof of control "to commit a 'fraud or injustice'" against the party alleging alter ego

liability); *Mills v. City of Port Arthur, Texas*, Civil Action No. 1:05-CV-298, 2006 WL 3531460 *10

(E.D. Tex. Dec. 4, 2006) (refusing to pierce the corporate veil where plaintiff "made no showing that

he suffered any particular harm intrinsic to the [defendant's] purported misuse of [ ] corporate form,"

and there was no allegation that the defendant "would be unable to satisfy a potential award of

damages and thereby avoid liability"), *aff'd*, 234 F.App'x 285 (5th Cir. 2007). "The alter ego

doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases."

8

*Bridas*, 447 F.3d at 416.

### III.    Discussion - Alter Ego Veil Piercing Theory

As set forth above, this proceeding is only about security – not about the underlying substantive claims that are pending in London arbitration proceedings between the parties to a charter agreement (Tank Punk as the owner of the M/T SPIKE and Geden Holdings Ltd. and Spike Shipping Ltd. as the charterers/performance guarantor). For that reason, the relationship among and between Defendants is especially important.

The hierarchical relationship between the "Advantage Group" Defendants is as follows: Defendant Gulsun Nazli Karamehmet Williams ("Williams") owns 85% of Defendant Forward Holdings LLC. The remaining 15% is owned by Ali Turgrul Tokgoz; Defendant Forward Holdings LLC owns 100% of Defendant Advantage Holdings LLC.; Defendant Advantage Holdings LLC owns 100% of Defendant Advantage Tankers LLC. ; and Advantage Tankers LLC owns (100%), through eleven separate LLCs, eleven oil tankers, including the M/T ADVANTAGE ARROW, which is owned by Defendant Advantage Arrow Shipping LLC, and which is the vessel that was initially attached in this case. With respect to the M/T ADVANTAGE ARROW, the entirety of the evidence shows that as of the date the original Complaint was filed, through the date of Tank Punk's Amended Complaint, the ADVANTAGE ARROW was owned by Advantage Arrow Shipping, LLC. – one of the Advantage Defendants. Prior to March 24, 2015, however, the M/T ADVANTAGE ARROW was owned by Geden Holdings, Ltd. through its subsidiary Target Shipping Ltd. and was named the M/T TARGET. *See* Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 23-25). On March 24, 2015, the M/T ADVANTAGE ARROW (formerly known as the M/T

9

TARGET), was sold for the sum of $44,000,000.00. *Id.* That sale is reflected in a "Memorandum of Agreement," a "Bill of Sale" and several wire transfer records, which show that more than $20 million was paid to Target Shipping Ltd. for its equity interest in the vessel. *Id.* (Bill of Sale and wire transfer documents); Exhibit 22 to Declaration of George A. Gaitas (Document No. 42-7 at 100-106) ("Memorandum of Agreement").

As for the relationships between the "Geden Group" Defendants, it is undisputed that Defendant Mehmet Emin Karamehmet owns 100% of Defendants Geden Holdings Ltd. and Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines. It now also appears, without dispute, that Geden Holdings, Ltd., used to own, through eleven wholly owned subsidiaries, the eleven oil tankers that were sold to Advantage Tankers LLC, over a period of four months, between February 15, 2015 and May 27, 2015. Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 1-44). Genel Denizcilik Nakliyati A.S. ("Geden Lines") did not own any of those tankers, but instead, from the evidence in the record, was the manager/operator of those tankers. *See* Declaration of Ali Togrul Tokgoz (Document No. 43-1).[6] As is relevant to the underlying substantive dispute, the evidence

---

[6] In its pleadings, particularly its Original Complaint, Tank Punk tended to conflate Geden Holdings, Ltd. with Geden Lines, at times referring to them interchangeably. The evidence, as developed through the parties' discovery efforts, now make it clear that Geden Lines never owned any of the tankers that were sold to the Advantage Defendants – Geden Holdings, Ltd. did. And, as explained by Tokgoz in his Declaration, Geden Lines provided to Geden Holdings, Ltd., and now provides to the Advantage Defendants, technical and managerial services for ocean going ships. Tokgoz states in his Declaration as follows:

   3.  [Geden Lines] is a technical manager of ocean going ships, meaning that it supplies management services to third party ship owners.
   4.  Specifically, [Geden Lines] provides a "turn-key" solution for ship owners that wish to outsource the day to day management of shipping assets, such as arranging and paying crew, maintaining vessels, obtaining insurance and supplies, and other specialized functions.
   5.  [Geden Lines] does not own any vessels, but manages vessels owned by numerous owners, including Advantage Tankers but also including other well-

10

    EXHIBIT 1

shows, and neither side disputes, that Geden Holdings, Ltd. was the original charterer of Tank Punk's vessel, the M/T SPIKE. Exhibit 1 to Tank Punk's First Amended Complaint (Document No. 47-1 at 2-21). Subsequently, Spike Shipping Ltd., a wholly owned subsidiary of Geden Holdings Ltd., was substituted as the charterer of the M/T SPIKE, with Geden Holdings, Ltd. then becoming the charter performance guarantor. *Id.* at 22, 33-35; Exhibit 3 to First Amended Complaint (Document No. 47-1 at 33-35).

As between the Advantage Defendants and the Geden Group Defendants, the most important relationship, and that relied upon by Tank Punk as a significant basis for its opposition to the Motion to Vacate Attachment and Dismiss, is that between the individual Defendants, Mehmet Emin Karamehmet ("Karamehmet") and Gulsun Nazli Karamehmet Williams ("Williams"). Williams is Karamehmet's daughter and only child.

---

known publicly traded companies.
6.      In the case of oil tankers, [Geden Lines] has built a reputation as an experienced and competent technical manager and manages numerous vessels under charter to the group of large oil companies colloquially referred to as the "oil majors".
7.      In my experience, when an oil tankers is chartered to an oil major, it must first undergo an extensive vetting process which, if successful, allows the vessel to be "entered" with these oil majors and hence chartered by them. A vessel entered with the oil majors commands a premium.
8.      Changing technical managers usually results in the loss of a vessel's approval to carry cargoes for the oil majors, and charter agreements with oil majors typically require that the technical manager stays the same.
9.      With respect to the Vessels, defined in the Motion to Dismiss, [Geden Lines] was retained as a technical manager when the Vessels were sold by Geden Holdings, or its subsidiaries, to Advantage Tankers and its subsidiaries.
10.      This is not unusual, and the lenders to Advantage Tankers, who took a security interest in the charters covering the Vessels, also insisted that [Geden Lines] be retained as the technical manager.
Declaration of Ali Togrul Tokgoz (Document No. 43-1). Tank Punk has not challenged or contested any of the statements in Tokgoz' Declaration.

11

In their Amended Motion to Vacate Attachment and Dismiss, the Advantage Defendants argue that Tank Punk's alter ego allegations of dominion and control are conclusory and unsupported, and that there are no allegations and no evidence that the Geden Group Defendants' assets were sold for less than market value or that the sale was used or intended to commit fraud or some other wrong against Tank Punk. In support of their arguments, the Advantage Defendants point to the uncontroverted evidence – in the form of bank records – that Williams used her own funds (close to $200 million) to purchase certain of the Geden Group Defendants' assets, including the M/T ADVANTAGE ARROW, and the absence of *any* evidence that: (1) the Geden Group Defendants actually exercise(d) any dominion or control over the Advantage Defendants; (2) Defendant Karamehmet and Williams conspired or colluded in connection with the sale of the Geden Group Defendants' assets; or (3) that there was any fraud or wrong associated with the sale of the Geden Group Defendants' assets which has resulted in injury to Tank Punk.

Against these arguments is Tank Punk's reliance on: (1) the familial relationship between Defendant Karamehmet and Williams; (2) the evidence that the Advantage Defendants have practically and effectively taken over the Geden Group Defendants' business, utilizing Geden Lines as the technical manager and operator of the vessels, looking to virtually the same lenders to provide financing for the purchase of the vessels, and maintaining the charter agreement and relationship Geden Holdings, Ltd. had with Shell Western Supply and Trading Limited; and (3) the terms of a unsuccessful re-structuring effort, outlined in a "Project Hermitage Report," which were designed to "ring-fence" the Geden Group Defendants' creditors.

12

## A.    Dominion and Control Prong

Neither Tank Punk's allegations in the First Amended Complaint nor the evidence in the record supports a conclusion that the Geden Group Defendants have exercised complete control and dominion over the Advantage Defendants. Tank Punk alleges that everything the Advantage Defendants do, and have ever done, has been at the behest of, and for the benefit of, Defendant Karamehmet and the Geden Group Defendants. But the evidence in the record does not support Tank Punk's allegations. Instead, the evidence shows that only *some* of the Geden Group Defendants' assets[7] were sold to the Advantage Defendants, and this was only *after* the Geden Group Defendants had explored several other re-structuring and re-financing options. Exhibits 9 ("Prospectus Universal Maritime") & 10 ("AlixPartners Project Hermitage Restructuring") to Tank Punk's Amended Complaint (Document No. 47-2 at 12-87); Deposition of Tokgoz at 43-47; 67-71 (Document No. 41-1 at 45-49; 69-73); Deposition of Mat at 26-28; 34-42 (Document No. 41-3 at 28-30; 36-44). In addition, the evidence in the record shows that the sale of assets to the Advantage Defendants was upon terms which were objectively reasonable to both the Geden Group Defendants and the Advantage Defendants at the time, with the value of the 11 tankers that were sold being set by third party brokers. Williams Deposition at pp. 27-31 (Document No. 41-2 at 29-33).

As part of the discovery conducted in this case, Tank Punk took the depositions of Ali Togrul Tokgoz ("Tokgoz"), Mehmet Mat ("Mat"), and Defendant Williams. Defendant Williams has an 85% ownership interest in Advantage Tankers, LLC, with the remaining 15% being owned by

---

[7] In their depositions, Tokgoz and Mat explained how Geden Holdings, Ltd. over a period of five to six years, sold most of its vessels ("about 50 to 60 ships roughly"), including the 11 tankers that were sold to the Advantage Defendants in 2015. Tokgoz Deposition at 45 (Document No. 41-1 at 47); Mat Deposition at 36, 40 (Document No. 41-3 at pp. 38, 42).

EXHIBIT 1

Tokgoz. Tokgoz currently serves as the CEO of Advantage Tankers, LLC, and a director of both Geden Holdings, Ltd. and Geden Lines. Prior to the sale of the 11 tankers to the Advantage Defendants, he served as the CEO of both Geden Holdings, Ltd. and Geden Lines. Somewhat similarly, Mat currently serves as the CFO of Advantage Tankers, LLC, and as the CFO of both Geden Holdings, Ltd. and Geden Lines.

As was made clear during the depositions of Tokgoz, Mat and Williams, and uncontroverted by Tank Punk, it was Tokgoz who approached Williams in 2014 about purchasing the 11 tankers from Geden Holdings, Ltd., which at that time was in the process of selling all of its vessels. Tokgoz Deposition at 71 (Document No. 41-1 at 73). Tokgoz testified that he did not approach Williams at the request or behest of Karamehmet, and only told Karamehmet about Williams' involvement after she had expressed an interest in the proposed investment. *Id.* at 73 (Document No. 41-1 at 75). Tokgoz explained, as follows, his reasons for approaching Williams, following the inability to re-structure or refinance Geden Holdings, Ltd's debt:

> Q: How did it come about [that] she [Williams] expressed an interest?
>
> A: I approached her.
>
> Q: Why did you approach her?
>
> A: I mean I just didn't want to lose the fleet, which was, I believe, a young and good fleet with a good chartered attached with oil major like Shell, and I asked if she would be interested to invest and after some discussions and explaining what it is and what can be done she said she was interested but not the full equity. She didn't want to go putting – taking all. She said if there is any other party who would co-invest with her she can proceed, and that is how it started.

*Id.* at 71 (Document No. 41-1 at 73). Mat similarly explained at his deposition how Williams became involved and ultimately purchased the 11 tankers by and through Advantage Tankers, LLC:

14

 EXHIBIT 1

A:    So maybe I should go back one step.

Q:    Yes?

A:    And talk about what has happened after Alix Partners proposal has been declined. After that I said we have seen that the restructuring of Geden Holdings indebtedness with the banks was not going to go through. We have decided to sell the assets in Geden Holdings and, as I said earlier, we have sold almost 20 ships within that year only. While market these ships to the market as managers, Tugrul [Tokgoz] and myself, we believe that the business is a nice business and there is a good value in it considering the Shell charter relationship that we have developed personally.

Then at that time Tugrul [Tokgoz] came up with the idea that Mrs. Williams herself could be the investor. . . .

\* \* \*

In the new structure what we proposed to Mrs. Williams is to get a guaranteed return from Shell charterers so that she would be more willing to invest more money because she would know that her returns would be granted to a certain extent. She has accepted. We approached Shell to get the charters with the floor rates, and by doing so we not only give comfort to Mrs. Williams but at the same time we managed to get better terms from the banks because they, as you may have seen from here, some of the banks have increased their commitments.

Mat Deposition at 40-42 (Document No. 41-3 at 42-44). Mat also testified that he did not discuss the proposed sale or Williams' involvement in the purchase of the 11 tankers with Karamehmet. *Id.* at 47 (Document No. 41-3 at 49).

In addition to this uncontroverted deposition testimony that Karamehmet did not instigate or control Williams' acquisition of the 11 tankers, there is documentary evidence which shows that Williams, in 2015, paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants, using nearly $200 million of her own funds, and securing hundreds of millions more in loans. Exhibits 1 and 2 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 4-75). The documentary evidence also shows that the Geden Group

15

Defendants received, in cash, their equity interests in each of the 11 tankers that were sold to the Advantage Defendants – totaling nearly $200 million – cash that was paid by Williams to Geden Holdings, Ltd. through its subsidiaries. Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 2-44); Exhibit 1 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 4).[8]

In the face of this evidence, Tank Punk points to language in a "Hermitage Report," prepared by AlixPartners in March 2013, as evidence that the Geden Group Defendants, all along, planned to restructure in such a way that their creditors would be "ring-fence[d]." *See* Amended Complaint (Document No. 47) at 13; AlixPartners Report, Exhibit 10 to Amended Complaint (Document No.47-1 at pp. 35-87). But, as explained by Tokgoz and Mat at their depositions, the proposals contained in the March 2013 "Hermitage Report" were not implemented because the banks providing financing to Geden Holdings, Ltd. would not, or could not, agree on the course of action proposed in the report. Tokgoz Deposition at 43-44 (Document No. 41-1 at 45-46); Mat Deposition at 37 (Document No. 41-3 at 39). As such, any language about "ring-fencing" in the March 2013 Hermitage Report has little relevance to the actual sale of the 11 tankers to the Advantage

---

[8] In its Sur-Reply (Document No. 59-1), Tank Punk points out certain discrepancies in the documents evidencing the sale of the M/T ADVANTAGE ARROW, discrepancies which do not consistently reflect or suggest that the M/T ADVANTAGE ARROW was not actually sold for $44 million. Despite the identified discrepancies between the sales and the loan documents for the ADVANTAGE ARROW as to the value of the ADVANTAGE ARROW, Tank Punk has not shown, by a preponderance of the evidence, that any discrepancy reflects a "sham" sale or continued control over the ADVANTAGE ARROW by the Geden Group Defendants following the sale. In addition, although Tokgoz testified at his deposition that he could not explain the dollar-number discrepancies between the sale and the loan documents, he believed that they may have been typographical errors, and was adamant that the entire $44 million for the sale of the M/T ADVANTAGE ARROW was "paid." Tokgoz Deposition at 114-119 (Document No. 41-1 at 116-121).

16

Defendants in 2015.

Tank Punk also makes much of the fact that Williams is Karamehmet's daughter and suggests that such a familial relationship, coupled with broad ownership references to the "Karamehmet family" in Geden Group Defendant documents, suggests either that Williams and Karamehmet should be considered one and the same for purposes of this case, or that Karamehmet has control over Williams and the Advantage Defendants. There is, however, no evidence in the record that there is any financial unity between Karamehmet and Williams, no evidence in the record that Karamehmet exerted any influence or control over Williams with respect to her purchase of the 11 tankers, and no evidence that the Geden Group Defendants have dominion and control over the Advantage Defendants. The evidence is simply that Williams is extremely wealthy, and was born wealthy. Williams Deposition at 61-63 (Document No. 41-2 at 63-65). Any argument that her father (Karamehmet) controls her, the funds she used to purchase those 11 tankers, or any of the Advantage Defendants is nothing more than mere speculation. Such speculation is insufficient to support an alter ego theory of liability. *Estate of Lisle v. Commissioner of Internal Revenue*, 341 F.3d 364, 377 (5th Cir. 2003), *mandate recalled*, 431 F.3d 439 (2005); *Settlement Funding, LLC v. RSL Funding, LLC*, Civil Action No. H-12-2044, 2013 WL 5231475 *7 (S.D. Tex. Sept. 16, 2013).

As for Tank Punk's allegation that the Advantage Defendants merely continued the business of the Geden Group Defendants following the sale of the 11 tankers, and are, in that sense, the alter ego(s) of the Geden Group Defendants, the only evidence in the record to support that allegation is a June 2, 2015, "Consent Letter" between Geden Holdings, Ltd. and Shell Western Supply and Trading Limited ("Shell Western"), whereby Geden Holdings, Ltd. facilitated the continued charter arrangement of 9 of the tankers that were sold to the Advantage Defendants. Tank Punk alleges in

17

EXHIBIT 1

its First Amended Complaint that this "Consent Letter" contains Geden Holdings Ltd.'s representations and assurances that Geden Holdings, Ltd. would retain ownership interest over the vessels despite their sale. *See* First Amended Complaint (Document No. 47) at 9 ("GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer – Shell Western Supply and Trading, Ltd – that it retained ownership over the Advantage-Group one-ship companies. *Id.* at Bates No. D01248, at ¶ 2."). However, *nothing* in that Consent Letter, particularly paragraph 2 referenced by Tank Punk in its Amended Complaint, can be read as such a representation by Geden Holdings. Paragraph 2 of the Consent letter provides as follows:

> 2. As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

"Consent Letter", attached as Exhibit 5 to Amended Complaint (Document No. 47-1 at pp. 37-41). As explained by Tokgoz in his Declaration and at his deposition, the continued charter arrangement with Shell Western was key to the sale of the 11 tankers to the Advantage Defendants, and it was both Shell Western and the banks financing part of the sale that insisted Geden Lines continue as manager/operator of the nine tankers under charter. Declaration of Tokgoz (Document No. 43-1); Tokgoz Deposition at 99 (Document No. 41-1 at 101) ("Correct, it was a requirement by the charter of Shell that the management should be kept the same."). Neither the terms of the Consent Letter nor the Advantage Defendants' subsequent charter agreements with Shell Western in any way evidence that the Geden Group Defendants retained control over any of the tankers following their sale. In fact, the terms of the Consent Letter indicate to the contrary. Paragraph 3(c) of the Consent Letter contemplates Shell Western's agreement to charter nine of the oil tankers to be sold to the

18

EXHIBIT 1

Advantage Defendants, upon the "New Owners being acceptable" to Shell Western following its "KYC and other relevant checks." Exhibit 5 to Amended Complaint (Document No. 47-1 at 37). While Tank Punk is correct that Geden Lines continued to act as the technical manager/operator of the tankers after they were sold, Geden Lines' continued role as a manager/operator of the tankers does not equate to the type of dominion and/or control over the Advantage Defendants that is required to pierce the corporate veil.[9]

As for the particular dominion and control factors identified by the Fifth Circuit as relevant to an alter ego theory, *Oxford Capital*, 211 F.3d at 284 n.2, only one supports Tank Punk's alter ego veil piercing theory. The Geden Group Defendants and the Advantage Defendants do not have common stock ownership, and there is no evidence the Geden Group Defendants and the Advantage Defendants file consolidated financial statements, no evidence the Geden Group Defendants finance the Advantage Defendants, no evidence the Geden Group Defendants "caused" the incorporation of the Advantage Defendants, no evidence the Advantage Defendants have operated with grossly inadequate capital, no evidence the Geden Group Defendants pay the salaries and other expenses of the Advantage Defendants, no evidence the Geden Group Defendants use the Advantage Defendants' property as its own, no evidence the daily operations of the Geden Group Defendants and the Advantage Defendants are not kept separate, and no evidence the Advantage Defendants do not observe corporate formalities. While the Geden Group Defendants and the Advantage Defendants both utilize Geden Lines to manage and/or operate their vessels, and while the Geden Group Defendants did facilitate the Advantage Defendants' acquisition of the Shell Western charter

---

[9] As explained by Tokgoz in his Declaration, *see infra* note 6, there were both practical and financial considerations that necessitated Geden Lines continuing as the technical manager/operator of the tankers that were chartered to Shell Western.

19

business, in the context of this case neither circumstance evidences continuing dominion and control by the Geden Group Defendants over the Advantage Defendants. It was Tokgoz and Mat who arranged for the Advantage Defendants to take over the Shell Western charter business, and it was Shell Western that insisted Geden Lines continue on as operator/manager of the nine tankers under charter. Tokgoz Deposition at 99 (Document No. 41-1 at 101). As for the one factor that is significantly present in this case – the commonality of directors and or/officers – the evidence is that both Tokgoz and Mat have interconnected and overlapping interests in both the Geden Group Defendants and the Advantage Defendants. But, despite those overlapping interests, there is no evidence that either Tokgoz nor Mat are, or have, utilized their positions with the Geden Group Defendants to control the Advantage Defendants. Instead, all the evidence shows is that Tokgoz and Mat, realizing the value of the tankers if a charter relationship could be continued with Shell Western, coordinated the sale for the benefit of the Geden Group Defendants, which had to sell the tankers, the Advantage Defendants, which were in a position to buy the tankers, and themselves, so that they could continue to benefit personally (in the case of Tokgoz) and professionally.

In all, Tank Punk's evidence of control, which is predicated primarily on the familial relationship between Karamehmet and Williams, and secondarily on the charter business with Shell Western the Advantage Defendants retained following their purchase of the 11 tankers, is simply insufficient, under a preponderance of the evidence standard, to meet the dominion and control prong of the alter ego test.

**B.    Fraud/Wrong/Injustice Prong**

Similarly, neither Tank Punk's allegations nor the evidence in the record supports a conclusion that the Geden Group Defendants exercised control over the Advantage Defendants "to

20

                                                                    EXHIBIT 1

commit a fraud or wrong that injured" Tank Punk. Tank Punk alleges in its First Amended Complaint that Defendants have engaged "in fraudulent corporate restructuring and asset reallocation practices in order to escape their liability for failing to pay bareboat charter hire and redeliver the vessel to her owners in a proper state and condition as required under the bareboat charter." First Amended Complaint (Document No. 47) at 23. This allegation is conclusory and falls far short of the particularized allegations that are required for a Rule B attachment. *See* Rule E(2)(a) (requiring particularized allegations); *Dry Handy Investments, Ltd. v. Corvina Shipping Co. S.A.*, 988 F.Supp.2d 579, 584 (E.D. Va. 2013) (granting motion to vacate Rule B attachment which was based on alter ego theory where there were no particularized allegations of "injustice or fundamental unfairness"). Moreover, and more importantly, there is no evidence in the record that the Geden Group Defendants sold their assets to commit or perpetuate a fraud or wrong *against* Tank Punk. There is also no evidence that Tank Punk has been injured in any way by the Geden Group Defendants' sale of the 11 tankers to the Advantage Defendants. The uncontroverted evidence in the record is that: (1) the Geden Group Defendants received close to $200 million in cash for their equity interests in the 11 tankers that were sold to the Advantage Defendants; and (2) the 11 tankers were sold for fair market value. The evidence also shows that Tank Punk could not have been disadvantaged by the sale of the 11 tankers to the Advantage Defendants because Geden Holdings, Ltd. received its full equity value in the vessels. Despoina Bacha, Tank Punk's corporate representative, testified in this regard at her deposition as follows:

> Q:    I'm not asking you that. I'm asking you if Geden received the value of its equity, if any, in the vessels listed in paragraph 36 –
>
> A:    Yes.
>
> Q:    – how is plaintiff disadvantaged?

21

EXHIBIT 1

A:     It's not disadvantaged.  They – if Geden managed to pay creditors, like Stealth, after this new restructuring plan, we don't have any problem. We don't have any objections what Geden will do with this corporate structure.  We have no interest if we receive our hires.  But we don't receive our hires, that's where we starting to investigate.  We don't have any problem with Geden receiving the capital or nor or equity or anything.

* * *

Q:     . . . . If the vessels listed in paragraph – if Geden when it sold the vessels listed in paragraph 36, received the value of its equity in those vessels, how is the plaintiff in this action disadvantaged by that sale?

A:     It could not be disadvantaged.  If they pay our money, we have no problem. We would have no problem with this.

Q:     So am I to understand, ma'am, that even though the – if the sale of these vessels, if Geden received the value of its equity in these vessels, plaintiffs could not have been disadvantaged by that sale.  Is that what you're saying?

A:     Yes.

Exhibit 3 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 79, 80-81).

Despite the absence of fraud/wrong/injustice allegations in the Amended Complaint, and despite this testimony from Tank Punk's corporate representative that Tank Punk was not disadvantaged by the sale of the sale of the tankers, for which the Geden Group Defendants received, in cash, their equity value in the tankers, Tank Punk argues that the second prong of the alter ego test has been, or can be, met on this record because the facts of this case are essentially the same as that at issue in *Bridas II*.  But, Tank Punk mis-reads both the breadth and applicability of *Bridas II* to the facts in this case.

In *Bridas I* and *II*, the Fifth Circuit explained and developed the law on alter ego veil piercing.  At issue was an arbitration award following the demise of a joint venture between Bridas S.A.P.I.C. (an Argentinian company) and State Concern Turkmenneft, and the determinations at the

22

                                                                                     EXHIBIT 1

District Court level that the State Concern Turkmenneft was not the alter ego of the Government of Turkmenistan. "Because the district court failed to take into account all of the aspects of the relationship between the Government [of Turkmenistan] and Turkmenneft," the Fifth Circuit, in *Bridas I*, remanded the case to the District Court to reconsider its alter ego determination. *Bridas I*, 345 F.3d at 359-360. In *Bridas II*, the Fifth Circuit reversed the subsequent decision of the District Court and rendered a decision in favor of Bridas "[b]ecause the totality of the record demonstrated that the Government [of Turkmenistan] should be bound as an alter ego of State Concern Turkmenneft." *Bridas II*, 447 F.3d at 414. In determining that Turkmenneft and the Government of Turkmenistan were alter egos, the Fifth Circuit focused on the undercapitalization of Turkmenneft, the Government's legislative actions which rendered Turkmenneft "immune from seizure under newly enacted Turkmenian law," and the Government's issuance of a "number of decrees distancing itself from the joint venture and attempting to limit its potential exposure to liability." *Id.* at 417, 420. In concluding that the District Court's alter ego determination was incorrect, the Fifth Circuit explained the unique circumstances of the case that justified its alter ego determination on appeal:

> Despite some indicia of separateness, the reality was that when the Government's export ban forced Bridas out of the joint venture, the Government then exercised its power as a parent entity to deprive Bridas of a contractual remedy. Intentionally bleeding a subsidiary to thwart creditors is a classic ground for piercing the corporate veil.

Id. at 420.

Nothing in this case has any factual similarity to *Bridas*. Tank Punk: (1) has not alleged or shown that it has no remedy against Geden Holdings, Ltd. - the party against whom it has its substantive claims; (2) has not alleged or shown that the Geden Group Defendants sold its vessels

23

EXHIBIT 1

in order to thwart Tank Punk and its other creditors; and (3) has not alleged or shown that the Geden Group Defendants cannot satisfy an award if Tank Punk were to prevail on its substantive claims in the pending arbitration proceeding.[10] Neither facts nor circumstances in *Bridas* provides any support for the fraud/wrong/injustice prong of Tank Punk's alter ego veil piercing theory in this case.

Here, because there are no allegations by Tank Punk that it has been defrauded, harmed, or suffered an injustice as a result of the Geden Group Defendants' sale of 11 oil tankers to the Advantage Defendants, and because Tank Punk's corporate representative admitted at her deposition that Tank Punk has not been disadvantaged by that sale given the full market value that was received by the Geden Group Defendants for those 11 tankers, Tank Punk has not, and cannot, meet its burden on the fraud/wrong/injustice prong of the alter ego test. Consequently, the Rule B attachment cannot be sustained on the alleged alter ego veil piercing theory. [11]

---

[10] Tokgoz testified at his deposition that the money received by Geden Holdings, Ltd. for its equity value in the 11 tankers is "[b]eing used for general business purposes." Tokgoz Deposition at 130 (Document No. 41-1 at 132).

[11] Argued as an additional and alternative reason for vacating the attachment and dismissing Tank Punk's claims, Defendants maintain that Defendant Geden Holdings, Ltd. could be "found " in this District both at the time Tank Punk, Inc.'s Original Complaint was filed on June 12, 2015, and at the time the Amended Complaint was filed on February 24, 2016, and therefore a Rule B attachment was unavailable to Plaintiff. In support of that argument, the Advantage Defendants point to the uncontroverted evidence that Geden Holdings, Ltd., as of June 14, 2015, when Tank Punk's Original Complaint was filed, had a presence in this District, having registered to do business in Texas with the Texas Secretary of State and having maintained an office and telephone number in this District. In addition, the Advantage Defendants point to the uncontroverted evidence that Geden Holdings, Ltd., as of November 3, 2015, before the Amended Complaint was filed, had designated with the Texas Secretary of State an agent for service of process. Tank Punk counters that Geden Holdings,. Ltd. was not initially named as a Defendant and its office in this District was nothing more than a virtual office, with no employees. In addition, Tank Punk maintains that Geden Holdings' designation of an agent for service of process in the State of Texas, an agent located in Dallas, is insufficient to show that Geden Holdings is amenable to service of process in this District.

Determining whether the Rule B attachment was proper at the time Tank Punk filed either

EXHIBIT 1

IV.    Discussion - Dismissal of Tank Punk's claims against the Advantage Defendants

The Advantage Defendants ask, without any substantive argument or citation to any legal authority, that the claims against them be dismissed if the attachment is vacated. Based on the conclusion reached herein that the attachment of the Advantage Defendants' assets should be vacated, coupled with the fact that Tank Punk has no substantive claim against the Advantage Defendants, Tank Punk's Rule B security claims against the Advantage Defendants should be dismissed. *See Olendorff Carriers*, No. C-12-074, 2013 WL 1628358 *7 (S.D. Tex. March 28, 2013, Memorandum and Recommendation), adopted, 2013 WL 3937450 (S.D. Tex. July 30, 2013).

V.    Conclusion and Recommendation

Based on the foregoing and the conclusion that the evidence preponderates against Plaintiff Tank Punk, Inc. having met its burden on the alter ego/piercing the corporate veil allegations in support of the Rule B the attachment in this case, the Magistrate Judge

RECOMMENDS that Defendants' Amended Motion to Vacate Attachment and Dismiss (Document No. 52) be GRANTED, that the attachment of the funds remaining in the registry of the Court be vacated, and Plaintiff Tank Punk, Inc.'s claim(s) against the Advantage Defendants be dismissed. Based on this recommendation, it is

ORDERED that Plaintiff Tank Punk's "Ex Parte Motion for Order Authorizing Issuance of Supplemental Process of Maritime Attachment and Garnishment and Authorizing Special Process

---

its Original or Amended Complaint need not be decided on this record, particularly given the procedural history of this case and the determination herein that Tank Punk has not met its burden of establishing the propriety of a Rule B attachment on an alter ego theory of liability.

EXHIBIT 1

Server" (Document No. 34) is DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 6th day of July, 2016.

Frances H. Stacy
United States Magistrate Judge

26

United States District Court
Southern District of Texas
**ENTERED**
October 04, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ECLIPSE LIQUIDITY, INC. | § | |
| | § | |
| | § | CIVIL ACTION NO. 4:15-CV-1645 |
| V. | § | CONSOLIDATED WITH: |
| | § | |
| AVOR NAVIGATION LTD.; | § | 4:15-CV-1673 |
| ADVANTAGE ARROW SHIPPING, | § | |
| LLC; GENEL DENIZCILIK | § | 4:15-CV-1675 |
| NAKLITAYI A.S. A/K/A GEDEN | § | |
| LINES; ADVANTAGE TANKERS, | § | ADMIRALTY |
| LLC; ADVANTAGE HOLDINGS, LLC; | § | |
| and FORWARD HOLDINGS, LLC | § | |

## ORDER

ON THIS DAY the Court considered the Advantage Defendants' Unopposed

Motion to Amend Caption *Nunc Pro Tunc* and finds that the Motion has merit and

should be GRANTED. It is therefore

ORDERED the caption of the Memorandum and Recommendations issued by

Magistrate Judge Stacy on July 6, 2016 [Dkt. No. 64] be and the same hereby is

deemed amended to include Civil Action No. 4:15-CV-01673 as a consolidated case,

to which all findings and recommendations of the Memorandum apply.

Signed this 4TH day of Oct, 2016.

Ewing Werlein, Jr.
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| PSARA ENERGY, LTD. | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **No. 1:18-cv-00178** |
| SPACE SHIPPING, LTD.; GEDEN HOLDINGS: | | |
| LTD.; ADVANTAGE ARROW SHIPPING, | : | |
| LLC; GENEL DENIZCILIK NAKLIYATI A.S. : | | |
| A/K/A GEDEN LINES; ADVANTAGE | : | |
| TANKERS, LLC; ADVANTAGE HOLDINGS, : | | **ADMIRALTY** |
| LLC; FORWARD HOLDINGS, LLC; | : | |
| MEHMET EMIN KARAMEHMET; | : | |
| GULSUN NAZLI  KARAMEHMET - | : | |
| WILLIAMS; and TUĞRUL TOKGÖZ | : | |
| | : | |
| **Defendants** | : | |

### PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT

Plaintiff PSARA ENERGY, LTD., by and through undersigned counsel, for its Verified

Complaint against Defendants: SPACE SHIPPING LTD.; GEDEN HOLDINGS, LTD.;

ADVANTAGE ARROW SHIPPING, LLC; GENEL DENIZCILIK NAKLIYATI A.S. A/K/A

GEDEN LINES; ADVANTAGE TANKERS, LLC; ADVANTAGE HOLDINGS, LLC;

FORWARD HOLDINGS, LLC; MEHMET EMIN KARAMEHMET; GULSUN NAZLI

KARAMAEHMET - WILLIAMS; and TUĞRUL TOKGÖZ alleges and pleads as follows:

### I. JURISDICTION, VENUE, AND PARTIES

1.     This is an admiralty and maritime claim within the meaning of rule 9(h) of the

Federal Rules of Civil Procedure in that it involves claims for the breach of a maritime contract,

*i.e.* an executed bareboat charter party for the employment of a seagoing cargo vessel. This case

also falls under this court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and

is brought under the provisions of Rule B of the Supplemental Rules for Certain Admiralty or

1



Maritime Claims, and Asset Forfeiture Actions (hereinafter "Supplemental Rule B") and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration.

2.     At all times material hereto Plaintiff, PSARA ENERGY, LTD. (hereinafter "PSARA" or "Plaintiff"), was a corporation organized under the laws of the Republic of the Marshall Islands and the registered owner of the Motor Tanker CV STEALTH (hereinafter "CV STEALTH" or "Vessel"), a crude oil tanker vessel registered in Malta.

3.     At all times material hereto Defendant, SPACE SHIPPING, LTD. (hereinafter "SPACE"), was and is a foreign company organized under the laws of Malta and the bareboat charterer of the M/T CV STEALTH under a bareboat charter party contract dated February 23, 2010 ("the bareboat charter"). A copy of the bareboat charter and addenda thereto are attached to this Original Verified Complaint as **EXHIBIT 1**. Though SPACE is incorporated in Malta, the business of SPACE is actually carried on entirely by Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES from the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

4.     At all times material hereto GEDEN HOLDINGS, LTD. (hereinafter "GEDEN HOLDINGS"), was and is a foreign company organized under the laws of Malta with its operating office at the office facilities of GEDEN LINES at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey. Though GEDEN HOLDINGS is incorporated in Malta, its business is actually carried on entirely by GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

5.     At all times material hereto Defendant ADVANTAGE ARROW SHIPPING, LLC (hereinafter "ADVANTAGE ARROW SHIPPING"), was and is a limited liability company organized under the laws of the Republic of the Marshall Islands, and the registered owner of the

Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7. Though ADVANTAGE ARROW SHIPPING is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

6.     At all times material hereto Defendant GENEL DENIZCILIK NAKLIYATI A.S. a/k/a GEDEN LINES (hereinafter "GEDEN LINES"), was and is a foreign corporate entity organized under the laws of Turkey with its principal place of business located at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey.

7.     At all times material hereto ADVANTAGE TANKERS, LLC (hereinafter "ADVANTAGE TANKERS"), was a foreign limited liability company organized under the laws of the Marshall Islands. ADVANTAGE TANKERS, LLC is a holding company that owns 100% of Defendant ADVANTAGE ARROW SHIPPING. Though ADVANTAGE TANKERS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

8.     At all times material hereto ADVANTAGE HOLDINGS, LLC (hereinafter "ADVANTAGE HOLDINGS"), was a foreign limited liability company organized under the Laws of the Marshall Islands. ADVANTAGE HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE TANKERS. Though ADVANTAGE HOLDINGS is incorporated in the Marshall Islands, its business is carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

9.     At all times material hereto FORWARD HOLDINGS, LLC (hereinafter "FORWARD HOLDINGS"), was a foreign limited liability company organized under the laws of the Marshall Islands.  FORWARD HOLDINGS, LLC is a holding company that owns 100% of Defendant ADVANTAGE HOLDINGS.  Though FORWARD HOLDINGS is incorporated in the Marshall Islands, its business is actually carried on entirely by Defendant GEDEN LINES from its office facilities at Buyukdere Cad., Yapi Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Turkey.

10.     At all times material hereto MEHMET EMIN KARAMEHMET (hereinafter "EMIN KARAMEHMET"), is an individual person and a citizen and resident of the Republic of Turkey and, respectively, through a Panamanian corporation that he entirely controls - Buselten Finance, S.A - is the 100% shareholder of GEDEN HOLDINGS and SPACE SHIPPING. Through another Turkish business entity he controls - Cukurova Holdings - he is 100% shareholder of Defendant GEDEN LINES.

11.     At all times material hereto, Tuğrul Tokgöz (hereinafter "TOKGÖZ") is an individual person and a citizen of the Republic of Turkey and a resident of Turkey. TOKGÖZ is the Chief Executive Officer of ADVANTAGE ARROW SHIPPING; ADVANTAGE TANKERS; and a director of GEDEN HOLDINGS and GEDEN LINES and, through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, is 15% controlling shareholder of ADVANTAGE TANKERS.

12.     At all times material hereto, GULSUN NAZLI KARAMEHMET–WILLIAMS (hereinafter "KARAMEHMET WILLIAMS") is an individual person and a dual citizen of the Republic of Turkey and the Swiss Confederation, and a resident of the United Kingdom. KARAMEHMET WILLIAMS is the adult daughter and only child of EMIN KARAMEHMET,

and through the intermediary holding companies FORWARD HOLDINGS, ADVANTAGE HOLDINGS, she is the 85% controlling shareholder of ADVANTAGE TANKERS.

13.     The jurisdiction of this Honorable Court is founded on the presence within the District of property of the Defendants, to wit: the M/T ADVANTAGE ARROW that may be attached by process of maritime attachment and garnishment under the provisions of Rule B of the Supplemental Rules as pled more fully in Section **V** of this Verified Complaint.

## II. THE SUBSTANTIVE CLAIMS

14.     Under the bareboat charter party dated February 23, 2010 and addenda thereto dated:  June 2, 2010; June 21, 2010; and January 29, 2010, Plaintiff chartered its vessel CV STEALTH for a "a term of 5 years straight period +/- 30 days in Charterer's option plus 1 or 2 years optional year(s) declaration by Charterers 5 months prior end of the firm period" to "Geden Holdings Limited,[1] Malta or nominee always guaranteed by Geden Line." *See* **EXHIBIT 1**, box 21. The vessel was delivered to the service of the nominee of GEDEN HOLDINGS, *i.e.* SPACE, and to GEDEN LINES, and was used and operated for profit by them as part of GEDEN LINES' non-owned, chartered-in fleet.

15.     By subsequent addendum to the bareboat charter, GEDEN HOLDINGS became the performance guarantor of SPACE. *See* **EXHIBIT 1**. *See* also Addendum dated June 2, 2010, and performance guarantee of GEDEN HOLDINGS, dated March 4, 2010 hereto attached as **EXHIBIT 2.**

16.     Under Part II Clause  10 of the bareboat charter, SPACE was obligated to maintain the vessel in a good state of repair, with all of her class certificates up to date.

---

[1] Geden Holdings Limited (hereinafter "Geden Holdings") was a holding company incorporated in Malta. It held 100% of the shares of SPACE and 100% of the shares of several one-ship-companies as is more specifically pled in this Original Verified Complaint.

17.    Under Part II Clause 15 of the bareboat charter, SPACE was obligated to redeliver the vessel at the end of the bareboat charter party term "…in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted." Moreover, the same clause provides that "…upon redelivery shall have her survey cycles up to date and trading and class certificates valid for at least the number of months agreed…".

18.    Under Part II Clause  17 of the bareboat charter, SPACE was obligated "to indemnify the Owners against any loss, damage or expense incurred by the Owners arising out of or in relation to the operation of the vessel by the Charterers…" and under Rider Clause 9, SPACE, as charterer undertook to indemnify the owners of the vessel "against, all costs charges, expenses, claims proceedings (whether civil or criminal), liabilities, losses, penalties, duties and fees…and taxes thereon suffered or incurred by the Owners arising directly or indirectly in any manner out of the possession, management, control, chartering, sub-chartering…use, operation, return, redelivery…of the Vessel…and regardless of when the same shall arise".

19.    Pursuant to clause 7 of a Settlement Agreement dated 8 December 2016, and entered into between Plaintiff as Owners, in settlement of interim disputes regarding an outstanding arbitration award in favor of Owners for unpaid charter hire; and Defendant SPACE as Charterers, and Geden Holdings as performance guarantors, the hire amount payable under the Charterparty was amended to USD 9,875 per day from 1 January 2017 onwards.

20.    Plaintiff delivered the vessel into the bareboat chartered service and rendered the contractual performance required of it. However, Defendant SPACE (hereinafter also referred to as "Charterer"), though possessing and using the CV STEALTH, has failed and refused to perform

its obligations under the bareboat charter party contract, and is in breach thereof as is further pled below.

21.     On April 10, 2014, SPACE time chartered the Vessel to ST Shipping & Transport Pte. Ltd. (hereinafter "ST"), a Singapore business entity, for a term of approximately twelve months. ST, operating out of its Stamford, Connecticut branch office, where it is registered as a foreign corporation and carries on business as a cargo ship operator, sub-chartered the vessel on a voyage charter party dated September 4, 2014 to lift a cargo up to 400,000 barrels of Venezuelan crude oil from Puerto La Cruz for discharge at a terminal in the U.S.A.

22.     The Vessel was directed by ST to Puerto la Cruz, Venezuela to load her cargo where after arriving, and tendering her notice of readiness to load, she was boarded by local police and prosecutorial authorities on or about September 13, 2014 and was detained by them on suspicion of attempting to carry a stolen cargo of crude oil.

23.     At Puerto La Cruz, the CV STEALTH was further detained by court order, and at the request of the prosecutorial authorities, for a period exceeding three years, which was beyond the agreed bareboat charter party contractual redelivery date.

24.     Under the terms of the bareboat charter, the latest date for the redelivery of the CV STEALTH to Plaintiff was on June 22, 2015. However, SPACE, in breach of the bareboat charter, failed to redeliver her to Plaintiff - her lawful owner - and at the same time was failing to pay hire as the bareboat charter requires.

25.     Owners commenced London maritime arbitration to enforce their claims against SPACE for unpaid hires. The arbitration tribunal ruled in favor of Plaintiff, requiring SPACE to

keep paying monthly bareboat charter hire until the Vessel was released and was actually redelivered to Plaintiff.

26.     On October 3, 2017, SPACE claimed the Venezuelan authorities' detention of the CV STEALTH had terminated and gave PSARA notice of its intent to redeliver the Vessel within approximately 30 days. However, the Vessel was incapable of being redelivered as she was out of class with her attending classification society the American Bureau of Shipping. Moreover, the Vessel was so extensively damaged due to SPACE's neglect and lack of maintenance throughout her 3 years long detention that she was incapable of sailing under her own power and was in need of extensive repairs.

27.     Ultimately SPACE arranged to have the vessel towed from Puerto La Cruz, Venezuela to Port of Spain, Trinidad where she was redelivered and taken over by Plaintiff's personnel on or about March 24, 2018 out of class, and in the same heavily damaged condition as she was before she was towed by SPACE to Port of Spain.

### *Breach of Charterers' Maintenance/Redelivery Obligations*

28.     Pursuant to Clause 10(a) of Part II the bareboat charter, SPACE was under an obligation to keep the Vessel well maintained and in a good state of repair throughout the duration of the charter. SPACE was also under an obligation to keep the Vessel's Class fully up to date and to maintain all other necessary certificates in full force at all times.

29.     Further, pursuant to Clause 15 of Part II of the bareboat charter, SPACE was obliged to: redeliver the Vessel to Owners "in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted; " with her survey cycles up to date and trading and class certificates valid.  Box 17 of part I of the bareboat charter required the Vessel to have passed her Special Survey dry docking without

8

extensions.

30.     In breach of Clauses 10(a) and/or 15 of Part II and/or Box 17 of the bareboat charter, SPACE did not undertake any (or any non-negligible) maintenance on the Vessel, which since September 2014, failed to pass her Special Survey dry docking, and instead redelivered the Vessel in a severely damaged condition on 24 March 2018 with all Class and statutory certificates expired.

31.     The work needed in order for the Vessel to be restored to the required redelivery condition; to pass Special Survey; and to have all Class and statutory certificates reinstated, includes the following non-exhaustive list of works:

(i)     complete overhauling and/or repair and/or replacement of all machinery and equipment and extensive renewals of major and miscellaneous spares;

(ii)    extensive piping system renewals, overhauling of valves, sensors and gauges;

(iii)   full hull and deck blasting and extensive steel renewals and recoating;

(iv)    extensive renewal of outfitting, supports, ladders;

(v)     extensive steel renewals in cargo and ballast tanks;

(vi)    re-tubing and/or replacement of auxiliary boilers and exhaust gas boilers;

(vii)   overhauling and renewal of cargo system, cargo piping, cargo monitoring and cargo equipment and machinery;

(viii)  steam lines and heating coils renewals;

(ix)    deck machinery overhauling and renewal including cranes and their hydraulic systems;

(x)     electrical, electronics and automation system service, repair and renewal;

(xi)    extensive rewiring;

(xii)   bridge navigation and communication equipment service and renewals;

(xiii)  overhauling, repairs and renewal of steering and shafting system;

(xiv)  overhauling, service, repair and renewals of all safety equipment, firefighting systems and appliances including lifesaving equipment; and

(xv)  fitting of ballast water treatment system.

32.    As a consequence of the extensive damage to the Vessel, it would cost more to tow her to repair facilities and repair her than her (repaired) market value. Plaintiff, the Owner of the Vessel, has submitted in London Maritime arbitration a claim for damages in an amount equivalent to the (repaired) market value of the Vessel, which is USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS).

### *Unpaid Bareboat Charter Hire*

33.    SPACE has failed to pay outstanding hire that was earned during the month of February 2018, for which PSARA has obtained an award from the London maritime arbitration tribunal - that has jurisdiction over the merits of the case - in the amount of USD 276,500. In addition to this amount, the arbitration tribunal has awarded PSARA Pounds Sterling 4,550.00 (USD 6,515.50) by way of arbitration costs for this particular reference relating to the February 2018 charter hire, with annual interests on each of the two amounts at the rate of 5%, compounded quarterly.

34.    SPACE has also failed to pay Plaintiff the charter hire for the month of March 2018 in the amount of USD 233,708.33, which Plaintiff is claiming in the ongoing London maritime arbitration.  This amount is also claimed in London maritime arbitration.

### III. UNDERLYING PROCEEDINGS ON THE MERITS

35.    Box 35 and clause 30(a) of the bareboat charter party (**EXHIBIT 1**) provide for arbitration of all disputes arising out of the contract in London.

36.     Plaintiff is claiming in London maritime arbitration the amount of USD 18,000,000.00 (EIGHTEEN MILLION U.S. DOLLARS) as the repaired value of the vessel; and the unpaid hire for the month of March 2018 in the amount of USD 233,708.33, together with interest and costs.

37.     Plaintiff is also owed charter hire for the month of February 2018 under the London maritime arbitration award together with arbitration costs in the total amount of USD 283,015.50.

38.     Plaintiff estimates the legal costs that will be incurred to pursue these claims in London maritime arbitration proceedings will be approximately USD 400,000.00. As it is customary in London arbitration, legal costs, including lawyers' fees, are awarded to the prevailing party.

39.     This action is an ancillary proceeding, brought to obtain jurisdiction over Defendant Charterer and to obtain security for Plaintiff's claims in the London maritime arbitration proceedings.[2]

## IV. IDENTITY OF THE CORPORATE AND INDIVIDUAL DEFENDANTS AND THEIR INTERRELATIONSHIPS

40.     In June of 2015, when SPACE had fallen substantially in arrears in its bareboat charter hire payment obligations, and the contractual redelivery of the Vessel to Plaintiff was approaching, Plaintiff became concerned and made enquiries regarding the status of the CV STEALTH and the other crude oil tanker vessels that were being operated by Defendant GEDEN HOLDINGS.  Plaintiff was astounded to discover the entire "owned" – as opposed to the

---

[2] Plaintiff is also filing a Rule B attachment against another vessel of Defendant in the Eastern District of Louisiana, in which it has sought the attachment of the M/T ADVANTAGE START.  It appears from the Marshall Islands mortgage records of the said vessel that the equity of the Defendants in the said vessel is approximately $ 8,000,000.00 and therefore insufficient to secure Plaintiff's claim, considering the lender mortgagee's interest.

"chartered-in" fleet - of GEDEN HOLDINGS had been surreptitiously transferred to new owners, as shown in **TABLE I** below:

**TABLE I**

| VSL FORMER NAME | FORMER OWNER | VSL NEW NAME | NEW OWNER |
|---|---|---|---|
| PROFIT | Profit Shipping, Ltd. | ADVANTAGE SOLAR | Advantage Solar Shipping, LLC |
| TARGET | Target Shipping, Ltd. | ADVANTAGE ARROW | Advantage Arrow Shipping, LLC |
| TRUE | True Shipping, Ltd. | ADVANTAGE AVENUE | Advantage Avenue Shipping, LLC |
| BLUE | Blue Shipping, Ltd. | ADVANTAGE SKY | Advantage Sky Shipping, LLC |
| PINK | Pink Shipping, Ltd. | ADVANTAGE SUMMER | Advantage Summer Shipping, LLC |
| BLANK | Blank Shipping, Ltd. | ADVANTAGE START | Advantage Start Shipping, LLC |
| REEF | Reef Shipping, Ltd. | ADVANTAGE SPRING | Advantage Spring Shipping, LLC |
| BRAVO | Bravo Shipping, Ltd. | ADVANTAGE ATOM | Advantage Atom Shipping, LLC |
| POWER | Barbaros Maritime, Ltd. | ADVANTAGE ANTHEM | Advantage Anthem Shipping, Ltd. |
| VALUE | Value Shipping, Ltd. | ADVANTAGE AWARD | Advantage Award Shipping, LLC |
| ROYAL | Prima Shipping, Ltd. | ADVANTAGE SUN | Advantage Sun Shipping, Ltd. |

41. Not only had the said vessels been transferred to new corporate owners, but they had been renamed and reflagged from the Maltese shipping register to that of the Marshall Islands.

42. Investigation into the ship register/ship mortgage record of the Republic of the Marshall Islands revealed that all of the above 11 crude oil tanker vessels which were formerly owned by one-ship-companies, and in turn, 100% controlled by shareholder GEDEN HOLDINGS, had been transferred in approximately the first 5 months of 2015 - without any notice to or the knowledge of Plaintiff - to new one-ship-companies 100% controlled by a new holding company:

ADVANTAGE TANKERS, LLC.  ADVANTAGE TANKERS is ultimately 85% controlled by

the daughter and only child of Defendant EMIN KARAMEHMET, *i.e.* Defendant

KARAMEHMET WILLIAMS and 15% by Defendant TOKGÖZ.  The said ship mortgage records

contain a diagrammatic representation of the said new ownership structure which is hereto attached

as **EXHIBIT 3**.

### A. *SUCCESSOR CORPORATION RELATIONSHIP*

43.     The grouping of the following corporate entities: ADVANTAGE TANKERS; its

subsidiary ADVANTAGE ARROW SHIPPING; ADVANTAGE HOLDINGS; FORWARD

HOLDINGS; and 10 other one-ship-company entities that are subsidiaries of ADVANTAGE

TANKERS[3] (said grouping hereinafter collectively referred to for the sake of brevity as

"Advantage-Group") comprise, respectively, successor corporate business entities of the grouping

formerly constituted of: GEDEN HOLDINGS; Target Shipping, Ltd., GEDEN LINES; SPACE

SHIPPING; and 10 other former one-ship-companies[4], as shown in TABLE I  (hereinafter

collectively referred to, for the sake of brevity, as "Geden-Group").

44.     As particularized in the following paragraphs 45-55 the Advantage-Group

corporate entities are successor corporations of the Geden-Group corporate entities in that: a) the

former have acquired and are respectively in possession of the trading assets of the latter[5]

---

[3] Foreign limited liability companies: Advantage Solar Shipping, LLC; Advantage Sky Shipping, LLC; Advantage Start Shipping, LLC; Advantage Arrow Shipping, LLC; Advantage Avenue Shipping, LLC; Advantage Award Shipping, LLC; Advantage Atom Shipping, LLC; Advantage Summer Shipping, LLC; Advantage Spring Shipping, LLC; Advantage Sun Shipping, LLC
[4] Foreign limited liability companies: Profit Shipping, Ltd.; Blue Shipping, Ltd.; Blank Shipping, Ltd.; Target Shipping, Ltd.; True Shipping Ltd.; Value Shipping, Ltd; Bravo Shipping, Ltd; Barbaros Maritime, Ltd; Pink Shipping, Ltd; Reef Shipping Ltd.; Prima Shipping, Ltd.
[5] The said assets are the tankers: PROFIT now renamed ADVANTAGE SOLAR; BLUE now renamed ADVANTAGE SKY; BLANK now renamed ADVANTAGE START; TARGET now renamed ADVANTAGE ARROW; TRUE now renamed ADVANTAGE AVENUE; VALUE now renamed ADVANATGE AWARD; BRAVO now renamed ADVANTAGE ATOM; POWER now renamed ADVANTAGE ANTHEM; PINK now renamed ADVANTAGE SUMMER; REEF now renamed ADVANTAGE SPRING; ROYAL now renamed ADVANATGE SUN. For the sake of brevity these vessels will be collectively referred to as "the 11 tanker vessels".

(hereinafter "the 11 tanker vessels"), as illustrated in the foregoing Table I;  b) they occupy and carry on business from the same business premises, *i.e.* Buyukdere Cad., Yapi  Kredi Plaza, A Blok K:12 34330 Levent-Istanbul-Tukey;  c) they transact their business by and through identical personnel as the latter;  d) they share common officers and directors with the latter;  e) they have taken over and are servicing the same customers as were being served by the latter;  f) they have virtually the same financing banks financing their business as the latter;  g) they have assumed numerous of the latter's obligations, including long term charter parties with Shell Western Supply and Trading, Ltd.; h) there is continuity of shareholders, GEDEN HOLDINGS retains ultimate control over the corporate entities of the Advantage-Group that own  the 11 tanker vessels; i) the controlling shareholder of GEDEN HOLDINGS and GEDEN LINES - EMIN KARAMEHMET – continues to maintain a substantial financial interest in the Advantage-Group companies, as GEDEN LINES (which is 100% controlled by him) manages and operates all of its 11 tanker vessels formerly held by the one-ship-companies of the Geden-Group; j) GEDEN LINES exercises complete control over all of the corporate entities of the Advantage-Group as its administrative, operations, technical, commercial, and safety manager;  k) following the purported sale of the 11 tanker vessels, GEDEN HOLDINGS formally ceased its ordinary business operations, through its subsidiary one ship companies and wound down its remaining business of operating chartered-in tonnage.

45.     As part of a business reorganization arrangement conceived and implemented by the management of the Geden-Group, in concert with EMIN KARAMEHMET, KARAMEHMET WILLIAMS, and TOKGÖZ, the one-ship-companies of the Geden-Group "sold" the respective vessels each one of them had owned to its homologous Advantage-Group one-ship-company, with these transactions occurring approximately during the first and second quarter of 2015.  The said

"sales", were in actual fact part of a "reorganization" and makeover of the ownership structure, whereby newly minted corporate one-ship-companies of the Advantage-Group would take over ownership of the assets with the control, however, remaining with GEDEN HOLDINGS. *See* "Consent Letter" agreement dated February 6, 2015 between GEDEN HOLDINGS and Shell Western Supply and Trading, Ltd. hereto attached as **EXHIBIT 4** at Bates No. D01248, at ¶ 2 thereof, wherein GEDEN HOLDINGS assures Shell Western Supply and Trading, Ltd that each of the Advantage-Group one-ship-companies would be "wholly owned by the Shareholder", *i.e.* GEDEN HOLDINGS.

46.     Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies, to the respective Advantage-Group one-ship-companies, all of the time charter parties under which the said respective vessels, before and at the time of the transfer, were being employed by Shell Western Supply and Trading, Ltd. continued seamlessly with the Advantage-Group one-ship-companies.  This was accomplished under contractual arrangements with Shell Western, worked out by GEDEN HOLDINGS / GEDEN LINES, KARAMEHMET-WILLIAMS, and TOKGÖZ, whereby the said charter parties, several of which had significant unexpired terms, were renewed for a 5-year period, at rates and on such other terms as were agreed on behalf of the Advantage-Group one-ship-companies by GEDEN HOLDINGS. *Id.* at D01248 - D01250.

47.     Notwithstanding the purported transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer - Shell Western Supply and Trading, Ltd - that it retained ownership over the Advantage-Group one-ship-companies. *Id.* at Bates No. D01248, at ¶ 2 thereof.  Said representations and warranties regarding

the ultimate ownership and control of the Advantage-Group one-ship-companies by GEDEN HOLDINGS were accepted by Shell Western Supply and Trading, Ltd in agreeing to enter into new time charters with the said Advantage-Group one-ship-companies. *See* relevant extract from the deposition of the General Manager of Shell Western Supply & Trading, Ltd. specifically identifying GEDEN HOLDINGS as the "shareholder" retaining the ultimate control over the Advantage-Group one-ship-companies, hereto attached as **EXHIBIT 5.**

48.    Notwithstanding the transfer of ownership of the respective vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, all day-to-day shore-side operations of the 11 tanker vessels continue to be performed by and through GEDEN LINES, including safety management, security management, crewing, victualing, supplying, technical monitoring and supervision, drydocking, repairs, accounting, insuring, and generally every function necessary in order to keep and maintain the said vessels trading as merchant vessels in the same manner and to the same extent that GEDEN LINES had performed before the said transfer of ownership of the 11 tanker vessels. *See e.g.* Ship Management Agreement for the M/T ADVANTAGE ARROW dated February 25, 2015, hereto attached as **EXHIBIT 6** at pp. 2405-2414; *See* also extract from Loan Agreement dated February 4, 2015 of Norddeutsche Landesbank Girozentale (hereinafter "NLDB") Loan Agreement with ADVANTAGE ARROW SHIPPING extract hereto attached as **EXHIBIT 7** at p. 2, defining "Approved Manager" as "Genel Denizcilik of Turkey as technical manager and as commercial manager or any other person approved in accordance with Clause 22.3 (Manager)", and designating "Genel Denizcilik" as Technical Manager and Operations Manager. *Id.* at p.133.

49.    The operation and management of the 11 tanker vessels of the Advantage-Group is performed by EMIN KARAMEHMET's GEDEN LINES, using the same employees; working out

16

of the same address (Buyukdere Ca., Yapi Kredi Plaza, A Blok K: 12 34330-Levent-Istanbul-Turkey), as previously, before the same 11 tanker vessels were transferred to the Advantage-Group.

50.    Notwithstanding the transfer of ownership of the 11 tanker vessels from the Geden-Group one-ship-companies to the respective Advantage-Group one-ship-companies, the majority of the lenders that financed the acquisition of the vessels by the Advantage-Group one-ship companies remained the same, with new rollover-like refinancing arrangements and ship mortgaging arrangements having been negotiated and worked out by GEDEN HOLDINGS / GEDEN LINES executives and directors on behalf of ADVANTAGE TANKERS. *See* **EXHIBIT 4** at ANNEX I.

51.    Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, which is controlled by EMIN KARAMAHMET, continues to maintain a substantial financial interest in the 11 tanker vessels enjoying a significant economic benefit as operator and manager of the ADVANTAGE TANKERS fleet of approximately USD 4,015,000.00 annually as compensation for its services.

52.    Notwithstanding the transfer of the 11 tanker vessels from the Geden-Group to the Advantage-Group, GEDEN LINES, in its capacity as the sole operator and manager of the 11 tanker vessels, and thereby its controlling shareholder EMIN KARAMEHMET, exercise complete control over all of the operational, technical, and all other business activities of the 11 one-ship-companies of the Advantage-Group.

53.    GEDEN HOLDINGS, GEDEN LINES, ADVANTAGE TANKERS, and the respective one-ship-companies of the Geden-Group and Advantage-Group have in common key management personnel including: the same Chief Executive Officer, who is also a director of

GEDEN HOLDINGS, GEDEN LINES and ADVANTAGE TANKERS; and the same Chief Financial Officer, who is also a director of GEDEN HOLDINGS.

54.     Following the "sale" of the 11 tanker vessels, their respective former one-ship-company owners ceased to own vessels.

55.     The holding company role of GEDEN HOLDINGS and the one-ship-companies of the Geden-Group, following the transfer of the 11 tanker vessels, was taken over by ADVANTAGE TANKERS and its subsidiary one-ship-companies. ADVANTAGE TANKERS and its subsidiary one-ship-companies thereby have assumed the obligations previously incumbent on GEDEN HOLDINGS and its one-ship-subsidiaries.

56.     By reason of the foregoing facts pled in averments ¶¶ 45-55, ADVANTAGE TANKERS and the one-ship-companies it holds, and GEDEN HOLDINGS and the one-ship-companies and single-vessel chartering companies it holds, have either entered into a *de facto* merger; or ADVANTAGE TANKERS and the one-ship-companies it holds are a mere continuation of the business of GEDEN HOLDINGS.

57.     In the alternative the transfer of the assets of the Geden-Group to the Advantage-Group in the manner set out in the foregoing averments ¶¶ 45-55 was a transaction entered into by the parties involved to avoid liabilities.

58.     The one-ship companies that formerly owned the 11 tanker vessels were absorbed by the Advantage-Group, as evidenced by the identity of assets, location, management, personnel, and stockholders.

59.     Accordingly, ADVANTAGE TANKERS and the one-ship-companies it holds, including ADVANTAGE ARROW SHIPPING, are liable for Plaintiff's claims respectively as the successor corporations of EMIN KARAMEHMET - controlled GEDEN HOLDINGS, SPACE

SHIPPING and TARGET SHIPPING, LTD, and the M/T ADVANTAGE ARROW may be attached as security for Plaintiff's claims.

### B.   FRAUDULENT TRANSFER ALLEGATIONS

60.    Plaintiff realleges ¶¶ 1-59 of the above and foregoing Original Verified Complaint and further avers as follows:

61.    In agreeing to bareboat charter its vessel the CV STEALTH to SPACE, a Maltese corporation without any known tangible assets or business performance record, and to accept the performance guarantee of GEDEN HOLDINGS, Plaintiff relied on express affirmative representations of fact made on behalf of GEDEN HOLDINGS / GEDEN LINES by their common CEO and director TOKGÖZ.  Specifically, TOKGÖZ represented that GEDEN HOLDINGS was the parent company of the "special purpose companies", *i.e.* the-one-ship companies which at the time owned the 11 tanker vessels.  A Copy of the March 4, 2010 letter of GEDEN HOLDINGS containing such representations in writing is hereto attached as **EXHIBIT 8.**

62.    The performance guarantee of GEDEN HOLDINGS (**EXHIBIT 2**) contemporaneously issued with the March 4, 2010 letter, is a continual guarantee extending over the entire duration of the performance of the charter party, and indeed, for at least 7 years past the delivery of the vessel, and specifically provides in relevant part that that it is given in consideration of Plaintiff's refraining from arresting or otherwise detaining any of the assets of GEDEN HOLDINGS.

63.    Plaintiff relied on the representations made in the March 4, 2010 letter (**EXHIBIT 8**), particularly the representation that GEDEDN HOLDINGS owned and would continue to own through its one-ship-companies the 11 tanker vessels, and thereby agreed to continue chartering the CV STEALTH to SPACE and accept the performance guarantee of GEDEN HOLDINGS.

64.     GEDEN HOLDINGS purports that during the first 5 months of 2015 it divested itself of its entire interest in the 11 tanker vessels and "sold" same to the Defendants comprising the Advantage-Group through legitimate arm's length transactions. In actual fact, the Defendants implemented a fraudulent restructuring scheme that had been in their planning and contemplation as pled below[6].

65.     During 2012 and 2013 as a result of a faltering tanker market, the high prices it had paid for the construction of the 11 tanker vessels and the acquisition of other tonnage, the Geden-Group experienced severe economic difficulties and pressing demands by various creditors that included attachment of vessels of the group.  In consultation with the group's lending banks, GEDEN LINES commissioned business restructuring specialist AlixPartners UK LLP to develop a proposed plan for the restructuring of their business.  A report was prepared by AlixPartners, dated March 6, 2013 under the title "Project Hermitage Restructuring".  *See* Report of AlixPartners hereto attached as **EXHIBIT 9**[7]  (hereinafter referred to as "Project Hermitage").

66.     Project Hermitage recommended the replacement of GEDEN HOLDINGS as the group's holding company by another new business entity - a "newco" - which, under the recommended plan, "[p]rovides for recategorization of exposure from "Geden Holdings Ltd." to Newco where equity is "in-the-money" and shareholders are better incentivized to provide ongoing

---

[6]  In a similar manner GEDEN HOLDINGS purportedly "sold" its fleet of product carrier tankers to new buyers while it continued to maintain control over their operation and to profit from trading same under FUTURE HOLDINGS, LTD. a management company controlled by Defendants KARAMEHMET-WILLIAMS and TOKGÖZ.

[7]  The Alix Partners' report specifically states: "This report ("Report") was prepared by AlixPartners UK LLP ("AlixPartners") exclusively for the sole benefit and internal use of GENEL Denizcilik Nakliyati A.S. – GEDEN Lines (the "Company") pursuant to a client relationship between AlixPartners and the Company stipulated in the agreement for the provision of consulting services dated 22 November 2012 (the "Engagement Letter"). EXHIBIT 10 at Bates No. P-001832. As to the factual content of the AlixPartners report it provides in relevant part: "The information contained in this Report is based upon financial and other data provided to AlixPartners and the representation made to AlixPartners by the management and staff of the Company" *Id.* at Bates No. P-001833. *Emphasis added.*

support." *See* **EXHIBIT 9** at Bates No. P-001870.   The plan of Project Hermitage also recommended the sale of the vessels or the one-ship-companies to "Newco"; the continuation of the management of the vessels by GEDEN LINES; the rollover financing of the existing debt to the financing banks; the retention of the equity of GEDEN HOLDINGS; the transfer of the surplus of equity in the assets to Newco (**EXHIBIT 9** (flow chart) Bates No. P-001846); and the ring-fencing of potential sources of disruption (such as arrests and sister-ship arrests).   *Id.* at Bates No. P-001870.

  67. Even though the recommendations of Project Hermitage were not adopted by Defendants in their exact proposed form, they were nonetheless substantially adopted and implemented as evidenced by the following events: a) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the incorporation of Advantage Tankers, LLC, in the Marshall Islands, *i.e.* the "Newco" contemplated by Project Hermitage[8]; b) GEDEN HOLDINGS / GEDEN LINES, by and through their common chief executive officer and chief financial officer, made arrangements for the rollover financing of the loans of GEDEN HOLDINGS' one-ship-companies with ADVANTAGE TANKERS taking on the role of corporate guarantor; c) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, caused the one-ship-companies controlled by GEDEN HOLDINGS to "sell" their vessels to newly minted Marshall Islands corporate entities that comprise the Advantage-Group shown in the foregoing TABLE I; d) GEDEN HOLDINGS / GEDEN LINES, acting by and through their common chief executive officer and chief financial officer, arranged for the management of the 11 tanker vessels to continue

---

[8] At all times material hereto, all  Defendants have the same Chief Executive officer - Tugrul Tokgoz- and the same Chief Financial Officer -Mehmet Matt - who also hold overlapping roles as directors and /or officers of the respective corporate Defendants of the one-ship-companies controlled by ADVANTAGE TANKERS.

being performed by GEDEN LINES under new 5 year contracts; e) by transferring all of the tangible operating assets of GEDEN HOLDINGS to the ADVANTAGE TANKERS one-ship-companies, *i.e.* the 11 tanker vessels, GEDEN HOLDINGS effectively "ringfenced" them, thereby blocking creditors of GEDEN HOLDINGS from seeking recourse against its assets.

68.     Project Hermitage specifically referred to the bareboat charter of the CV STEALTH and other chartered-in tonnage of other owners in the following terms: "Group D, Geden Oldco: 11 Group D vessels make up the residual fleet and are not part of the Company's future. These include the vessels funded by FSL, Icon, Octavian and Stealth when traditional financing was unavailable." With specific reference to Plaintiff's vessel the CV STEALTH Project Hermitage notes: "not ours". *See* **EXHIBIT 9** at P-001856.

69.     The actions of the Defendants in implementing the recommendations of Project Hermitage in the manner described in the foregoing, manifests the design, plan, and intent of the Defendants to deal with their assets in a fraudulent manner to the detriment and prejudice of their creditors, specifically including Plaintiff as noted in ¶ 68 *supra*.

70.     Defendant SPACE SHIPPING, LLC's sole business is to act as the nominee of GEDEN HOLDINGS in the performance of the bareboat charter.  As pled in the foregoing, Plaintiff entered in the bareboat charter relying on the representations and warranties that GEDEN HOLDINGS was the owner of the 11 tanker vessels and several other vessels, and on its performance guarantee.

71.     At all times material hereto and as pled in the foregoing, GEDEN HOLDINGS through the machinations of its equity holder EMIN KARAMEHMET "restructured" the ownership of its assets, by arranging their transfer to ADVANTAGE TANKERS, a company 85% controlled by his only child KARAMEHMET WILLIAMS, and 15% by his hand-picked CEO of

GEDEN LINES and GEDEN HOLDINGS, TOKGÖZ.  As a result, Plaintiff was left without any

of the recourse that it had agreed to forego (*i.e.* the attachment of Geden Holdings' owned vessels)

in consideration for GEDEN HOLDING's performance guarantee.

72.     Notwithstanding the fraudulent restructuring of the ownership of its shipping

assets, GEDEN HOLDINGS provided in confidence express assurances to Shell Western Supply

& Trading, Ltd. that it remained the controlling shareholder of the same 11 tanker vessels through

its complete control of the Advantage-Group one-ship companies.

73.     Though Defendants KARAMEHMET WILLIAMS and TOKGÖZ have warranted

to the lenders of the Advantage-Group that they hold respectively 85% and 15% of the ultimate

beneficial interest in ADVANTAGE TANKERS, which, in turn,  warrants it controls 100% of the

11 tanker vessels, (See **EXHIBIT 3**),  TOKGÖZ, who is the Chief Executive Officer of

ADVANTAGE TANKER and a director of GEDEN HOLDINGS, has also warranted to Shell

Western Supply & Trading, Ltd. that it is actually GEDEN HOLDINGS, which controls the

Advantage-Group corporate entities, that own the same vessels even after their purported transfer

to the Advantage Group.   Based on the foregoing and the conflicting representations of

Defendants, the ownership of the ADVANTAGE ARROW (ex TARGET) was fraudulently

transferred to the detriment of unsecured creditors.

74.     Plaintiff invokes the power of this honorable court as a court of admiralty "...to

protect its jurisdiction from being thwarted by a fraudulent transfer, [by] .... authorizing an

attachment to secure an independent maritime claim." *Swift Co Packers v. Compania Colombiana

Del Caribe,* 339 U.S. 684, 694-695 (1950).

75.     Based on the expressed rationale underlying the transfer of the 11 tanker vessels

from GEDEN HOLDINGS to ADVANTAGE TANKERS noted in the foregoing, *i.e.* the

"ringfencing" of the assets in order to avoid "arrests";  the close family relationship between EMIN

KARAMEHMET and KARAMEHMET WILLIAMS that constitutes the latter an insider of the

former in relation to his status as 100% shareholder of Plaintiff's obligors GEDEN HOLDINGS /

GEDEN LINES and SPACE;  the transfer of what was substantially all of the assets of the said

obligors of Plaintiff;  the failure of the Defendants to disclose to Plaintiff the impending transfer

of the assets from the Geden-Group to the Advantage-Group; the Defendants express intent to

fraudulently restructure the ownership of the corporate holding structures for the benefit of the

equity holders and to the detriment of unsecured non-lending creditors;  and all of the factual

circumstances pled in the foregoing ¶¶ 60-74, there are reasonable grounds and probable cause to

believe that the said transfer was intended to hinder, delay, or defraud the creditors of SPACE and

same may and should be set aside as a fraudulent conveyance.

### V. APPLICATION FOR ATTACHMENT UNDER
### SUPPLEMENTAL ADMIRALTY RULE B

76.    None of the Defendants are or were at the time of the filing of this suit present

within the District or can be found in the District within the meaning of Rule B of the Supplemental

Rules for Certain Admiralty and Maritime Law Claims and under the laws of Texas governing

personal jurisdiction. *See* Attorney Declaration of George Gaitas attached hereto as **EXHIBIT 10**.

Nevertheless, Defendants have within the District tangible or intangible personal property in the

hands of parties who may be named garnishees in the process of maritime attachment and

garnishment consisting of debts, credits, or effects.

77.    More specifically there is presently, or imminently due to arrive in the Eastern

District of Texas, the Motor Tanker ADVANTAGE ARROW, a tanker vessel registered in the

Marshall Islands, with IMO No. 9419448 and international call sign V7KZ7, as pled in the

foregoing.

78.     Defendants have used and continue to use the purportedly corporate separateness, and incorporated status of their surrogate entities ADVANTAGE ARROW, ADVANTAGE TANKERS, ADVANTAGE HOLDINGS, and FORWARD HOLDINGS abusively, to wit: to engage in fraudulent corporate restructuring and asset reallocation practices in order to escape their lawful obligation to repair or pay the cost of repairs of the CV STEALTH and also pay bareboat charter hire until the redelivery of the CV STEALTH to Plaintiff - her lawful owner.

79.     Plaintiff has maritime claims against the Defendants arising out of the breach of a maritime contract (*i.e.* – the bareboat charter party with CV STEALTH dated February 23, 2010, and the performance guarantee dated April 4, 2010).

80.     The amounts of Plaintiff's claims as reasonably as it can be estimated is as follows:

A.     The repaired cost of the CV STEALTH……………….....$      18,000,000.00

B.     Unpaid Charter Hire due and owing………………………$      510,208.33

C.     Awarded legal costs…………………………………...........$      6,515.50

C.     Interest at 6% compounded quarterly for 1 year………...$      943,340.00

E.     Recoverable Legal Fees and Costs……………………… $      400,000.00

**Total Claim………………………………………………………$ 19,860,063.80**

Therefore, Plaintiff's total claim for breach of the maritime contracts against Defendants is in the aggregate sum of **USD 19,860,063.80 (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)**

**WHEREFORE PREMISES CONSIDERED**, Plaintiff prays as follows:

A.     That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction be issued against Defendants and said Defendants be cited to appear and answer the allegations of this Original Verified Complaint;

25

B.     That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, all of the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including, but not limited to the M/T ADVANTAGE ARROW and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished in an amount sufficient to answer Plaintiff's claim;

C.     That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

D.     That judgment be entered against each of the Defendants and each of them in the sum of Nineteen Million Eight Hundred Sixty Thousand Sixty Three Dollars and eighty cents **(USD 19,860,063.80) (NINETEEN MILLION EIGHT HUNDRED SIXTY THOUSAND SIXTY THREE DOLLARS AND EIGHTY CENTS)** together with interest and costs, be applied in satisfaction thereof;

E.     That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

By:     GAITAS, KENNEDY & CHALOS, P.C.

/s/George A. Gaitas
George A. Gaitas
State Bar No. 24058885
Federal Bar No. 705176
Sean D. Kennedy
State Bar No. 24102006
Federal Bar No. 1007545
Jonathan M. Chalos
State Bar No. 24097482

Federal Bar No. 3008683
6250 Westpark Dr.
Suite 222
Houston, Texas 77057
Telephone: 281-501-1800
Fax: 832-962-8178
E-mail:gaitas@gkclaw.com
       kennedy@gkclaw.com
       chalos@gkclaw.com

*Attorneys for Plaintiff*
Psara Energy, Limited

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

PSARA ENERGY, LTD.,

             Plaintiff,

vs.                                                                    NO.1:18-CV-00178-MAC

SPACE SHIPPING, LTD., et al.,

             Defendants.

## ORDER FOR SUBSTITUTE SECURITY

This case is assigned to the Honorable Marcia A. Crone, United States District Judge, and

is referred to the undersigned United States Magistrate Judge for pretrial management.  Pending

before the court is the "Advantage Defendants' Motion to Vacate Attachment or, Alternatively,

for Reduction in Security."  Doc. No. 7.

### I.  Background

On April 20, 2018, Plaintiff Psara Energy, Ltd. (Psara) filed suit for breach of contract

against the Defendants pursuant to FED. R. CIV. P. 9(h), Rule B of the Supplemental Rules for

Certain Admiralty and Maritime Claims ("Rule B"), and the Federal Arbitration Act, 9 U.S.C. §§

4, 8 in aid of maritime arbitration.  Doc. No. 1, at 1–2.  According to the complaint, Psara alleges

it entered into a bareboat charter agreement in 2010 with Defendant Geden Holdings, Ltd. to

charter the CV STEALTH vessel.  *Id.* at 5.  The charter was amended so that Defendant Geden

Holdings became the "performance guarantor" of Defendant Space Shipping, Ltd.  *Id.*  Though

Defendant Space Shipping, Ltd. was obligated to keep the vessel in a good state of repair with up-

to-date classifications, it failed to do so.  *Id.*  In 2014, the CV STEALTH was detained in Venezuela

for more than three years by prosecutorial authorities, and Defendant Space Shipping, Ltd. failed



to return the ship by the contractual redelivery date. *Id.* at 7. When the CV STEALTH was finally released from Venezuela, it was out-of-class and so extensively damaged due to neglect that it was incapable of sailing and in need of extensive repairs. Doc. No. 1, at 8. Defendant Space Shipping, Ltd. towed the CV STEALTH to Trinidad where Psara took possession on March 24, 2018. *Id.* Due to the extensive damage to the CV STEALTH, Psara has initiated a London maritime arbitration claim for damages equivalent to the repaired market value of the ship ($18,000,000.00) and amounts for unpaid charter hire, legal costs, interest, and other costs (an additional $1,860,063.80). *Id.* at 10, 25. Due to the transfer of a vessel fleet from Defendant Geden Holdings, Ltd. to other corporate entities (including Defendants), Psara brings suit against the current slate of Defendants under fraudulent transfer and corporate succession theories. *See generally id.*

Psara filed its "Motion for Order Authorizing Issuance of Process of Maritime Attachment and Garnishment" (Doc. No. 3) on the same day as the complaint. The motion requested the court issue a writ of maritime attachment for a shipping vessel—the M/T ADVANTAGE ARROW, IMO #: 9419448, Call Sign: V7KZ7—located within this judicial district. Doc. No. 3, at 2. An *ex parte* order was entered directing the United States Marshal for the Eastern District of Texas to seize and attach the M/T ADVANTAGE ARROW, and a bond to obtain the release of the vessel was fixed at $19,860,063.80.[1] Doc. No. 4. The vessel was seized and attached. *See* Doc. No. 8.

On April 26, 2018, Defendants Advantage Arrow Shipping, LLC, Advantage Tankers, LLC, Advantage Holdings, LLC, and Forward Holdings, LLC ("Advantage Defendants") made a special appearance to file their "Motion to Vacate Attachment or, Alternatively, for Reduction in Security." Doc. No. 7. Psara filed a response to the motion to vacate (Doc. No. 11), and a hearing was held on the motion before the undersigned on April 30, 2018. Doc. No. 13. At the hearing,

---

[1] All monetary figures are in U.S. Dollars.

the parties were instructed to attempt to reach an agreement by May 4, 2018, concerning the amount of substitute security to be provided in lieu of keeping the M/T ADVANTAGE ARROW under attachment, otherwise the court would determine the amount of substitute security.  On May 1, 2018, the Advantage Defendants informed the court that the parties are unable to reach an agreement because of "an apparent fundamental disagreement regarding how the amount of security should be calculated," and the Advantage Defendants request the court determine the amount of substitute security at the court's earliest convenience.  Doc. No. 14, at 2.  Psara's response, though blaming the Advantage Defendants for unilaterally deciding to cease negotiations, illustrates the fundamental disagreement regarding which figures should be used in calculating substitute security.  *See* Doc. No. 15.  At the hearing, and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees for the attachment of the M/T ADVANTAGE ARROW.

## II.  Legal Standard

Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Rule E") addresses substitute security:

> In the event of the inability or refusal of the parties [to stipulate the amount and nature of the security,] the court shall fix the principal sum of the bond or stipulation at an amount sufficient to cover the amount of the plaintiff's claim fairly stated with accrued interest and costs; but the principal sum shall in no event exceed (i) twice the amount of the plaintiff's claim or (ii) the value of the property on due appraisement, whichever is smaller. The bond or stipulation shall be conditioned for the payment of the principal sum and interest thereon at 6 per cent per annum.

Rule E(5)(a).  Rule E itself provides no further instructions on calculating the "fairly stated" value of a plaintiff's claim, and "guiding standards are sparse."  *Billfish Marina One, Inc. v. M/Y Hideaway*, 2017 A.M.C. 1743 (S.D. Fla. Jan. 23, 2017).  Evidence from outside the complaint (i.e. affidavits) may be considered in determining the fairly stated amount of a plaintiff's claim.  *20th*

*Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1429, 1430 (M.D. Fla. 1997) (The court "may look beyond the 'four corners' of the claim" in determining the "fairly stated" claim amount) (citing 7A Moores Fed. Prac. 2d Ed. ¶ E.13[2] at E–612–613); *see also Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp.*, 2009 A.M.C. 2628 (2d Cir. 2009) ("In light of the historical practice and purpose of maritime attachments, we conclude that a court may assess preliminarily the reasonableness of plaintiff's damages claim when setting a security under Rule E(5)."). A plaintiff does not need to prove damages with "exactitude," but the court should satisfy itself during the preliminary assessment that a plaintiff's claims are not "frivolous." *Transportes Navieros*, 2009 A.M.C. 2628.

The Advantage Defendants argue that under English law "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach." Doc. No. 7, at 17 (citing M. Davis, Bareboat Charters § 15.12 at 90 (Informa Law 2005), citing *Channel Island Ferries Ltd. v. Cenargo Navigation Ltd.* (The "Rozel"), [1994] 2 Lloyd's Rep. 161). Psara does not explicitly refute this articulation of English law. Psara sets out a formula for all of the variables involved in such a calculation in the instant case. *See* Doc. No. 15, at 3–4.

The substitute security for the release of the vessel must include not only the amount that would be due at the time of the substitute security hearing, but a sufficient sum to cover payment of the claim when the case would ultimately come to trial. *Angad v. M/V Fareast Trader*, 1989 A.M.C. 2721 (S.D. Tex. 1989). "Any ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434.

Under federal law, courts have not included attorney's fees in the substitute security amount because there is no federal statute authorizing such an award. *See Billfish Marina One*,

2017 A.M.C. at 1746; *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995) (holding, under the well-established "American Rule," prevailing parties do not recover attorney's fees from the losing party, absent a statute or contractual provision to the contrary.). Accordingly, the Advantage Defendants are likely not entitled to attorney's fees for defending the instant case in this court. However, Rule E(2)(b) does appear to authorize including attorney's fees as part of the substitute security amount (when appropriate), and Psara has requested its attorney's fees for London arbitration to be included. Doc. No. 1, at 11. The English legal system does not follow the "American Rule," and arbitration tribunals commonly tax costs and attorneys' fees to the losing party. *Arbitration Act of 1996*, c. 23, § 61 (Eng.).

### III. Analysis

**A.     Substitute Security Formula**

As stated previously, the Advantage Defendants argue "the proper measure of damages is the diminution in value of the vessel by reason of the charterer's breach" under English law. Doc. No. 7, at 17. Accordingly, the Advantage Defendants simply calculate the proper amount of substitute security as the repaired value of the CV STEALTH ($9,500,000) subtracted by its scrap value ($7,825,000), resulting in $1,675,000. Doc. No. 7-4.

Psara's most recent filing argues the proper method to calculate the "quantum of its claim fairly stated" is to:

- begin with the **repaired value of the CV STEALTH vessel;**
- subtract the **scrap value of the vessel;**
- add the **towage fees related to scrapping the vessel;**
- add the **amount of unpaid charter hire;**
- add **interest;**
- add **costs;** and
- add **lawyer's fees.**

Doc. No. 15, at 3–4.  Based on the figures suggested by Psara, this calculation results in a claim for "$15,910,208.30 at the very least." *Id.* at 4.[2]  Though Rule E(5)(a) might allow them to request it, Psara does not request a substitute security of up to twice that amount.  Instead, Psara requests a substitute security of $16,000,000 even.  The formula suggested by Psara for calculating the value of the CV STEALTH itself is the same as the Advantage Defendants' formula, though Psara also specifically addresses the other damages that may be included in the overall claim amount. The parties obviously differ on the value of the variables within the formula.

**B.     Substitute Security Variables**

*1.  Value of the CV STEALTH*

Psara argues that the market value of the CV STEALTH (fully repaired) is $18,000,000.00. Doc. No. 15, at 4.  Psara arrived at this market value based on a claim written by Barrister Alexander Wright with Chambers at 4 Pump Court in London in March 2018.  Doc. No. 11, at 15. However, Barrister Wright does not provide *any* facts underlying the bald assertion that the "(repaired) market value of the Vessel . . . is USD 18 million."  Doc. No. 11, Ex. 5, at 5–6. Accordingly, the claim from Barrister Wright is unhelpful in determining the value of the CV STEALTH because he does not point to any underlying evidence that aided him in his conclusion.

By coincidence, one month *after* Barrister Wright made his claim that the CV STEALTH's repaired value was $18,000,000, an April 2018 valuation letter from "international ship sale and purchase brokers Cass Technava in Piraeus, Greece," states that the CV STEALTH (in good repair) is worth approximately $18,000,000.  Doc. No. 11-6.  Psara relies on Cass Technava's

---

[2] Psara's figures: $18,000,000 repaired value − $3,600,000 scrap value after towing fees + $510,208.33 unpaid charter hire + $1,000,000 for interest, legal costs, and recoverable legal fees = $15,910,208.33 (Psara miscalculated the figure by three cents).  Doc. No. 15, at 3–4.  The combined value for interest, legal costs, and recoverable legal fees is listed as $1,000,000 in Doc. No. 15, but in the complaint it was listed as $6515.50 in awarded legal costs, $943,340 in interest and $400,000 in recoverable legal fees.  Doc. No. 1, at 25.

valuation in their argument concerning the market value of the ship. Doc. No. 11, at 15.  However, the Cass Technava letter is also of little value for the following reasons: (1) no information is provided about the qualifications of the authors; and (2) there is no underlying factual basis for arriving at the valuation figure (i.e. the valuation does not specify if it has taken into account similar vessels which have been sold for comparable amounts).  Doc. No. 11-6.

Psara's most recent filing addresses, for the first time, how the scrap value of the CV STEALTH should be subtracted from its market value when calculating the substitute security. Doc. No. 15.  Without any supporting documentation of the scrap value or towing costs, Psara posits that the scrap value is $3,600,000 *after* towage fees to Trinidad. *Id.* at 3.  The CV STEALTH is already in Trinidad according to Psara.  Doc. No. 1, at 8.  Psara bases its figure on a declaration from an English Solicitor, Jeremy Biggs, who represents Psara in London arbitration proceedings. Doc. No. 15-1, at 1.  Mr. Biggs makes his claim that the scrap value is $3,600,000 after towing without *any* supporting documentation or reference to any external sources. *Id.* at 3.  Mr. Biggs' estimate is conclusory because he does not point to any underlying evidence that aided him in his conclusion.

The Advantage Defendants provided a declaration and ship valuation from Mr. Paul Willcox of C.W. Kellock & Co., a ship valuation company based in London.  Doc. No. 7-4.  Mr. Willcox values the CV STEALTH "in sound trading condition" at $9,500,000, and the "demolition value" as $7,825,000.  Mr. Willcox's valuations appear reliable for the following reasons: (1) Mr. Willcox is employed as a "senior ship valuer"; (2) he has prepared expert reports and given evidence in two separate cases in the United States Bankruptcy Court for the Southern District of Texas in 2011 and 2012; (3) under penalty of perjury, Mr. Willcox declares that the two valuation reports attached are true and accurate copies of the originals; (4) both valuations specify that Mr.

Willcox has taken into account similar vessels which have been offered for sale in light of the market knowledge and experience of C.W. Kellock & Co. within the industry; and (5) pursuant to his declaration, the Advantage Defendants have Mr. Willcox's written permission to rely on the valuations in this court. Doc. No. 7-4. Because Mr. Willcox's valuations have some factual basis, he sets forth his qualifications for his expertise (including the admission of his expert testimony in an adjacent federal district), and the Advantage Defendants have his permission to use his valuation in court, the undersigned finds his valuation more credible than Psara's valuation. The values from Mr. Willcox's valuation will be used in the substitute security amount.

### 2. Towing Costs

Neither party has specifically addressed the costs of actually towing the CV STEALTH for demolition. Psara argues that the scrap value itself is $3,600,000 *after* towing costs to Trinidad, but they do not offer an estimation of what the towing costs would be or any information about alternative destinations. Doc. No. 15-1, at 3. The Advantage Defendants rely on Mr. Willcox's valuation which assumes the ship will be delivered to India for demolition, but he does not specify the cost of towing to India or any alternative destination. It is the responsibility of Psara to state with "particularity" in the complaint the circumstances from which the claim arises to allow the Defendants to investigate and frame their responsive pleading. Rule E(2)(a). *See Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000) ("[I]t was incumbent on [plaintiff] under Rule E to state the amount of its claim with particularity, indicating the basis for arriving at that amount, inasmuch as [the parties] could not agree on the amount of the bond to be posted to secure release of his boat."). Because Psara has not stated towing costs with any particularity— Psara has not even given an estimated figure—no towing costs will be included in the substitute security amount.

### 3. Interest

Psara claims reasonable interest at 6% (compounded quarterly for one year) amounts to $943,340, but they did not inform the court exactly how this amount was calculated. Doc. No. 1, at 25. The Advantage Defendants implicitly concede that some interest may be proper in the substitute security amount, but they argue the interest amount requested by Psara is too high based on the CV STEALTH's proper valuation and should be "adjusted according[]" to the ship's true, lower valuation. Doc. No. 7, at 18. However, the Advantage Defendants also fail to inform the court exactly how the interest should be calculated. Based on a the calculated damages for the CV STEALTH at $1,675,000.00 (Mr. Willcox's fair market value minus scrap value), the interest rate of 6% (compounded quarterly for one year) results in an interest amount of $102,783.95. This amount will be included in the substitute security amount.

### 4. Legal Costs

For previously awarded legal costs, Psara claims $6515.50. The Advantage Defendants mention, but never challenge, the previously awarded legal costs claimed by Psara. *See* Doc. No. 7, at 17. Accordingly, this amount will be included in the substitute security amount. Psara also seeks $400,000 in legal costs that "will be incurred to pursue these claims in London maritime arbitration proceedings" because it is customary in London arbitration for the prevailing party to be entitled to legal costs and lawyers' fees. Doc. No. 1, at 11; *see also Arbitration Act of 1996*, c. 23, § 61 (Eng.). The Advantage Defendants argue that Psara has provided "no support or evidence for its claimed entitlement to security for $400,000 in recoverable legal fees and costs," but they do not provide the court with what they believe to be a reasonable figure. Doc. No. 7, at 18–19.

Given the already contentious nature of the proceedings in this court[3] concerning the Rule B attachment, $400,000 appears to be a reasonable figure if the parties pursue the claim in London arbitration. Psara will likely be awarded its costs if it wins in arbitration, and $400,000 will be included in the substitute security amount.

C.      **Dockage Fees**

At the hearing on April 30, 2018 (Doc. No. 13), and by subsequent motion (Doc. No. 17), the parties also dispute which party is responsible to pay dockage fees after the attachment of the M/T ADVANTAGE ARROW. In *Beauregard*, the court required all seizing parties to share in the cost of maintaining a seized ship. *Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 353 (5th Cir. 1997) ("Often the party that filed a suit will pay the entire cost of maintaining the *res* until the resolution of the case. At the judicially ordered sale, the cost of maintenance is deducted from the sale proceeds before the remaining proceeds are divided among the claimants. Therefore, even when a single litigant advances the cost of maintenance, all claimants are eventually required to share in this cost."). Under 28 U.S.C. § 1921(a)(1)(E), the United States marshals shall collect fees for "keeping of attached property," including ships. United States Marshal Service Policy Directive 11.9 implies that arresting parties are ordinarily responsible for dockage fees. *See* Doc. No. 17-5, at 8 ("The 'initial' arresting party is responsible for making the payments."). This appears to be the case even when the Marshal uses another entity to store the property. *See Marastro Compania Naviera S.A. v. Canadian Mar. Carriers, Ltd.*, 963 F.2d 754, 757 (5th Cir. 1992) ("The court holds the marshal responsible for the execution of the writ, including the storage and safekeeping of the seized property although it is customary and common practice for the

---

[3] Psara has also attached another ship owned by a related Advantage entity in the Eastern District of Louisiana based upon similar allegations. *See Psara Energy, Ltd. et al v. Space Shipping, Ltd. et al.*, Case No. 2:18-cv-4111-ILRL-JCW.

marshal on occasion to delegate certain of these duties, including storage and safekeeping to others."). Accordingly, the court determines, at this time, that Psara is responsible to pay the dockage fees (and other fees) associated with arresting the vehicle and docking it since the arrest.

**D.     Conclusions**

For the purposes of this order for substitute security, the undersigned makes the following calculations:

| | |
|---|---:|
| Repaired Value of CV STEALTH | $9,500,000.00 |
| Scrap Value of CV STEALTH | ($7,825,000.00) |
| Unpaid Charter Hire[4] | $510,208.33 |
| Towing | $0.00 |
| Interest | $102,783.95 |
| Awarded Legal Costs | $6,515.50 |
| Future Legal Costs | $400,000.00 |
| | |
| **TOTAL of Fairly Stated Claim:** | **$2,694,507.78** |

Under Rule E(5)(a), the parties were unable (or refused) to stipulate to a substitute security amount, and the court fixes the sum. Psara's claim, fairly stated, amounts to $2,694,507.78. **The undersigned fixes the substitute security amount at $4,000,000.00** because "[a]ny ultimate recovery against the res itself is limited to the amount of the bond; therefore it is prudent to err on the high side." *20th Century Fox*, 992 F. Supp. at 1434. The substitute security of $4,000,000 does not, under Rule E(5)(a) "exceed (i) twice the amount of the Plaintiff's claim," nor does it exceed "(ii) the value of the property on due appraisement." Rule E(5)(a).

It is, therefore, **ORDERED** that the Advantage Defendants' "Motion to Vacate Attachment or, Alternatively, for Reduction in Security" is **GRANTED in part** because a

---

[4] *See* Doc. No. 7, at 17 (Advantage Defendants mention, but never challenge, the unpaid charter hire figure claimed by Psara).

reduction in security is appropriate at this time.  The court will address the "Motion to Vacate Attachment" at a later time.

It is further **ORDERED** that upon the posting of **$4,000,000.00** in cash security into the registry of the Court as substitute security, the attachment of the M/T ADVANTAGE ARROW shall then be released.  This order is intended to set substitute security for the claims alleged by Psara in this action, without additional seizure of the M/T ADVANTAGE ARROW, and is not intended to be and is not a waiver of any rights, remedies, claims, counterclaims, or defenses that may be available to any Party.

It is further **ORDERED** that Psara shall be responsible for paying the custodial costs associated with the attachment and docking of the ship in connection with the instant case.  Should the Advantage Defendants not post the substitute security by 8:00 AM on May 11, 2018, the Advantage Defendants will then be responsible for the costs associated with docking of the ship after that date.

It is further **ORDERED** that the Advantage Defendants' "Emergency Opposed Motion for Order Regarding Payment of Custodial Costs" (Doc. No. 17) is **DENIED** as moot.

SIGNED this 4th day of May, 2018.

Zack Hawthorn
United States Magistrate Judge